**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-9003
_____

UNITED STATES OF AMERICA

v.

KABONI SAVAGE,
a/k/a Joseph Amill,
a/k/a Bonnie,
a/k/a Yusef Billa,
agent of Dirt,
agent of Bighead,
                              Appellant


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 2-07-cr-00550-003
District Judge: The Honorable R. Barclay Surrick

Argued January 7, 2020

Before: SMITH, *Chief Judge*, JORDAN, and FUENTES,
*Circuit Judges*

(Filed: August 11, 2020)

David E. Troyer
Robert A. Zauzmer          **[ARGUED]**
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA  19106
  *Counsel for Appellee*

Madeline S. Cohen
1942 Broadway
Suite 314
Boulder, CO  80302

Barry J. Fisher
Office of Federal Public Defender
39 North Pearl Street
5th Floor
Albany, NY  12207

Lawrence S. Lustberg          **[ARGUED]**
Gibbons
One Gateway Center
Newark, NJ  07102
  *Counsel for Appellant*

Geoffrey M. Wyatt
Skadden Arps Slate Meagher & Flom
1440 New York Avenue, N.W.

2

Washington, DC  20005
*Counsel for Amicus Appellant*

————————————

OPINION OF THE COURT

————————————

SMITH, *Chief Judge*.

TABLE OF CONTENTS

I.   Introduction ........................................................... 4

II.  Factual Background ................................................. 5

III. Procedural History ................................................ 12

IV.  Gaps in the Record .............................................. 15

V.   Substitution of Counsel ......................................... 27

VI.  Vicinage Challenge ............................................... 47

VII. Fair-Cross-Section Challenge ................................ 51

VIII. *Batson* Objection .............................................. 73

IX.  Transferred Intent Instruction .............................. 98

X.   Lay Opinion Instruction ....................................... 123

XI.  Penalty-Phase Proceedings ................................... 134

   A. Background ...................................................... 135

   B. The Government permissibly argued that Savage posed a risk of future dangerousness. ........................... 141

   C. The District Court did not plainly err by admitting victim-impact statements. ................................... 159

D. The District Court's admission of autopsy photographs offered to support the "especially heinous, cruel, or depraved" aggravator was not improper...........................169

E. The Government's argument against the "equally culpable" mitigator did not violate the Fifth or Sixth Amendments. ...............................................................176

F. The Government properly rebutted the mitigators relating to Savage's relationship with his family. ...........184

G. The verdict sheet's format did not violate the Eighth Amendment....................................................................196

XII. Conclusion ...................................................................200

## I. INTRODUCTION

Kaboni Savage led a regional drug trafficking operation in North Philadelphia referred to at trial as the Kaboni Savage Organization (KSO). The KSO distributed large quantities of controlled substances and, not surprisingly, fiercely protected its network and territory through the use of guns and violence. Threats to the organization, whether perceived or real, were quickly tamped down or extinguished. Early in the KSO's operation, Savage took care of such threats himself, but as his power grew, his enforcers did his bidding without question.

Even while detained on criminal charges, Savage continued to manage the affairs of the KSO from his prison cell. He led by retaliating against those who dared to cooperate with government agents and prosecutors. What makes this case stand out is that Savage not only arranged for the murder

4

of the prosecution's main witness in a murder case; in a later case, he orchestrated the firebombing of the family home of another cooperating witness in a fashion that ensured no one would survive. Eventually, Savage was charged with, *inter alia*, a dozen counts of murder in aid of racketeering, among other serious offenses. The Government sought the death penalty.

This appeal follows the jury's guilty verdict on all charges and the imposition of a sentence of death. For the reasons that follow, we will affirm.

## II.  FACTUAL BACKGROUND

Savage began his career in illegal drug trafficking by selling for others. By the early 1990s, he was peddling phencyclidine (PCP) on his own, operating predominantly out of his mother's house on Darien Street in North Philadelphia. Before long, he was a distributor selling PCP in various forms, as well as marijuana. He utilized numerous dealers who controlled drug corners in the vicinity of Erie Avenue in North Philadelphia. For a time, he was in a partnership distributing crack cocaine. But by the late 1990s, Savage had come into his own. He was "running everything," A17:8749,[1] dealing in "more than five, six, seven kilos" of cocaine at a time. A17:8759.

As his cocaine sales increased, Savage began to dilute the drug and then recompress it to increase the quantity. His

---

[1] The citation to A17:8749 indicates that the quotation is from the Appendix, Volume 17, Page 8749.

5

profit margin rose accordingly. In the early 2000s, Savage's "right-hand man" was Eugene Coleman. A21:10960–61. Coleman helped distribute cocaine to various individuals in the "family"—Savage's distribution network—and also handled proceeds from the drug sales. A17:8728, 8764. Savage's inner circle included "enforcers" who carried out Savage's commands without hesitation. Among the enforcers were Kareem Bluntly and Lamont Lewis. Although loyal to Savage for a time, Coleman and Lewis eventually cooperated with the Government prior to their respective guilty pleas in February 2004 and April 2011. Both testified at Savage's trial about the operations of the KSO and its use of violence.

And that violence was often deadly. For example, in March 1998, when Savage was in the vicinity of competitor Tybius Flowers's drug corner, a driver by the name of Kenneth Lassiter accidentally bumped into Savage's car. A confrontation ensued and Savage demanded that Lassiter pay for the damage. Despite Lassiter's apology, Savage "pulled a gun out . . . and shot him once." A13:6461. Lassiter died from the gunshot wound. Flowers witnessed the murder.

More violence followed. Mansur Abdullah belonged to the Savage "family," and he and Savage would supply each other with cocaine. It was Savage who first taught Abdullah how to dilute and recompress cocaine, which eventually raised the suspicion in Savage's mind that Abdullah was overcharging him. In September 2000, Abdullah visited Savage to collect a debt. Savage paid him with cash placed in a red sneaker box. He then directed Kareem Bluntly to accompany Abdullah back to his home, ostensibly to provide protection because of robberies that had recently taken place.

6

Bluntly was armed. Coleman was directed to pick up Bluntly soon afterward. When Coleman and Bluntly returned a half-hour later, Bluntly handed Savage the red sneaker box with the cash still inside. Although Bluntly had carried out the instruction to shoot Abdullah, he was unsure if Abdullah was actually dead. Savage instructed Coleman to find out. Coleman followed orders and later confirmed that he saw Abdullah "keeled over" in his car. A17:8823. Philadelphia's assistant medical examiner determined that the cause of death was multiple gunshot wounds to the head, chest and abdomen.

Carlton Brown was another victim of multiple gunshot wounds to the head and chest. Although Brown was a member of the Savage family, Savage suspected Brown of killing Savage's good friend Ronald Walston. Savage instructed Lewis that "he ha[d] to do it," which Lewis understood to mean he had to kill Brown. A21:10923. Lewis obeyed, and Brown died.

Lewis also killed Barry Parker at Savage's direction. It appeared Parker was attempting to take over Steven Northington's drug corner, so Northington complained to Savage, his supplier. Savage replied to Northington that "[n]obody come and take nothing. You have to handle your business. This is what we do." A17:8850. On February 26, 2003, at Savage's command, Lewis left Savage's house with Northington, who identified Parker at the drug corner. Lewis then eliminated Northington's competition by shooting Parker several times in the chest. Clearly Savage did not hesitate to protect his organization by killing those who threatened to interfere with his distribution network.

7

He also had no qualms about murdering those he believed were cooperating with law enforcement. In March of 2003, Savage suspected that Tyrone Toliver, Coleman's friend, was a "snitch." A17:8873. When Toliver had difficulty filling a cocaine order, he looked to Savage to supply him. Although Savage did not have cocaine available, he agreed to help and directed Coleman to take Toliver to Coleman's apartment where the organization regularly recompressed cocaine. Bluntly arrived at the apartment shortly thereafter. To Coleman's surprise, Bluntly shot Toliver in the head. At Savage's direction, Bluntly and Coleman disposed of the body.

In addition to the benefit of eliminating someone Savage thought was a snitch, the Toliver murder allowed Savage "to put some dirt on" Coleman. A21:10959. Coleman knew a lot about the KSO's operations, and "everybody thought [Coleman] was weak and if he got into some trouble, he would tell." A21:10960.

Around this same time, in a further effort to assure the loyalty of those closest to him and to thwart any thoughts his allies might have of cooperating with law enforcement, Savage, along with Lewis and two other high-ranking members of the KSO, made a pact. In short, the men agreed that if any one of them cooperated with law enforcement, "our mothers' lives would be in danger." A21:10960. Although Coleman was not present when the deadly pact was made, Savage made sure that Coleman learned of it.

In 2004, Savage was prosecuted for Lassiter's murder. While jailed awaiting trial, Savage continued to intimidate and threaten others with retaliation if he suspected they were

8

working with the Government. First, Savage set his sights on eyewitness Tybius Flowers, the prosecution's main witness. Savage told Lewis, who was also in jail, that he was not worried because Flowers "would never make it to court." A21:10915. Savage made similar remarks to another prisoner. Savage's prophecy came true when Flowers was killed in a shower of bullets as he sat in his car outside of his aunt's house the night before trial. While there were no eyewitnesses, Northington later told a fellow prisoner of his disdain for snitches and disclosed that "he [had] slumped [Flowers] and sent him to rat heaven." A23:11738–40. Savage, too, revealed he had played a part in Flowers's murder, advising the same fellow prisoner that he had "spanked the case" and would be released soon. A23:11831.

Savage's brutal efforts paid off. Lacking Flowers's testimony, the prosecution foundered and Savage was acquitted of Lassiter's murder. He was released from Philadelphia County prison on April 8, 2004. But within a week, federal authorities arrested him on drug trafficking and other charges.[2] Even while detained, Savage continued to direct the KSO's operations from his jail cell. He was enraged that Coleman, who was also in jail, was assisting the

---

[2] A jury ultimately convicted Savage in December 2005 of 14 federal counts related to charges stemming from his role in the KSO, including conspiracy to distribute cocaine, money laundering, firearm offenses, and threatening to retaliate against witnesses. On April 27, 2006, he was sentenced to thirty years' imprisonment. We affirmed the conviction and sentence. *See United States v. Walker*, 392 F. App'x 919, 921 (3d Cir. 2010).

prosecution. Coleman received threats from other inmates who had connections to the KSO. While in the visiting room of the prison, Coleman saw Savage's sister, Kidada Savage. She encouraged him not to "let these crackers break you." A18:8938. Kidada later wrote to Coleman, encouraging him not to reveal anything to federal agents, closing her letter with the statement: "Death before Dishonor (to your family)." A18:8946. Coleman understood that parenthetical to threaten his personal family, not members of the KSO. Later, when Coleman was in a holding cell in the federal courthouse, Savage and one of his associates were placed in an adjacent cell. Immediately, Savage spoke of killing the "rats" and told Coleman that his family should die as well. A18:8953–54.

By this time, Savage had instructed Kidada to have Lewis firebomb Coleman's family home in retaliation for Coleman's cooperation with the Government. In a telephone call from prison on the evening of October 8, 2004, Savage spoke with both Kidada and Lewis. Lewis agreed to do anything Savage ordered, even if it meant "kill[ing] somebody for him." A21:10981. After the call concluded, Kidada relayed to Lewis the directive from Savage to firebomb the Coleman house. She instructed Lewis to torch the home late that night when "everybody"—Coleman's mother and brother—would be there. A21:10986. Kidada drove Lewis to the block where Coleman lived and "pointed out the house." A21:10988. She also informed him that guns and a pit bull may be inside. Lewis told Kidada that his cousin, Robert "BJ" Merritt, would help him. Kidada promised Lewis $5000 for doing the job.

10

Around 4:00 a.m. the following morning, Lewis and Merritt took two cans filled with gasoline to Coleman's house. Lewis kicked in the door and fired his gun twice. Merritt lit and threw both cans into the house, causing an explosion. Fire then ravaged the structure, resulting in the deaths of all six occupants: Coleman's mother, Marcella Coleman; his infant son, Damir Jenkins; his twin-brother's fifteen-year-old son, Sean Rodriguez; his sister Regina Nash's twelve-year-old son, Tajh Porchea; his cousin, Tameka Nash (whom Coleman regarded as a sister); and Tameka's ten-year-old daughter, Khadijah Nash.

Acting on Kidada's instruction, Lewis called her and left a message that Savage's order had been carried out. It was not until later that Lewis learned that four children had died in the fire. When Lewis confronted Kidada about the children in the house, Kidada responded to Lewis, "F*** 'em." A21:11006. Kidada paid Lewis only part of the $5000 he had been promised. Merritt received a used car and $500.

Subsequent recordings of prison conversations between Savage and others demonstrated his complicity in the Coleman firebombing. They also revealed Savage's great satisfaction that the killings had taken place, and the intercepted conversations revealed plans to kill yet other witnesses and their families. Savage's continued threats were troubling enough that in February 2007, the United States Attorney General authorized the Bureau of Prisons to impose Special Administrative Measures (SAMs) restricting Savage's communications with others, including his family. *See* 28 C.F.R. § 501.3. In April 2009, an indictment in this case was returned naming Savage, Lamont Lewis, Robert Merritt and

11

Steven Northington as defendants. *United States v. Savage*, No. 2:07-cr-550, ECF 51 (E.D. Pa. Apr. 8, 2009).

## III. PROCEDURAL HISTORY

The Fourth Superseding Indictment was later filed in May 2012 against Savage, Merritt, Northington and Savage's sister, Kidada Savage. By the time of trial,[3] the charges against Savage were as follows:

- one count of conspiracy to participate in a racketeering (RICO[4]) enterprise, 18 U.S.C. § 1962(d);

- twelve counts of violent crime in aid of racketeering (VICAR) murder, § 1959(a)(1), for the Lassiter, Abdullah, Brown, Parker, Toliver, Flowers, and six arson murders;

- one count of VICAR conspiracy to commit murder, § 1959(a)(5), for the conspiracy to commit the arson murders;

- one count of retaliating against a witness, § 1513, for the arson murders in retaliation for Eugene Coleman's testimony and other cooperation; and

---

[3] Before trial, the District Court dismissed a witness tampering count under 18 U.S.C. § 1512(a)(1)(A).

[4] Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68.

- one count of using fire to commit a felony, § 844(h)(1), for the fire used to commit VICAR murder at the Coleman house.

Shortly after Savage was indicted in 2009, the District Court appointed Christopher Warren as counsel of record. Because the charges carried a maximum penalty of death, the District Court also appointed Timothy Sullivan as learned capital-qualified counsel pursuant to 18 U.S.C. § 3005.[5] Savage sought a replacement for Warren, so in 2010 the District Court appointed Christian Hoey and allowed Warren to withdraw. Sullivan's conditional appointment as a federal magistrate judge spurred further substitution. In November 2012, the District Court granted Savage's motion to appoint additional learned counsel, appointing William Purpura. The District Court then allowed Sullivan and his associate to withdraw in December 2012. At trial, Hoey and Purpura acted as counsel of record.

The Government provided pretrial notice of its intent to seek the death penalty for the VICAR murder and witness retaliation counts,[6] as required by 18 U.S.C. § 3593(a). The District Court rebuffed Savage's attempts to strike the notice.

---

[5] The District Court later allowed Sullivan's associate, Brett Cook, to join the defense team.

[6] When retaliation against a witness consists of killing a person, as in this case, the punishment is that associated with murder and manslaughter. 18 U.S.C. § 1513(a)(1), (2)(A); *see also* § 1513(c) (addressing maximum term of imprisonment for

13

The extensive pretrial proceedings also addressed the composition of the jury. The District Court rejected defense efforts to limit potential jurors to residents of Philadelphia County and to expand the source of potential jurors beyond voter registration lists.

Hundreds responded to the summons to jury service and filled out questionnaires at the District Court's instruction. The District Court and counsel questioned potential jurors during voir dire proceedings that began on November 5, 2012. After thirty days of voir dire, jury selection concluded. The panel was composed of ten white jurors, two black jurors and six alternates—five white and one black. Although Savage interposed *Batson* challenges to the exclusion of certain black jurors, the District Court determined that the Government exercised its peremptory strikes on a race-neutral basis.

Trial began on February 4, 2013. The Government's case featured more than seventy witnesses, over a thousand exhibits and many recordings of intercepted conversations. On the fifty-fifth day of trial, the jury returned a verdict finding Savage guilty of all counts. At the conclusion of the guilt phase, the District Court placed the jurors in recess for seven days (extended an eighth day), after which the penalty phase commenced.

The capital sentencing hearing, conducted pursuant to 18 U.S.C. § 3593(b) before the same jury, took seven days. The jury was presented with evidence of both aggravating and

retaliation based on attendance at or testimony in criminal case).

14

mitigating factors under § 3592, and on May 31, 2013, it unanimously voted that Savage be sentenced to death on each of the thirteen eligible counts, pursuant to §§ 3591(a)(2) and 3593(e).

On June 3, 2013, the District Judge formally pronounced a sentence of death on each eligible count: twelve VICAR murders plus witness retaliation. Savage was also sentenced to life imprisonment for the racketeering conspiracy, as well as two ten-year terms of imprisonment for the VICAR conspiracy and the use of fire to commit a felony. The District Court waived a $1600 special assessment as to all counts.

After sentencing, Savage moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, a new trial under Rule 33 and arrest of judgment under Rule 34. The District Court denied those requests in September 2014.

Savage timely appealed from final judgment and the denial of his new-trial motion.[7] Although he raises a host of issues on appeal, he does not challenge the sufficiency of the evidence for any of the crimes of conviction.

## IV. IF ANY GAPS EXIST IN THE RECORD, THEY DO NOT ENTITLE SAVAGE TO RELIEF.

We first address Savage's most foundational claim of error, an error which he contends prevented him from proving

---

[7] The District Court had jurisdiction over the federal charges against Savage pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

15

that he preserved certain issues while also eclipsing his ability to spot and raise other issues. Despite the vast appellate record before us—over eighteen thousand pages spanning more than thirty-four volumes—Savage contends he lacks access to "at least 50 letters, e-mails, and other undocketed written communications that the district court exchanged with the parties." Def. Br. 339. He also claims the record omits "at least 50 unrecorded" oral communications involving the District Court, including sidebars, in-chambers charge conferences to hammer out jury instructions, and conversations between the District Court and jurors where counsel was not present. *Id.* Savage argues these alleged omissions violate the Constitution, the Federal Death Penalty Act and the Court Reporter Act. But "the real centerpiece of [his] argument" is Federal Rule of Appellate Procedure 10. Oral Argument Tr. 126:20–24.

Rule 10 provides appellants a way to reconstruct missing portions of an appellate record. And though we have previously granted a new trial when an incomplete record prejudiced an appellant, *see Simmons v. Beyer*, 44 F.3d 1160, 1168-69 (3d Cir. 1995), we have always required appellants to attempt Rule 10 reconstruction before seeking relief. *See, e.g.*, *Roberts v. Ferman*, 826 F.3d 117, 125 (3d Cir. 2016).

Yet Savage attempts to skirt that prerequisite. He argues that before forcing him to undertake Rule 10 reconstruction, we should permit him to take wide-ranging discovery from the District Court—including searching the District Judge's files for any undocketed written communications and scouring his personal notes for insight into any untranscribed oral communications. Alternatively,

Savage contends the District Court's refusal to submit to that examination entitles him (at least) to a presumption that the defense properly preserved all issues or (at most) to a new trial.

Quite simply, Savage overreaches. The record in its existing form enables us to decide his appeal consistent with precepts of fundamental fairness and with our obligation under the Federal Death Penalty Act to "review the entire record." 18 U.S.C. § 3595(b). If indeed gaps exist—and the Government argues there are none—Savage's failure to pursue Rule 10 reconstruction forecloses relief.

\* \* \*

We can easily dispatch Savage's constitutional claim. Although due process demands a record "sufficiently complete" to facilitate "an adequate review of [the defendant's] conviction . . . . neither the Supreme Court, nor our Court, has held that due process requires a verbatim transcript of the entire proceedings or that an incomplete record confers automatic entitlement to relief." *Fahy v. Horn*, 516 F.3d 169, 190 (3d Cir. 2008). That's hardly surprising, since at the time of the Founding and for generations thereafter, contemporaneous (let alone verbatim) accounts of trial proceedings in federal court were the exception and not the norm. *See* Oswald M. T. Ratteray, *Verbatim Reporting Comes of Age*, 56 Judicature 368, 368–69, 373 (1973); *see also Miller v. United States*, 317 U.S. 192, 198–99 (1942).[8] We decline to

---

[8] Indeed, incomplete transcription remained common in some state courts until relatively recently. *See Oliver v. Zimmerman*, 720 F.2d 766, 768 (3d Cir. 1983) ("The general trial practice

17

graft what is a relatively modern development onto the Due Process Clause or any other constitutional guarantee. The Constitution does not require an all-encompassing trial record to identify issues for appeal.

The same goes for Savage's Federal Death Penalty Act claim. As he points out, § 3595(b) obliges us to "review the entire record" in capital cases. But that subsection also specifies a minimum set of contents the "record" must include:

1. "the evidence submitted during the trial";
2. "the information submitted during the sentencing hearing";
3. "the procedures employed in the sentencing hearing"; and
4. "the special findings returned" as to aggravating and mitigating factors.

*Id.*; *cf. Gardner v. Florida*, 430 U.S. 349, 361 (1977) ("[I]t is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed."). Savage does not dispute either that the current record clears these statutory minima or that it adequately discloses why he received the death penalty.

---

in Pennsylvania is that only testimony of witnesses and statements of the court are transcribed as of course. Opening and closing speeches are not transcribed unless requested by counsel, but any objection lodged during the course of such speeches is transcribed together with the judge's ruling thereon.").

18

Nor does Savage explain why, even if our § 3595(b) obligation extends beyond the four discrete categories we have enumerated, it stretches so far as to cover the items he claims are missing. At most, we think our obligation to "review the entire record" is cabined by Rule 10(a), which defines "the record on appeal" as "the original papers and exhibits filed in the district court; the transcript of proceedings, if any; and a certified copy of the docket entries prepared by the district clerk." In other words, § 3595(b) does not reach the untranscribed conversations and many[9] of the unfiled writings

[9] Insofar as any of the writings Savage identifies could be considered "original papers and exhibits filed in the district court," he has failed to adequately demonstrate any non-speculative prejudice from the absence of those writings on appeal. Relatedly, Savage has not articulated how the purportedly missing items could or would give rise to "any difference[s] . . . about whether the record truly discloses what occurred in the district court," and, indeed, failed to have any such differences settled by the District Court, as is his obligation. Fed. R. App. P. 10(e)(1). Neither Rule 10(a) nor § 3595(b), to the extent that statute incorporates Rule 10(a), provides an appellant relief in such circumstances. *See United States v. Smart*, 448 F.2d 931, 936 (2d Cir. 1971) ("The missing documents would appear to have no significance to the issues which could be advanced on appeal. Those records necessary for prosecution of the appeal—the minutes of the trial and the minutes of the suppression hearing—are intact and were available to [the appellant] and his appellate counsel. [The appellant] has failed to show any prejudice to his right to appeal resulting from the missing documents.").

19

Savage claims are missing here. Indeed, for those communications (or their reconstructions) to have become part of the "record on appeal," Savage needed to move to supplement the record. *Cf. United States v. Moreno*, 857 F.3d 723, 727 (5th Cir. 2017). He did not, so there is no Federal Death Penalty Act violation.

That leaves his Court Reporter Act claim, which—as Savage acknowledged at oral argument—applies only to any untranscribed oral communications. The Court Reporter Act requires "[e]ach session of the court" to be "recorded verbatim," including "all proceedings in criminal cases had in open court." 28 U.S.C. § 753(b). Though the Act does not prescribe a remedy for violations, courts have awarded relief up to a new trial. *E.g.*, *Simmons*, 44 F.3d at 1168–69; *see United States v. Sussman*, 709 F.3d 155, 170–72 (3d Cir. 2013); *see also United States v. Kelly*, 167 F.3d 436, 438 (8th Cir. 1999) (collecting cases).

Litigants typically seek relief under the Court Reporter Act when an unanticipated technical malfunction, human error or natural disaster renders transcripts of proceedings unavailable. *See, e.g.*, *Kelly*, 167 F.3d at 437 (recording and notes destroyed in a fire before they could be transcribed); *United States v. Brand*, 80 F.3d 560, 562 (1st Cir. 1996) (transcripts "permanently lost"); *United States v. Sierra*, 981 F.2d 123, 125 (3d Cir. 1992) (court-reporting system malfunctioned); *United States v. Antoine*, 906 F.2d 1379, 1380 (9th Cir. 1990) (court reporter "unable to locate her trial notes and tapes"); *United States v. Preciado-Cordobas*, 981 F.2d 1206, 1209 (11th Cir. 1993) (transcription unavailable because of a "defective ribbon in the stenotype machine used . . . to take

20

down the proceedings" and since the "backup" "tape recording" "either could not be found or was unintelligible"); *United States v. Selva*, 559 F.2d 1303, 1304–05 (5th Cir. 1977) (court reporter's tape recorder malfunctioned). But a few courts have concluded that "[t]he duty to comply with" the Court Reporter Act "lies with the court, not the parties," and they have granted relief when a district court held off-the-record sidebars—something Savage claims occurred in this case. *United States v. Nolan*, 910 F.2d 1553, 1560 (7th Cir. 1990); *see also, e.g.*, *United States v. Haber*, 251 F.3d 881, 889–90 (10th Cir. 2001); *United States v. Gallo*, 763 F.2d 1504, 1529–30 (6th Cir. 1985); *United States v. Garner*, 581 F.2d 481, 488–89 (5th Cir. 1978); *see also Sierra*, 981 F.2d at 127 ("The Court Reporter Act applies to all proceedings in open court, which includes sidebar conferences.").

At the outset, we question whether Savage appropriately invokes the Court Reporter Act for the first time on appeal. To be sure, remanding a case for record reconstruction or a new trial over a Court Reporter Act violation makes some sense when a conversation everyone thought was being recorded evades transcription because of an unforeseeable circumstance. In such a case, no one could have known to raise the Court Reporter Act in the District Court. Yet granting Savage's request for relief under the Court Reporter Act—raised now for the first time—makes far less sense. His trial counsel apparently knew the untranscribed conversations were not being recorded and thus arguably "waive[d] an objection to the court's failure to comply with § 753(b) . . . by acquiescing in the court's procedure." *Nolan*, 910 F.2d at 1560; *see also Gallo*, 763 F.2d at 1531; *cf. Garner*,

21

581 F.2d at 488 & n.4.  But even were we to excuse Savage's failure to object at trial, his Court Reporter Act claim still fails on its merits.  We cannot excuse Savage's failure to pursue Rule 10 reconstruction.

Only when a defendant shows a "colorable need" for the missing transcripts will we grant Court Reporter Act relief. *Fahy*, 516 F.3d at 190 (quoting *Karabin v. Petsock*, 758 F.2d 966, 969 (3d Cir. 1985)).  To show a colorable need, a defendant must do two things.  First, a defendant must make "a specific showing of prejudice." *Sierra*, 981 F.2d at 125.  In other words, a defendant must particularly assert what the missing record would show and why it would justify relief. *See id.* at 127.  Second, a defendant must explain why Rule 10(c)'s record-reconstruction procedure cannot cure the prejudice. *See Roberts*, 826 F.3d at 124–25 (collecting cases).[10]

---

[10] Every circuit to consider this issue has agreed that an appellant must specifically show prejudice and explain why Rule 10 reconstruction won't work before obtaining Court Reporter Act relief. *See Kelly*, 167 F.3d at 438 (collecting cases).   That said, the Fifth Circuit has relaxed those requirements when an appellant has new counsel on appeal and the alleged omission is "substantial and significant." *Selva*, 559 F.2d at 1306.  (The Eleventh Circuit follows that rule as binding precedent, since it predates 1981 legislation splitting the original Fifth Circuit into the present-day Fifth and Eleventh Circuits. *See Preciado-Cordobas*, 981 F.2d at 1212.) Savage tries to engraft that partial exception onto our caselaw, but we have already refused. *See Sierra*, 981 F.2d at 126 (noting "[t]he *Selva* approach has not been widely followed"

Savage comes closest to alleging prejudice by speculating that a more complete record might show that he preserved objections to various legal issues we must otherwise review under the heightened plain-error standard applicable to unpreserved error. We address standard-of-review issues as we encounter them in the following Parts. To resolve his Court Reporter Act claim, we need only note that Savage has never

and explaining how it perversely incentivizes "defendant[s] to dismiss trial counsel and seek appointment of new counsel on appeal"); *see also Haber*, 251 F.3d at 889–90.

What's more, even under the Fifth and Eleventh Circuits' standard, Savage still would not obtain relief: the omissions he alleges don't qualify as "substantial and significant." Whether a gap counts as substantial and significant in those courts "depends upon the likelihood that error which could be pursued on appeal occurred during those parts of the trial for which we do not have a verbatim transcript, and which the reconstruction does not allow us to review." *Preciado-Cordobas*, 981 F.2d at 1214. In practical terms, gaps relating to "indispensable part[s] of the proceedings, both in terms of time spent and potential influence on the outcome," might justify reversal. *Id.* But "[m]ere speculation, entirely unsupported or contradicted by the record, that error may have been committed during an unrecorded part of the trial simply is not enough to support a finding that omissions are substantial and significant." *Id.* The latter aptly describes Savage's approach here. Savage does not dispute that we know what happened during the most critical trial stages. Rather, he seeks a new trial because we don't know what happened in some sidebar and in-chambers conferences.

23

formally sought to reconstruct any untranscribed conversation—even though Rule 10 "provides a specific mechanism by which the parties can have [a] dispute over the contents of the trial court record resolved, and clearly places the responsibility for initially creating the record on the appellant." *Roberts*, 826 F.3d at 123.

Savage argues it would be futile to pursue Rule 10 reconstruction since his attorneys on appeal did not participate in his trial and therefore cannot be expected to know what went on in the untranscribed conferences. But Rule 10 provides for that eventuality: a defendant may submit a declaration saying he does not remember what happened, passing the ball to the government to document its recollection and giving the defendant a chance to object before allowing the District Judge to resolve any remaining discrepancies in accordance with the provided documentation and with any notes he has retained and his own recollections. At least one court of appeals has approved that very procedure under similar circumstances. *See United States v. Wilson*, 16 F.3d 1027, 1029 (9th Cir. 1994).

That reasoning also thwarts Savage's stunning request for discovery of the District Court's files, the District Judge's personal notes, and the work-product of every lawyer involved in the case. Of course, the District Judge may rely on his notes and recollection in certifying a reconstruction's accuracy—just as prosecutors may rely on their notes and recollections to rebut an appellant's initial reconstruction. But it does not follow that Savage can discover everyone else's notes or recollections. Savage cites no rule entitling him to such discovery, and we will not create one. Nor will we wade into the thorny privilege

24

questions and perverse incentives that such a rule would surely precipitate.

In short, Rule 10's text puts the ball in Savage's court. The Rule and our caselaw require a collaborative reconstruction effort that includes opposing counsel and the District Judge. But it starts with the appellant. Otherwise, an appellant could "manufacture his own disputes, attribute legal significance to them, and then claim that they only can be resolved by an examination of testimony that is unavailable." *Sussman*, 709 F.3d at 172. That appears to be what Savage attempts here, and it is an approach we will not countenance.

\* \* \*

We close this Part with three observations from our supervisory perch as a Court of Appeals, and from our shared perspective as three former trial judges. First, the record omissions Savage most often rehashes include the two untranscribed charge conferences (one during the guilt phase and one during the penalty phase), plus "extensive[]" undocketed emails swapping proposed jury instructions (which we view as a "virtual" charge conference). Def. Br. 344. To the extent Savage claims that this constitutes legal error, neither Federal Rule of Criminal Procedure 30 nor the Court Reporter Act require on-the-record charge conferences. Still, and even though off-the-record charge conferences routinely occur in the Eastern District of Pennsylvania (and elsewhere), we observe that the practice does have the potential to allow a legal error to go unnoticed and uncorrected. Relative to the costs of an entire criminal prosecution—especially a four-year, multidefendant capital case like this one—there seems little

25

expense saved or convenience gained by a charge conference conducted without a court reporter present.

Second, when it comes to making motions and preserving objections, the obligation rests with trial counsel to ensure the record reflects all motions or objections. Deciding to raise or to forgo a potentially meritorious objection often entails balancing fraught—and sometimes countervailing—considerations, both tactical and strategic. We will not bless a result where any potential record gap empowers creative counsel to resuscitate a waived objection on appeal.

Third, Savage credibly alleges that the District Court twice talked to the jury without counsel or a court reporter present. We know about the first conversation because the transcript from the last day of the Government's guilt-phase case reveals that the District Judge advised counsel, after the Government rested: "I'm going to go back and talk to the jury and tell them what we're doing, the fact that we're not going to be back until next Monday." A25:13393–94; *see also id.* at 13406 ("Ladies and gentlemen, at this point we're going to recess, and let you go back to get some lunch. It's 12 o'clock. I understand lunch is on its way up. I will come back and talk to you briefly to advise you of the schedule that we are going to be operating from here on. Okay?"). But the actual discussion was not transcribed, and we are unaware of its being restated on the record later.

We know about the second conversation because, in a break during the various closing arguments, an attorney brought up a "housekeeping matter": "I believe the Court yesterday was going to talk to the jury about whether or not

26

they are available tomorrow or not." The District Judge responded, "They will be here tomorrow if—I told them also tomorrow if I can charge—if I can begin charging the Jury in the morning, first thing, then we will do that and let them deliberate. However, if closings—if closing statements are still going on tomorrow morning, we are going to recess until Monday and let them come back on Monday for the charge." A28:14848. Here too, this after-the-fact summary is the only information we have about the judge–jury exchange.

Though we cannot know exactly what was said, what we do know assures us that the conversations were entirely scheduling-related. That said, we further stress the advisability of having counsel present for all interactions between the court and jurors, and our preference that such interactions be transcribed. *See also Gallo*, 763 F.2d at 1529 n.37.

## V. THE DISTRICT COURT DID NOT ERR BY SUBSTITUTING COUNSEL.

Savage claims that he was denied his Sixth Amendment right to counsel because the District Court waited until four days before voir dire began to substitute new lead counsel. We conclude that the District Court's substitution constituted neither structural nor trial error.[11]

---

[11] We leave for a future date the question of whether a structural error claim is subject to waiver or forfeiture. That said, we are not persuaded by the Government's argument that Savage waived, forfeited or invited any alleged trial error.

27

## A. Background

On June 23, 2009, the District Court appointed Timothy Sullivan to represent Savage as learned capital-qualified counsel. Christian Hoey was appointed to represent Savage alongside Sullivan on February 19, 2010. In January 2011, Sullivan was appointed as a U.S. Magistrate Judge, but because this appointment was contingent on the current incumbent of that magistrate judgeship being confirmed as a district court judge, there remained uncertainty as to if and when Sullivan would assume his new office. While the record does not make clear when Sullivan first brought this issue to the District Court's attention, it does contain representations that Sullivan advised the District Court of his pending appointment as early as January 2011.

The District Court addressed the issue of Sullivan's pending appointment during a June 2012 hearing. Soon afterward, on June 19, 2012, Sullivan submitted a letter to the District Court proposing the appointment of William Purpura as additional learned capital-qualified counsel.[12] The letter explained that

> [i]f circumstances warrant, and Mr. Sullivan seeks leave to withdraw from this case in the near-future, Mr. Purpura has indicated that he wishes the Court to be on notice that he might request a short continuance until October 2012. This request will only be made if Mr. Purpura

---

[12] Around this time, Sullivan's associate, Brett Cook, also joined the defense team.

> requires additional time to prepare for trial and for any penalty hearing case. Mr. Purpura is prepared to meet with the Court to discuss these matters.

A33:17393. Accompanying the letter was an account of Mr. Purpura's considerable capital case experience. Sullivan followed up with the District Court's courtroom deputy via email on June 25, 2012, writing, "Mr. Purpura is anxious to receive word from the Court on his appointment since each day counts now." A4:1864. The record does not reveal a response to Sullivan's letter and follow-up email.

On either June 24 or July 24, 2012,[13] Savage submitted a pro se, ex parte "emergency motion" for appointment of new counsel or to proceed pro se. A4:1858–63. Savage asserted that the District Court was "well aware" of Sullivan's pending appointment, that Sullivan was "preoccupied" with his appointment, and that Sullivan was "underperforming" in preparing Savage's case. *Id.* at 1858. Savage also claimed that Sullivan "knows nothing about the basic facts," did not visit him unless there was to be a hearing, was "wholly ineffective," "cares nothing about my case," and like Hoey, was a "compulsive liar[]." *Id.* at 1858–59, 1862. Moreover, Savage alleged that there were disputes between Sullivan and Hoey resulting from ineffective communication.

---

[13] While the motion was dated June 24th, Savage states in the body of the motion that he is writing on the 24th of July. That said, the District Court did not receive the motion until August 9, 2012.

29

He then requested "concerned dedicated counsel" to protect his Sixth Amendment rights. *Id.* at 1858. Savage closed stating: "If a man/attorney does not want to be apart [sic] of a defense team, why would I want him to defend me or why would the court keep him on my case[?]" *Id.* at 1862.

On August 10, 2012, the District Court's courtroom deputy forwarded Savage's letter to Sullivan, observing that the letter was received in chambers and adding simply, "Please advise." *Id.* at 1857. The District Court took no further action with respect to Savage's self-styled motion.

Savage, through counsel, moved ex parte for appointment of Purpura as additional learned counsel on October 16, 2012. This motion explained that Sullivan could be sworn in before the end of the year (at which time he would immediately assume his duties as a magistrate judge) and that "Mr. Purpura will be prepared to move forward with the representation of Mr. Savage under existing [sic] Court's schedule." A33:17390. It also expressed that "[t]he appointment of Mr. Purpura must occur as soon as possible in order to permit him sufficient time to familiarize himself with the discovery, work with Mr. Sullivan and become familiar with the mitigation evidence, the aggravating evidence and for any penalty hearing." *Id.* Counsel further represented that "Mr. Savage has no objection to Mr. Purpura replacing Mr. Sullivan, if necessary." A33:17391.

On November 1, 2012, the District Court held a hearing to address the motion for appointment of counsel. Sullivan advised the District Court that he had discussed the matter with Savage, declaring: "I believe Mr. Savage is amenable and

30

consents to the relief that we seek." A7:3312. The District Court then confirmed this, asking Savage: "You are satisfied if this Court were to go ahead and make that appointment; is that correct?" *Id.* Savage responded, "Yes." *Id.* The District Court then turned to Purpura and asked if he was "ready to take over representation of Mr. Savage," to which Purpura replied:

> Your Honor, I cannot represent that I'm ready to take over the representation of Mr. Savage. I don't think the Court would expect me to make that representation. I have met with Mr. Savage. We met back in June. At that time I know Mr. Sullivan filed the first motion on this particular issue.
>
> Obviously jury selection starts on Monday. I've talked to Christian Hoey, who seems to know the case almost as well as Mr. Savage himself, as far as going through the discovery. So we have gone through everything there.
>
> Mr. Cook, as well, and Mr. Sullivan, has had this case in litigation as well as the defense. I believe that I can add right now a lot to this team to keep this train on the track and to go forward at this point. But if the Court is asking me specifically, if at this very moment could I step into the shoes of Mr. Sullivan who has been here for three and a half years, I would have to honestly tell the Court that that is not possible.

A7:3312–13.  Seeking clarification, the District Court inquired further: "[A]re you satisfied that you can get yourself up to speed so that this matter is not going to be delayed?"  A7:3313–14.  Purpura responded,

> Judge, I can tell the Court honestly that I am experienced in Federal as well as State capital cases.  I would do nothing except this particular case, whatever amount of time it took me per day.
>
> Teresa Whalen[14] is a close associate and friend of mine.  I've tried capital cases in the District of Maryland with her, and I know that she will help bring me up to speed as well as everybody else.  It's a big team effort.
>
> So the answer is yes, I'll do everything in my power to be brought up to speed, and I have the experience to do it.  I hope to make Mr. Savage satisfied of that as well.

A7:3314.  The Government did not object to the motion, and after conferring with the local office of the Federal Public Defender, the District Court recorded the appointment of Purpura.[15]

---

[14] Teresa Whalen was an attorney representing co-defendant Kidada Savage.

[15] The District Court entered an order formally appointing Purpura as additional learned counsel on November 16, 2012.

The initial hardship stage of jury selection had already taken place on September 26 and 27, 2012, but voir dire began on November 5, 2012, less than a week after Purpura's oral appointment. Savage then moved, on December 13, 2012, for the appointment of additional associate counsel Marta Kahn and Brady Locher. No order reflecting their appointment appears in the record, however, and neither Kahn nor Locher appear as counsel of record on the District Court docket. Nevertheless, the Government avers—and the record reflects—that Kahn did participate as additional counsel. Sullivan and Cook moved to withdraw on December 19, 2012, which the District Court granted.

At no time did either side seek a continuance.

Voir dire concluded on Tuesday, January 29, 2013. The following Monday, February 4, 2013, the guilt phase of trial got underway. Although substantial discovery was conducted pretrial, Purpura never told the Court that he was inadequately prepared or that he needed more time. The trial concluded more than three months later, with the jury returning a guilty verdict on all charges on May 13, 2013. The proceedings next advanced to the penalty phase, which began on May 21, 2013. The jury returned a death penalty verdict on May 31, 2013.

## B. Savage did not suffer a constructive denial of counsel: there was no structural error.

The Sixth Amendment guarantees a criminal defendant the right "to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. In practice, this means that

33

constructive denial of the assistance of counsel requires per se reversal.[16] *See Perry v. Leeke*, 488 U.S. 272, 280 (1989).

The Supreme Court has held that "it is a denial of the accused's constitutional right to a fair trial to force him to trial with such expedition as to deprive him of the effective aid and assistance of counsel." *White v. Ragen*, 324 U.S. 760, 764 (1945); *see also United States ex rel. Tillery v. Cavell*, 294 F.2d 12, 20 (3d Cir. 1961) ("Effective aid and assistance of counsel is of necessity impossible where counsel is not given reasonable time to consult with the accused and prepare the case."). Yet the Court has declined to "fashion a per se rule requiring reversal of every conviction following tardy appointment of counsel." *Chambers v. Maroney*, 399 U.S. 42, 54 (1970); *see also United States v. Cronic*, 466 U.S. 648, 661

---

[16] "In *Arizona v. Fulminante*, 499 U.S. 279 (1991), the Supreme Court recognized a distinction between structural defects, which require reversal, per se, and trial errors, which require a reviewing court to engage in harmless error analysis. Structural defects are defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards. A structural defect affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself. Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Lewis v. Pinchak*, 348 F.3d 355, 357 (3d Cir. 2003) (internal quotation marks and citations omitted).

(1984) ("[E]very refusal to postpone a criminal trial will not give rise to [a presumption of prejudice].").

Instead, courts must look to whether "the surrounding circumstances make it unlikely that the defendant could have received the effective assistance of counsel." *Cronic*, 466 U.S. at 666; *see also id.* at 659–60 (circumstances necessitating a per se reversal may exist "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial"). This question

> necessarily involves a comparison of the time of the appointment with all the attendant circumstances, such as the gravity of the charge, the experience of appointed counsel, the extent of his knowledge and participation in similar cases, his opportunity for preparation and even what he may have been told by the defendant which may reduce the area of necessary preparation.

*Moore v. United States*, 432 F.2d 730, 735 (3d Cir. 1970).

Precedent provides some insight into the circumstances that constitute a constructive denial of counsel requiring per se reversal. In *Avery v. Alabama*, the Supreme Court held that there was no denial of counsel where counsel was appointed three days before a capital trial began. 308 U.S. 444, 453 (1940). The Court concluded that the defendant was "afforded

35

the assistance of zealous and earnest counsel" who "contested every step of the way leading to final disposition of the case." *Id.* at 450. "That the examination and preparation of the case, in the time permitted by the trial judge, had been adequate for counsel to exhaust its every angle is illuminated by the absence of any indication, on the motion and hearing for new trial, that they could have done more had additional time been granted." *Id.* at 452.

We similarly held, in *Tillery*, that per se reversal was not warranted where an attorney was appointed to represent a defendant on the day of trial.[17] 294 F.2d at 22. There, the attorney had practiced law for fifteen years, had met with the defendant twice prior to trial, and had heard his account of the crime. *Id.* The defendant had also failed to disclose any witness or alibi requiring investigation. *Id.* at 20–22. Likewise, in *United States ex rel. Mathis v. Rundle*, we held that the late appointment of counsel did not require per se reversal where counsel had "a good reputation and solid credentials" and was able to review a colleague's notes from an interview with the defendant, but did not have time to interview the defendant himself, did not ask for a continuance when witnesses did not appear because he "had no reasonable expectation" that the witnesses would help, and "was unable to say that he had been insufficiently prepared to go to trial." 394 F.2d 748, 752–54 (3d Cir. 1968), *overruled on other grounds by Moore*, 432 F.2d 730.

---

[17] As federal capital cases rarely involve a constructive denial of counsel, we turn to non-capital caselaw for guidance.

In contrast, the Supreme Court has clearly stated that trial counsel who merely goes through the motions is really no counsel at all.  The Court concluded in *Powell v. Alabama* that per se reversal was required since the defendants "were not accorded the right of counsel in any substantial sense": the representation provided was "pro forma rather than zealous and active"; "[n]o attempt was made to investigate" and "[n]o opportunity to do so was given"; and the defendants were instead "hurried to trial."  287 U.S. 45, 58 (1932).

We similarly held, in *United States ex rel. Washington v. Maroney*, that the defendant was constructively denied assistance of counsel where counsel was appointed the day of trial, made no pretrial preparations, consulted with the defendant only briefly in the back of the courtroom, did not object to the admission of a possibly coerced confession, and failed to impeach the key government witness or call any character witnesses on the defendant's behalf.  428 F.2d 10, 14–15 (3d Cir. 1970); *see also Vance v. Lehman*, 64 F.3d 119, 122 (3d Cir. 1995) (explaining that the per se rule may apply where counsel fails to subject the prosecution's case to adversarial testing, has little or no legal training, or is prevented from assisting the defendant).

Savage argues that Purpura's late substitution constituted a constructive denial of counsel that requires per se reversal.  Several facts weigh in favor of Savage's claim:

- The District Court appointed Purpura only four days before voir dire began. *See Moore*, 432 F.2d at 735 ("A belated appointment of counsel [is] strong evidence in a defendant's behalf.").

37

- The guilt-phase trial lasted slightly longer than the time Purpura had between appointment and trial to prepare. *See Washington*, 428 F.2d at 14 ("[C]ounsel for an indigent defendant, held in custody, must be appointed by the court sufficiently far in advance of trial to enable counsel adequately to prepare the defense." (internal quotation marks omitted)).

- This was a complex death penalty prosecution involving conduct that extended over more than a decade and involved twelve murders. Discovery was substantial, including numerous recordings that would have required significant time to review. *See, e.g.*, A34:18093 (MR. PURPURA: "We understand the Government has given us volumes of evidence, actually probably too much evidence for me to review. We are trying to review it and trying to catch up. . . . At this point I'm having difficulty between the forest and the trees."); A34:18100 (MR. PURPURA: "The amount of discovery here is so gargantuan that we have no notice."); *cf. United States v. Accetturo*, 842 F.2d 1408, 1413–14 (3d Cir. 1988) (concluding that the district court's determination that twenty-four days was sufficient for counsel to prepare was not an abuse of discretion where the district court stated the amount of evidence was rather discrete, intermittent and of small quantity).

- The District Court may have been aware of Sullivan's potential exit from the case as early as January 2011, but it failed to act until November 2012. *Cf. Chambers*, 399

38

U.S. at 54 ("Unquestionably, the courts should make every effort to effect early appointments of counsel in all cases."). Because courts have an independent obligation to ensure that the rights of criminal defendants are protected, this delay does give us pause.[18] *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) ("When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed."); *Glasser v. United States*, 315 U.S. 60, 71 (1942), *superseded on other grounds by* Fed. R. Evid. 104(a) ("Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused.").

Nonetheless, Savage fails to take into account numerous facts that undermine his constructive denial of counsel claim:

- In addition to representing to the District Court that he had the experience to familiarize himself with the case in a timely manner and that he was prepared to undertake the efforts necessary to do so, Purpura affirmatively stated to the District Court that he could be ready for trial. *See Morris v. Slappy*, 461 U.S. 1, 12 (1983) ("In the face of the unequivocal and uncontradicted statement by a responsible officer of the court that he was fully prepared and 'ready' for trial, it

---

[18] We also recognize that this substitution involved lead counsel, the only capital-qualified counsel then on the record. *See* 18 U.S.C. § 3005; *see also* § 3599; *Martel v. Clair*, 565 U.S. 648, 659 (2012).

39

was far from an abuse of discretion to deny a continuance. On this record, it would have been remarkable had the trial court not accepted counsel's assurances.").

- The District Court's statements on the record indicate that it thought Purpura would be able to adequately prepare in the amount of time available. *See, e.g.*, A34:18070 (THE COURT: "I would anticipate that Mr. Purpura could get up to speed by that time.").

- Purpura was an experienced death penalty counsel.

- Savage did not lodge any pro se objection to the substitution or lack of a continuance.

- Neither Purpura nor Savage pro se moved for a continuance.

- Sullivan consistently indicated a desire to remain on the case while his appointment to a judgeship was pending and was uncertain about if or when he would need to withdraw. He even contributed to and participated in over six weeks of voir dire.

- Hoey's contribution to Savage's defense was substantial. He was on the case almost from the beginning, remained after Sullivan withdrew, and according to Purpura, seemed to know the case almost as well as Savage did—at least as to discovery materials.

40

- The District Court had to weigh significant issues of judicial administration, including the involvement of multiple defendants and the availability of numerous attorneys.[19]

Considering all the attending circumstances, we conclude that Savage did not suffer a constructive denial of counsel. First, Purpura was an experienced capital-qualified counsel. Second, Purpura relied on his experience in representing to the District Court that he could get "up to speed" in time for trial. Third, neither Purpura nor Savage himself moved for a continuance or indicated that Purpura was unprepared to proceed to trial. Given that capital defense counsel are not, as a rule, timid creatures, we have every reason to believe that if Purpura thought he needed additional time to prepare, he would have moved for a continuance. Fourth, although Purpura was lead counsel and the only capital-qualified counsel, Hoey had been a member of Savage's defense team for several years, and he remained on the team to assist Purpura in both preparing and trying the case. *See United States v. Merlino*, 349 F.3d 144, 149–50 (3d Cir. 2003)

---

[19] *See Morris*, 461 U.S. at 11–12 ("Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." (internal quotation marks and citations omitted)).

(defendant was not "left bereft of counsel"). Fifth, it is reasonable for us to infer that Purpura inherited *some* work product from Sullivan and Hoey. Sixth, and most importantly, our careful examination of the record confirms that Purpura provided Savage with zealous representation throughout trial. *See United States ex rel. Chambers v. Maroney*, 408 F.2d 1186, 1195–96 (3d Cir. 1969) ("This is not a case where belated appointment of counsel may have resulted in the failure to call witnesses . . . or in the failure to raise defenses of which counsel was unaware or which he was unprepared to pursue, or in an improvident plea of guilty." (internal footnotes omitted)), *aff'd sub nom. Chambers*, 399 U.S. 42. In fact, it is unclear to us what more Purpura could have done had he requested and received additional time to prepare.[20]

The situation that the District Court confronted was not one where, "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that" per se reversal is required. *Cronic*, 466 U.S. at 659–60. Thus, there was no structural error.

---

[20] Savage has alleged that the late appointment of Purpura violated both his Sixth Amendment right to counsel and his enhanced right to capital counsel under 18 U.S.C. §§ 3305 & 3599, but Savage was never without capital counsel. We conclude that his statutory right to capital counsel was not violated for the same reasons that his Sixth Amendment right was not.

42

**C. The District Court committed no trial errors in the substitution of counsel.**

In addition to his structural error claim, Savage alleges that the District Court erred in delaying the substitution of counsel by (1) overlooking Sullivan's June 2012 letter; (2) failing to adequately address Savage's pro se, ex parte emergency motion; and (3) granting substitution in November 2012 without a continuance.

**1. Standard of Review**

We review a district court's decision regarding substitution for an abuse of discretion. *See Martel*, 565 U.S. at 663–64. While "[t]here are no mechanical tests for determining an abuse of discretion," *United States v. Restaino*, 405 F.2d 628, 631 (3d Cir. 1968), the Supreme Court has held that a motion for substitution should be granted when it is in the "interests of justice," *Christeson v. Roper*, 574 U.S. 373, 377 (2015). *See also Martel*, 565 U.S. at 652 (holding that district courts "should employ the same 'interests of justice' standard that [is applied] in non-capital cases" in evaluating motions to replace capital counsel). "[F]actors a court of appeals should consider in determining whether a district court abused its discretion . . . 'include: the timeliness of the motion; the adequacy of the district court's inquiry into the defendant's complaint; and the asserted cause for that complaint, including the extent of the conflict or breakdown in communication between lawyer and client (and the client's responsibility, if any, for that conflict).'" *Christeson*, 574 U.S. at 377 (quoting *Martel*, 565 U.S. at 663); *see also United States v. Goldberg*, 67 F.3d 1092, 1098 (3d Cir. 1995) (additional considerations

43

include "the efficient administration of criminal justice; the accused's rights, including the opportunity to prepare a defense; and the rights of other defendants awaiting trial who may be prejudiced by a continuance").

An abuse of discretion may also occur where a court makes no inquiry into a defendant's request to substitute counsel. *See Goldberg*, 67 F.3d at 1098; *United States v. Welty*, 674 F.2d 185, 187 (3d Cir. 1982); *see also McMahon v. Fulcomer*, 821 F.2d 934, 942 (3d Cir. 1987) ("Even when the trial judge suspects that the defendant's contentions are disingenuous, and motives impure, a thorough and searching inquiry is required.").[21]

### 2. The District Court did not abuse its discretion in its handling of counsel's June 2012 letter.

Savage treats Sullivan's June 2012 communication as akin to a motion. Yet it was no more than a letter and did not purport to be anything other than that. As such, the District Court was not called upon to grant or deny relief.

Even if we were to conclude that the District Court should have acted based on the letter, the District Court did so

---

[21] *Welty* and its progeny are the basis for much of our Court's substitution of counsel caselaw. Yet for our purposes, they are hardly a perfect fit. The court in *Welty*, for instance, denied substitution. 674 F.2d at 187. Here, the District Court eventually granted relief by appointing Purpura. Furthermore, Savage consented to the substitution.

44

approximately four months later with the appointment of Purpura. Savage's only objection is that the District Court should have acted sooner. Given the deference afforded to district courts in matters of case administration, *see Morris*, 461 U.S. at 11–12; *Fuller v. Diesslin*, 868 F.2d 604, 611–12 (3d Cir. 1989), we see no abuse of discretion in the District Court's failing to substitute counsel promptly upon receipt of Sullivan's letter.

### 3. The District Court did not abuse its discretion in forwarding Savage's pro se, ex parte emergency motion to counsel.

In his June/July 2012 pro se, ex parte emergency motion seeking substitution of counsel or to proceed pro se, Savage made several allegations that may have constituted good cause: Sullivan was not working on the case diligently; communication between Savage and Sullivan had broken down; and Savage felt that Sullivan was untrustworthy. The District Court did not directly address these claims. Rather, the courtroom deputy transmitted Savage's letter to Sullivan, asking counsel to advise the District Court.

Considering the procedural history of this case, the District Court's actions were appropriate. Savage had previously submitted numerous pro se filings seeking substitution of counsel or permission to proceed pro se. The District Court held hearings to address each of those motions in turn, and Savage always retracted his grievances. While courts must proactively address motions, given Savage's past actions and the deference afforded to district courts in matters of case administration, *see Fuller*, 868 F.2d at 612, there was

45

no abuse of discretion in the District Court's handling of Savage's pro se, ex parte emergency motion.

**4. The District Court did not abuse its discretion by substituting counsel without a continuance in November 2012.**

For the reasons stated below, we conclude that the District Court did not abuse its discretion in substituting Purpura for Sullivan.

First, Purpura was a highly experienced death penalty counsel. His background could reasonably be expected to save him valuable preparation time, not to mention court time. Moreover, Purpura's background and experience make it extremely likely that he would have sought a continuance if he believed he needed it. *See Moore*, 432 F.2d at 735. No continuance was sought.

Second, Purpura affirmatively represented to the District Court that he would be ready for trial. *See Morris*, 461 U.S. at 12 (noting that it "would have been remarkable had the trial court not accepted counsel's assurances").

Third, Purpura was hardly alone in representing Savage. He joined a team of committed lawyers, *see Merlino*, 349 F.3d at 149–50, that included Hoey—who had been on the case for nearly three years. Hoey helped Purpura prepare and was involved extensively in voir dire, trial and sentencing.

Finally, Sullivan consistently indicated a desire to remain on the case while his appointment was pending,

46

uncertain as he was about if or when he would need to withdraw.

*   *   *

We are well satisfied that Savage did not suffer a constructive denial of counsel and that the District Court did not commit trial error in the handling of substitution of counsel.

## VI.    SAVAGE'S VICINAGE ARGUMENT LACKS MERIT.

Section 3235 of Title 18 provides that a trial in a capital case "shall be had in the county where the offense was committed."  18 U.S.C. § 3235.  Savage contends that the "language and history" of this statutory section "show that it encompasses the right to a jury drawn from the county of the offense."  Def. Br. 115.  The District Court disagreed, and so do we.[22]

Section 3235 has its roots in the 1789 Judiciary Act. The relevant section provided

> [t]hat in cases punishable with death, the trial shall be had in the county where the offence was committed, or where that cannot be done without great inconvenience, twelve petit jurors at least shall be summoned from thence.

---

[22] Because statutory interpretation presents a question of law, we exercise plenary review.  *United States v. Randolph*, 364 F.3d 118, 121 (3d Cir. 2004).

47

Act of Sept. 24, 1789, ch. 20, § 29, 1 Stat. 88. This statute remained unchanged until 1862. At that time, Congress enacted a new law that specified "[t]hat so much of section twenty-nine of [the Judiciary Act] . . . as requires in cases punishable with death, twelve petit jurors to be summoned from the county where the offence was committed, be, and the same is hereby, repealed." Act of July 16, 1862, ch. 189, § 2, 12 Stat. 589. Thus, Congress explicitly eliminated in 1862 the requirement in the Judiciary Act for a local jury in a capital case. Thereafter, in 1948, § 3235—Venue in Capital Cases— was codified in its current form:

> The trial of offenses punishable with death shall be had in the county where the offense was committed, where that can be done without great inconvenience.

18 U.S.C. § 3235. Consistent with the 1862 repeal, the title and text of § 3235 omit any reference to vicinage or a requirement for a jury to be summoned from the county where the offense occurred.

In light of this statutory history and consistent with the plain text of the statute, we conclude that the District Court did not err in rejecting Savage's "attempt to import a 'vicinage requirement' into the statute." A1:29–30. We agree with the District Court that "[t]here is nothing in § 3235 that requires the jury to be selected from the county of the offense." A1:29; *see United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241 (1989) (instructing that "where . . . the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms'") (quoting *Caminetti v. United States*, 242 U.S.

48

470, 485 (1917)). Inasmuch as our task in interpreting a statute is "to give effect to the intent of Congress," we refuse to add a vicinage requirement that Congress eliminated more than a century ago. *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940).

Indeed, our caselaw already acknowledges the repeal of the Judiciary Act's vicinage requirement in capital cases. In *Zicarelli v. Gray*, we addressed whether a state prisoner's Sixth Amendment right to trial by a fair cross-section of the community was "violated when he [was] indicted for crimes arising out of acts occurring in one county of the state and [was] subsequently tried before a jury drawn exclusively from a second county in the state." 543 F.2d 466, 468 (3d Cir. 1976) (en banc). Our late colleague Judge Adams examined the vicinage requirement under English common law, the Constitution's guarantee of a trial in the State where the crime occurred,[23] and the 1789 Judiciary Act together with its requirements of vicinage in capital and noncapital cases. *Id.* at 475–76. He distilled three themes from his historical review:

> First, the proposition that a trial must take place before a jury drawn from within the state and federal judicial district in which the crime was committed was considered salient enough to be

[23] Article III, § 2, clause 3 of the U.S. Constitution provides in relevant part: "The Trial of all Crimes . . . shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed." The Sixth Amendment also guarantees that the trial shall be held in the district where the crime occurred. U.S. Const. amend. VI.

guaranteed by the Constitution. Second, the concept that a criminal trial must be before a jury composed of residents of the county where the crime occurred was not deemed to be of sufficient consequence to be guaranteed by the Constitution. Rather, if such a rule was to be adopted, it would have to be done by Congress.

*Id.* at 477–78 (footnote omitted). The third theme concerned the vicinage of jurors in both capital and noncapital trials, prompting the observation that "[t]he mandate that 12 jurors be summoned from the county of the crime in capital cases was repealed in 1862." *Id.* at 478 n.60.

In short, no vicinage requirement has existed in capital cases since 1862. If there is to be such a rule, Congress will need to enact it once again.[24]

Finally, we reject Savage's assertion that the District Court's denial of the motion to empanel a jury drawn solely from Philadelphia County amounted to structural error. "The purpose of the structural error doctrine is to ensure insistence on certain basic, *constitutional* guarantees that should define the framework of any criminal trial." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017) (emphasis

---

[24] Even if Savage's argument had some traction, it would derive from the right to have the trial conducted in the county of the offense. That right is not "absolute . . . , but only a qualified right in cases where such a trial could be had 'without great inconvenience.'" *Brown v. United States*, 257 F. 46, 48 (5th Cir. 1919), *rev'd on other grounds*, 256 U.S. 335 (1921).

50

added). Yet we observed in *Zicarelli* that the vicinage requirement of drawing a jury in a capital trial from "the county where the crime occurred was not deemed to be of sufficient consequence to be guaranteed by the Constitution." 543 F.2d at 477–78. Accordingly, there is no constitutional guarantee to support Savage's contention that a structural error occurred when the District Court refused to seat a jury comprised solely of Philadelphia residents.

In sum, the District Court did not err in denying the motion to secure the jury from the county of offense pursuant to 18 U.S.C. § 3235.

## VII. SAVAGE HAS NOT ESTABLISHED A VIOLATION OF HIS CONSTITUTIONAL AND STATUTORY RIGHTS TO A JURY DRAWN FROM A FAIR CROSS-SECTION OF THE COMMUNITY.

Under the Sixth Amendment, a criminal defendant is entitled to a trial by an "impartial" jury.[25] One important step in furthering impartiality is to draw jurors from diverse segments of the population. *See Holland v. Illinois*, 493 U.S. 474, 480 (1990). The Supreme Court has declared this method a constitutional guarantee by concluding that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment

---

[25] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. Const. amend. VI.

51

right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975).

A corresponding statutory framework facilitates the selection of a representative jury. The Jury Selection and Service Act of 1968 (JSSA) provides that federal juries are to be "selected at random from a fair cross section of the community." 28 U.S.C. § 1861. Federal district courts are tasked with creating jury-selection plans consistent with this fair-cross-section principle. § 1863(a). These plans generally must draw potential jurors from "voter registration lists" or "lists of actual voters," but they also must identify other sources "where necessary to foster the policy and protect the rights secured by" the JSSA's fair-cross-section principle. § 1863(b)(2).

The U.S. District Court for the Eastern District of Pennsylvania has long drawn its potential jurors exclusively from voter registration lists. *See, e.g.*, *Savage v. United States*, 547 F.2d 212, 214–16 (3d Cir. 1976) (unrelated case describing 1968 version of jury-selection plan); A1:66 n.7 (describing 2009 version applicable here). That approach reflects the Eastern District's assessment that "[v]oter registration lists represent a fair cross section of the community in the Eastern District of Pennsylvania." U.S. Dist. Ct. for Eastern Dist. of Pennsylvania, Plan for the Random Selection of Grand and Petit Jurors § 3 (adopted 2017).

The Eastern District forms its jury pool through essentially three steps.[26] Every two years, registered voters in the jurisdiction are randomly selected to populate a master jury wheel. Then the master wheel is culled by randomly choosing individuals, mailing each of them a juror qualification form, and evaluating their responses to identify who is disqualified, exempt or excused from service. The result is a qualified jury wheel. Finally, individuals randomly selected from the qualified wheel are summoned to serve on venires (i.e., panels) of potential jurors in Eastern District trials.

In preparing to challenge the Eastern District's jury-selection system, Savage sought discovery of extensive information that went into creating the master wheel, the qualified wheel and the venire.[27] *See* 28 U.S.C. § 1867(f) (providing for discovery). The District Court granted Savage's discovery motion in part, providing him access to the Eastern District's jury plan (2009 version) and spreadsheets containing statistical information about the race and ethnicity of:

---

[26] For purposes of this overview, the applicable 2009 version of the Eastern District's plan—as described by the District Court in this case—does not differ from the presently operative 2017 version. *See* A1:66 n.7; 2017 Jury Plan §§ 3–7.

[27] Savage's co-defendant Steven Northington filed this discovery motion and the follow-up motion to strike the venires. We refer to both motions as filed by Savage since the District Court determined that Savage had standing to join them.

- the potential jurors on the master and qualified jury wheels assembled in 2007, 2009 and 2011;

- the grand jurors who returned the First Superseding Indictment;

- the potential petit jurors who were summoned; and

- the subset of potential petit jurors who "responded to the summons and showed up to fill out a jury questionnaire on September 26 and 27, 2012."[28]

A1:39.

Asserting a violation of his Sixth Amendment right to a jury selected from a fair cross-section of the community, Savage moved to strike the two panels of prospective jurors.[29] He urged the District Court to draw jurors instead from lists maintained by the Administrative Office of Pennsylvania

_____

[28] This was a case-specific jury questionnaire that the District Court administered to the panels of potential jurors.

[29] We assume the Eastern District summoned two panels because of the impending trial in this case. *See* 2017 Jury Plan § 7(b) (providing option of two panels in anticipation of "a highly publicized or extremely lengthy case or cases" calling for "an extraordinary [sic] large panel of jurors"). In any event, two more panels were added later because of "the Court needing two additional panels to fill out questionnaires." A1:65 n.5; *see also* A1:70 n.9.

Courts, which supplemented voter registration rolls with various other sources. The District Court denied the motion because Savage had not made a threshold showing of a fair-cross-section violation under *Duren v. Missouri*, 439 U.S. 357 (1979), and *United States v. Weaver*, 267 F.3d 231 (3d Cir. 2001). Savage now argues the District Court erred in determining that he failed to satisfy two prongs of the *Duren* standard.

After briefing in this case concluded, a different panel of this Court decided a case presenting a fair-cross-section claim, *Howell v. Superintendent Rockview SCI*, 939 F.3d 260 (3d Cir. 2019), *reh'g denied*, No. 17-1758 (3d Cir. Nov. 26, 2019), *petition for cert. filed*, *Howell v. Garman*, No. 19-8378 (Apr. 24, 2020). The Government raised *Howell* in a Rule 28(j) letter, to which Savage responded. The parties had a further opportunity to address *Howell*'s import at oral argument.

## A. Standard for a Fair-Cross-Section Challenge[30]

Savage has the burden to establish a violation of his fair-cross-section rights by identifying (1) "a 'distinctive' group in the community" (2) that was "not fair[ly] and reasonab[ly]" represented among potential jurors compared with its representation in the community (3) because of "systematic

---

[30] "Whether a defendant has been denied his or her right to a jury selected from a fair cross section of the community is a mixed question of law and fact, and is reviewed *de novo*." *Weaver*, 267 F.3d at 235.

exclusion of the group in the jury-selection process."[31, 32]
*Duren*, 439 U.S. at 364.

In *Duren*, women comprised 54% of the relevant population, but only approximately 15% of the weekly venires in state court. *Id.* at 362–63, 365. Recognizing that women were a distinctive group, the Supreme Court determined that their underrepresentation was not only unfair, but attributable to systematic exclusion because the underrepresentation "occurred not just occasionally but in every weekly venire for a period of nearly a year." *Id.* at 364–66. The Court could easily pinpoint the exclusionary processes: the jury-selection system included several exemptions expressly for women, including an automatic exemption upon failure to respond to the summons and appear for service. *Id.* at 361–62, 366–67.

---

[31] If Savage can make this prima facie showing, then the Government would "bear[] the burden of justifying this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest." *Weaver*, 267 F.3d at 237 (quoting *Duren*, 439 U.S. at 368) (internal quotation marks omitted). In this case, we need not reach the Government's rebuttal burden.

[32] Savage forfeited the opportunity to pursue a JSSA claim here by failing to raise it in the District Court. *See United States v. Baxter*, 951 F.3d 128, 136 (3d Cir. 2020), *petition for cert. filed*, No. 20-5133 (July 14, 2020). But because the fair-cross-section standard is equivalent for claims under the Sixth Amendment and the JSSA, *Weaver*, 267 F.3d at 236–37, excluding the JSSA claim makes little difference to our analysis.

56

Here, Savage established the first *Duren* prong by identifying a similarly distinctive group: black individuals. But the District Court correctly determined that he failed at the second prong because he had not demonstrated unfair and unreasonable representation of that group. We also agree with the District Court's third-prong determination that Savage did not show that any underrepresentation stemmed from systematic exclusion.

### B. Savage has not made a prima facie showing of a fair-cross-section violation.

#### 1. Blacks are a distinctive group.

To satisfy the first prong, Savage points to the alleged underrepresentation of Blacks among prospective jurors. We ask whether that group is "sufficiently numerous and distinct from others in the population that if members of the group are systematically eliminated, the defendant's right to a jury composed of a fair cross section of the community would be violated." *Weaver*, 267 F.3d at 239–40. We routinely recognize that Blacks qualify as a distinctive group. *See, e.g.*, *id.* at 240; *Howell*, 939 F.3d at 266. No further discussion is necessary on this point.

#### 2. Blacks were not unfairly or unreasonably represented on the qualified jury wheel.

Savage argues that representation of Blacks among potential jurors was not "fair and reasonable" when compared to the proportion of that group within the Eastern District population. In evaluating Savage's argument as to the second

57

prong, we look to statistics to assess the degree, if any, to which Blacks were underrepresented. *Weaver*, 267 F.3d at 240 (noting the inquiry is "at least in part, a mathematical exercise, and must be supported by statistical evidence").

Our analysis involves (1) identifying that share of the Eastern District population who are Blacks; (2) determining the share of the Eastern District's jury wheel or the venires in this case that consisted of Blacks; and (3) deploying statistical methods to evaluate any disparity between the two shares. *See id.* at 240–44 (analyzing portion of master wheel); *Duren*, 439 U.S. at 364–66 (using venires).

***Population Percentage.*** Savage relied on census data compiled by a consulting firm to calculate that Blacks comprised 16.82% of the Eastern District population as of his 2012 motion. The District Court accepted this undisputed statistic. But the District Court should have distilled the jury-service-eligible population of Blacks in the Eastern District. *See Berghuis v. Smith*, 559 U.S. 314, 319, 323 (2010); *Howell*, 939 F.3d at 263, 266; *Ramseur v. Beyer*, 983 F.2d 1215, 1231 (3d Cir. 1992) (en banc). That jury-service-eligible statistic does not appear in the record, so despite the District Court's error, we will consider the statistic representing the full population of Blacks in the Eastern District.

***Jury Wheel Percentage.*** The District Court decided it was more appropriate to assess Blacks' representation on the qualified wheel than either the master wheel or two venires assembled for Savage's trial. In the District Court's view, the wheels would better capture any systematic exclusion. And as between the two wheels, the master wheel contained limited

58

racial data, so the District Court determined the qualified wheel reflecting juror questionnaire responses was preferable for fair-cross-section purposes. The District Court also noted the venire-based statistic was incomplete, for it did not account for two more venires empaneled while the fair-cross-section motion was pending.

On appeal, Savage does not challenge the District Court's reliance on the Eastern District's qualified wheel[33]—consisting of 8.37% black individuals,[34] A1:71—so we will rely on it as well. Precedent reinforces that the qualified wheel is a valid option for assessing a fair-cross-section claim. *See Duren*, 439 U.S. at 363–64 (stating fair-cross-section principle with respect to "jury wheels, pools of names, panels, or venires from which juries are drawn" (quoting *Taylor*, 419 U.S. at 538) (internal quotation marks omitted)); *Savage*, 547 F.2d at 214 (construing cross-section challenge as targeting qualified wheel).

***Statistical Methods.*** We work with two statistical inputs: Blacks represented 16.82% of the Eastern District population, but only 8.37% of the qualified wheel. We evaluate the significance of this shortfall by calculating two

---

[33] Specifically, the District Court considered "the 2011 Qualified Jury Wheel as of August 29, 2012." A71.

[34] Savage misattributes the 8.37% statistic to the master wheel but does not object to our use of that statistic.

59

metrics: absolute and comparative disparities.[35]  *Howell*, 939 F.3d at 268.

Absolute disparity is simply the difference between our two statistical inputs, or 8.45%.  *See Weaver*, 267 F.3d at 238. That means if we drew a venire of one hundred people from the qualified wheel, we would expect to find about eight fewer Blacks among them than if we drew one hundred people from the Eastern District at large.  *See Howell*, 939 F.3d at 268 n.7.

Comparative disparity is the quotient of the absolute disparity and the population percentage.  *Weaver*, 267 F.3d at 238.  We divide 8.45% by 16.82% for a comparative disparity of 50.24%.  Thus, Blacks were about half as likely to appear in the qualified wheel as we would expect based on their share of the Eastern District's population.  *See Howell*, 939 F.3d at 268 n.8; *Weaver*, 267 F.3d at 238 n.5.

The two methods have countervailing weaknesses when it comes to evaluating the underrepresentation of a relatively small minority: Absolute disparity tends to *under*state any discrepancy, while comparative disparity tends to *over*state it. *Weaver*, 267 F.3d at 242–43 (collecting cases).  So relying on these methods "can be misleading" when a group's population percentage is small.  *Berghuis*, 559 U.S. at 329; *see, e.g.*, *United States v. Ashley*, 54 F.3d 311, 313–14 (7th Cir. 1995) (denying fair-cross-section claim when group comprised 3% of

---

[35] We have also used a third metric, standard deviation, to assess the reliability of sample data.  *See Howell*, 939 F.3d at 266–68.  But no sampling occurred here.  Instead we rely on a statistic representing the entire qualified wheel.

relevant population but 0% of venire, due to absolute disparity of merely 3%).

Still, the Supreme Court has expressly left open the question of which method(s) courts should use to assess a fair-cross-section challenge. *Berghuis*, 559 U.S. at 329–30 (mentioning absolute disparity, comparative disparity and standard deviation). In *Duren*, the Court did not discuss any methods, but simply determined the second-prong showing was satisfied based on a side-by-side comparison of the percentages of women in the population (54%) and in the weekly venires (15%). *See* 439 U.S. at 362–66. That seemed to endorse the absolute disparity method. *See Weaver*, 267 F.3d at 242. But more recently, in *Berghuis v. Smith*, the Court observed that "neither *Duren* nor any other decision of this Court specifies the method or test courts *must* use to measure the representation of distinctive groups in jury pools." 559 U.S. at 329 (emphasis added).

This Court continues to use both absolute and comparative disparity methods, *see Howell*, 939 F.3d at 268–69, because, when applied together, one method can be reasonably expected to offset the shortcomings of the other, *see Weaver*, 267 F.3d at 241–43. Nevertheless, taking our cues from *Duren* and persuasive authority, we have shown some solicitude for absolute disparity. *See id.* at 242 (observing it "seems to be the preferred method of analysis in most cases").

We considered the interplay of absolute disparity and comparative disparity most recently in *Howell*, where Blacks comprised 10.7% of the relevant population. 939 F.3d at 266, 268. The absolute disparity of 5.83% was "lower than or

61

similar to absolute disparities in other cases where courts have found no constitutional violation, and in fact, numerous courts have noted that an absolute disparity below 10% generally will not reflect unfair and unreasonable representation." *Id.* at 268 (collecting cases). We were also persuaded by authority determining that "comparative disparities similar to the comparative disparity in [*Howell*], 54.49%, were insufficient to demonstrate unfair and unreasonable representation." *Id.* (collecting cases). Evaluating the two statistical methods together in light of "factually similar cases," we concluded that Howell had not met his burden under *Duren*'s second prong. *Id.* at 269.

Savage argues that the District Court inappropriately took "bright-line" approaches dismissive of an absolute disparity under 10% and a comparative disparity for a small population. These characterizations fail to appreciate the District Court's nuanced treatment of the absolute and comparative disparities together. With the benefit of *Howell*, we reach the same conclusion as the District Court—that the two disparities are insufficient to show unfair and unreasonable representation under *Duren*.[36]

---

[36] We easily dispose of Savage's argument that the District Court failed to account for the "practical realit[ies]" of these absolute and comparative disparities. Def. Br. 141–42. He tries to explain, in layman's terms, what the results of these methods say about underrepresentation of Blacks from the Eastern District. The only authority he cites is inapposite. *See id.* at 141 (citing *Garcia-Dorantes v. Warren*, 801 F.3d 584, 588 (6th Cir. 2015)). So we maintain our established approach.

Here, the absolute disparity of 8.45% is only slightly higher than the absolute disparities that fell short in *Howell* and other cases where a minority group's population percentage was comparable to that of Blacks within the Eastern District. *See* 939 F.3d at 268 (absolute disparity of 5.83%; population percentage of 10.7%); *United States v. Davis*, 854 F.3d 1276, 1295 (11th Cir. 2017) (absolute disparity of 6.7%; population percentage of 12.1%); *United States v. Grisham*, 63 F.3d 1074, 1078–79, 1081 (11th Cir. 1995) (absolute disparity in one instance of 4.72%; relevant population percentage of 18.31%); *United States v. Clifford*, 640 F.2d 150, 154–55 (8th Cir. 1981) (absolute disparity of 7.2%; population percentage of 15.6%); *cf. Ramseur*, 983 F.2d at 1230–32 (absolute disparity of 14.1% was "of borderline significance" in equal-protection analysis overlapping with fair-cross-section analysis; population percentage of 35.9%).

Although *Howell* looked favorably on jurisdictions that have adopted 10% thresholds, *see* 939 F.3d at 268; *see also Davis*, 854 F.3d at 1295; *Ashley*, 54 F.3d at 314; *Clifford*, 640 F.2d at 155; *United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir. 1980),[37] we are wary of ossifying that consideration through a rule when our own precedent requires us to consider comparative disparity as well.[38]

---

[37] In *Berghuis*, the Supreme Court was asked to impose a 10% threshold, but the Court declined to reach the issue. 559 U.S. at 330 n.4.

[38] Just as the Supreme Court has "not augur[ed] or authorize[d] the fashioning of detailed jury selection codes by federal courts," we faithfully maintain that "[t]he fair-cross-section

Turning to comparative disparity, the 50.24% figure here is similar to those deemed insufficient in other cases, especially *Howell*. *See* 939 F.3d at 268 (comparative disparity of 54.49%; population percentage of 10.7%); *United States v. Orange*, 447 F.3d 792, 796, 798–99 (10th Cir. 2006) (comparative disparities "rang[ing] from 38.17% to 51.22%"; population percentages ranging from 1.64% to 8.63%); *United States v. Chanthadara*, 230 F.3d 1237, 1256–57 (10th Cir. 2000) (comparative disparities of 40.89% and 58.39%; population percentages of 7.9% and 2.74%, respectively); *cf. Weaver*, 267 F.3d at 240, 243 (considering comparative disparities of 40.01% and even 72.98% to be "of questionable probative value" due to particularly small population percentages of 3.07% and 0.97%, respectively).

Savage points out that the comparative disparity here exceeds the "about 40%" disparity we called "borderline" in *Ramseur*. 983 F.2d at 1230, 1232 (population percentage of 35.9%). But even if *Ramseur* lent some support when Savage filed his briefs, it is less helpful in the wake of *Howell*. There we determined that a comparative disparity of 54.49%—higher than both *Ramseur*'s 40% and Savage's 50.24%—was not enough to tip the scales. The comparison with *Howell* is not quite open-and-shut, for the somewhat higher population percentage here (16.82% vs. *Howell*'s 10.7%) makes the comparative disparity a slightly more accurate indicator of underrepresentation. But we are unpersuaded that the statistics in Savage's case differ meaningfully.

---

principle must have much leeway in application." *Taylor*, 419 U.S. at 537–38.

Savage attempts to bolster his comparative disparity argument by briefly invoking out-of-circuit authority that sets a more modest standard for establishing unfair and unreasonable representation. In *Garcia-Dorantes v. Warren*, the Sixth Circuit decided that a habeas petitioner made the requisite showing based on a population percentage of 8.24%, an absolute disparity of 3.45%, and a comparative disparity of 42%, caused by a glitch in the electronic jury selection system. 801 F.3d 584, 590–93, 600, 603 (6th Cir. 2015). Because the disparities in Savage's case are somewhat larger, and the population percentage is somewhat higher, his case may clear the Sixth Circuit's second-prong hurdle. No matter, we must adhere to our own standard. Moreover, *Garcia-Dorantes* is distinguishable on its merits for at least two reasons.

First, the Sixth Circuit expressly prefers comparative disparity where small populations are involved because absolute disparity tends to understate discrepancies in those instances. *Id.* at 601–02. We agree with that premise, but we also recognize the tendency of comparative disparity to exaggerate discrepancies for small populations. *Weaver*, 267 F.3d at 242. For that reason, we do not give comparative disparity pride of place. *See id.* at 241–43. Second, the *Garcia-Dorantes* court relied on non-Third Circuit precedent indicating that even more modest disparities met the second-prong standard. *See* 801 F.3d at 601–02 (citing *Smith v. Berghuis*, 543 F.3d 326, 336–39 (6th Cir. 2008), *rev'd on other grounds*, 559 U.S. 314 (2010); *United States v. Rogers*, 73 F.3d 774, 776–77 (8th Cir. 1996)). We must look to Third Circuit caselaw, where Savage runs up against *Howell* and our other precedent. *Garcia-Dorantes* may inform our understanding of

65

absolute and comparative disparities, but we are certainly not bound by it.

Here, we have considered the absolute and comparative disparities together in light of the relevant authorities, *Howell* most particularly. We conclude that Savage fails to meet his burden of proving that Blacks were unfairly and unreasonably represented on the Eastern District's qualified jury wheel. Because Savage has not satisfied *Duren*'s second prong, he cannot establish a violation of his fair-cross-section rights.[39]

### 3. Alternatively, Blacks were not systematically excluded from the qualified jury wheel.

Even if Savage were able to meet *Duren*'s second prong, he would still need to show that Blacks were underrepresented on the Eastern District's qualified jury wheel due to systematic exclusion from the jury-selection process. The District Court observed no such third-prong showing. Looking again to *Howell*, we agree.

---

[39] Although "petit juries must be drawn from a source fairly representative of the community," the Supreme Court has never required "that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor*, 419 U.S. at 538. Still, we note Savage's concession elsewhere that two of twelve empaneled jury members (16.67%) were black, approximating their 16.82% share of the Eastern District population.

This is not a case where an exclusionary process is "readily apparent" as it was with the several exemptions for women in *Duren*. *Howell*, 939 F.3d at 269. Even so, a defendant may establish an exclusionary process by identifying "a large discrepancy over time such that the system must be said to bring about the underrepresentation." *Id.* (quoting *Weaver*, 267 F.3d at 244) (internal quotation marks omitted). We evaluate evidence of "the nature of the system, length of time studied, and 'efforts at reform to increase the representativeness of jury lists.'" *Id.* (quoting *Ramseur*, 983 F.2d at 1234–35). From the record in this case, we are not convinced that these factors demonstrate systematic exclusion of Blacks.

***Nature of the System.*** It goes without saying that overtly barring a racial group from jury service constitutes systematic exclusion from participation in the process.[40] Such practices are offensive not only to the Constitution but to our values as a free society. Similarly, if a jury-selection plan simply gave a racial group additional opportunities to opt out that were not provided to others, and members of that group often availed themselves of those opportunities, then the plan would be systematically excluding that group too.[41] *See Duren*, 439 U.S. at 366–67 (evaluating results of exemptions for women). Otherwise, "[a] selection process that is facially

---

[40] Such a plan would also violate the JSSA's ban on excluding potential jurors based on protected characteristics such as race. 28 U.S.C. § 1862.

[41] The absence of intentional discrimination is not dispositive of a fair-cross-section claim, *Weaver*, 267 F.3d at 244, unlike an equal-protection claim, *Duren*, 439 U.S. at 368 n.26.

neutral is unlikely to demonstrate systematic exclusion." *Howell*, 939 F.3d at 269.

Savage has not identified anything on the face of the Eastern District's jury selection process that draws racial distinctions. The process relies exclusively on voter registration lists, consistent with other facially neutral processes this Circuit has upheld. *See id.* (voter registration lists and driving records); *Weaver*, 267 F.3d at 237, 244–45 (voter registration lists); *Ramseur*, 983 F.2d at 1229, 1235 (voter registration and licensed driver lists); *Savage*, 547 F.2d at 215 (voter registration list).

We have, nevertheless, left open the possibility that drawing on voter registration lists alone might be actionable "under some circumstances" when use of those lists "over time did have the effect of sizeably underrepresenting a particular class or group on the jury venire." *Weaver*, 267 F.3d at 244–45. Accordingly, facial neutrality alone of a selection system is not dispositive.

***Length of Time Studied.*** Even if a process is facially neutral, it might consistently produce disproportionately low representation of a particular group. The *Duren* Court saw a large shortfall in women's representation in "every weekly venire for a period of nearly a year," reinforcing that exemptions for women generated their systematic exclusion from venires. 439 U.S. at 366–67. Extrapolating from *Duren*, we have suggested that the use of a voter registration list alone might still run afoul of the third prong if it produced underrepresentation "over time"—enough time to deem the underrepresentation "persistent." *Weaver*, 267 F.3d at 244–45.

68

But we have yet to determine the duration that would have to be shown to constitute "persistence." A two-year showing is not necessarily enough, *see Ramseur*, 983 F.2d at 1230, 1235, but something even shorter might suffice if the cause of the underrepresentation were as "readily identifiable" and the evidence as "similarly specific" as it was in *Duren*. *Howell*, 939 F.3d at 269–70 (eight months sufficient in *Duren*, but not six months in *Howell*).

At oral argument, Savage conceded that he had not provided the District Court with any record of underrepresentation over time. Oral Argument Tr. 185:15–186:3; *see also id.* 186:19–20 (as noted by panel). But Savage rejected the suggestion that this concession doomed his prima facie case; instead, he insisted that a showing of duration is not an "absolute requirement" to meet *Duren*'s third prong. *Id.* 186:19–187:12. *Howell* forecloses that argument by stating flatly that a study of underrepresentation "*must* have demonstrated ongoing discrimination over a sufficient period of time."[42] 939 F.3d at 269 (emphasis added).

Savage's failure to show the District Court that Blacks were underrepresented on an ongoing basis prevents him from establishing systematic exclusion. While he points to other evidence he submitted to the District Court, none of that material is availing.[43] Nor can we consider evidence Savage

---

[42] We read *Howell*'s reference to "discrimination" in context to include unfair and unreasonable representation resulting from a facially neutral system.

[43] In the District Court, Savage identified two pieces of point-in-time evidence to suggest that exclusion was systematic:

failed to present to the District Court. *See Howell*, 939 F.3d at 269 n.9. Even if we were to consider such new evidence, as we occasionally have, *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 267 n.27 (3d Cir. 2013), the evidence

---

Pennsylvania state legislation and a Pennsylvania state commission report. *See* A2:529–30.

In 2007, state legislation expanded the sources of potential jurors available to state courts, Act of July 17, 2007, P.L. 123, No. 37, § 3 (codified as amended at 42 Pa. Cons. Stat. § 4521.1), and soon made information available to federal district courts in Pennsylvania as well "[u]pon request," § 4521.1(d)(2) (2008 amendment). *See also* A2:529–30.

Also in 2007, a state commission asserted that using voter and vehicle registration lists alone frequently distorts the representation of certain groups on venires, which as a result "may not be reflective of the community-at-large, particularly the minority community." A2:530; Def. Br. 145–46 (quoting Pa. Interbranch Comm'n for Gender, Racial, & Ethnic Fairness, *Suggested Standardized Procedures for Jury Selection in Pennsylvania* (Sept. 12, 2007)) (internal quotation marks omitted).

This "snapshot" evidence fails to demonstrate systematic exclusion in 2007, much less in 2012 when Savage moved to strike the venires. Neither the state legislation nor the state report specifically addresses underrepresentation of Blacks on jury wheels or venires in federal court in the Eastern District of Pennsylvania.

70

in his opening and reply briefs is likewise unpersuasive.[44, 45]

---

[44] In his opening brief, Savage argues that the federal district courts in Pennsylvania have failed to implement a jury-selection lesson learned by their sister courts within the Third Circuit. Federal district courts in New Jersey, Delaware and the Virgin Islands supplement voter lists with at least one other source. *See* Dist. Ct. of Virgin Islands, Juror Selection Plan § E (rev. Feb. 20, 2019) (voter registration and licensed driver lists); Plan of Implementation of U.S. Dist. Ct. for Dist. of New Jersey Pursuant to Jury Selection & Service Act of 1968 § C(1)(a) (rev. Mar. 20, 2009) (voter registration lists, and if available, lists of licensed drivers, state income tax filers, and Homestead rebate application filers); Revised Plan of U.S. Dist. Ct. for Dist. of Delaware for Random Selection of Grand & Petit Jurors, as Amended § 4 (Dec. 22, 2008) (voter registration, licensed driver, and state ID card lists). Yet this contrast suffers a flaw similar to Savage's evidence in the District Court: the use of supplementary sources in other jurisdictions does not by itself demonstrate systematic exclusion of Blacks in the Eastern District of Pennsylvania.

Savage's opening brief also insists that "black people in Pennsylvania have faced significant challenges in participating in the voting process." Def. Br. 147 n.67. This "one-sentence footnote"—devoid of authority or record citation—"falls far short of meeting the requirement that an appellant raise an issue in his opening brief or else waive the issue on appeal." *United States v. Hoffecker*, 530 F.3d 137, 162 (3d Cir. 2008).

[45] Savage's reply brief relies on two additional sources in an attempt to demonstrate systematic exclusion: a law review

We need not reach *Howell*'s third factor, jury selection reform initiatives, to conclude that Savage has failed to demonstrate systematic exclusion.  His fair-cross-section challenge fails on these grounds as well.[46]

article by the Chief Judge of the Eastern District, and another article reporting results of a voter study in Pennsylvania.

Similar to the state commission discussed above, Chief Judge Juan R. Sanchez explains that a discrepancy in voter registration rates would generate underrepresentation of some groups among potential jurors.  Hon. Juan R. Sanchez, *A Plan of Our Own: The Eastern District of Pennsylvania's Initiative to Increase Jury Diversity*, 91 Temp. L. Rev. Online 1, 13 (2019).  According to the other article, a Pennsylvania state law enacted in 2012 reportedly disenfranchised voters in mostly black districts at a much higher rate.  Edward A. Purcell, Jr., *Reflections on the Fiftieth Anniversary of the March and the Speech: History, Memory, Values*, 59 N.Y. L. Sch. L. Rev. 17, 54 (2014–2015) (citing study).

Even assuming *arguendo* that this evidence is timely presented in reply, it hardly furthers Savage's argument.  These observations are unspecific to the Eastern District, and they fail to demonstrate underrepresentation over time.

[46] It is presumably the Eastern District's institutional role—not the role of Savage or the District Judge in this case—to conduct a study and make findings before deciding that voter registration lists must be supplemented with other sources.  After all, the responsibility to create a jury-selection plan consistent with § 1861, and to modify it as needed, resides firmly with the respective district court under the supervision

\* \* \*

The District Court correctly determined that Savage was unable to establish a prima facie violation of his Sixth Amendment right to a jury drawn from a fair cross-section of the community. Even if Savage had not forfeited the corresponding statutory claim, he would still be unable to establish a prima facie violation of the JSSA.

## VIII. THE DISTRICT COURT DID NOT ERR IN DENYING THE *BATSON* OBJECTION.

Savage raised a *Batson*[47] challenge to the Government's peremptory strike of Prospective Juror 185, a black female. The District Court determined that the Government's reasons for striking Number 185 were race-neutral and that the

of a reviewing panel comprised of the circuit's judicial council and the district's chief judge or designee. 28 U.S.C. § 1863(a).

[47] *Batson v. Kentucky*, 476 U.S. 79 (1986), held that a prosecutor's purposeful racial discrimination in the selection of the jury violated the state prisoner's equal protection rights under the Fourteenth Amendment. Savage asserts an analogous claim under "the implicit equal protection component of the Fifth Amendment." *United States v. Clemmons*, 892 F.2d 1153, 1155 n.1 (3d Cir. 1989) (citing *United States v. Frame*, 885 F.2d 1119, 1137 (3d Cir. 1989)). For ease of reference, we will refer to Savage's claim as a *Batson* claim. The critical inquiry for a trial court is "whether the defendant has shown purposeful discrimination." *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008)).

73

prosecution did not strike her because of race. We conclude that the District Court did not clearly err.

### A. Background

Savage raised his first *Batson* challenge when the Government exercised a peremptory challenge to Number 185,[48] the eighth black prospective juror to be considered. The prior seven had been addressed as follows:

- Number 2 was seated;
- Number 11 was excused for cause;

---

[48] Prior to jury selection, the Government filed a motion seeking an anonymous jury panel and heightened jury security. The Government asked to shield from the parties, their attorneys and the public the prospective jurors' names, addresses and employers. The request was based on the "history of violence and intimidation" and a view that such safeguards were "necessary to protect jurors from the threat of danger posed by Defendants." A1:18. The District Court granted the motion, ordered an anonymous jury, and required the shielding of each prospective juror's name, address and place of employment. The District Court noted these same measures had been taken in Savage's 2005 federal jury trial and that, while detained in the Federal Detention Center in Philadelphia, Savage had "plotted to obtain the addresses and telephone numbers of the jurors" serving in that trial. A1:20. In addition, the U.S. Marshals Service was ordered to transport the jurors each day from an undisclosed location to court and back to that location at the end of the day.

- Number 20 was stricken by the Government's peremptory challenge;
- Number 79 was excused for hardship;
- Number 108 was excused for cause;
- Number 110 was excused for "anonymity reasons," A34:18041, which are not contained in the record; and
- Number 118 was excused for hardship.[49]

Number 185, who was age thirty-one, lived in North Philadelphia with her seventy-eight-year-old grandmother, her eleven-year-old daughter and her brother. According to her jury questionnaire, she was an unemployed home health aide who planned to return to college in the fall semester to pursue a nursing degree. During voir dire, she stated that she was actively seeking part-time, evening work that would run from 7:00 to 11:00 p.m. She did not believe that such part-time work would interfere with her performance as a juror. When asked her general view of the death penalty, she replied that it "depend[ed] on the circumstances" and that it isn't "fair to judge someone for the death penalty without knowing the circumstances." A34:18019. The prosecutor described her answers to questions on the subject as "straight down the middle." A34:18019.

But Number 185 resided in North Philadelphia, and the Savage prosecution involved drug transactions, violent crimes

---

[49] The circumstances supporting the excusal of these six black prospective jurors, including the peremptory strike of Number 20, have been gleaned from the arguments made at the time of the *Batson* challenge at issue here.

and murders that occurred in that part of the city. The evidence to be presented at trial could be expected to involve frequent references to locations within North Philadelphia. Yet when asked by the prosecutor if she had any concerns about being on the jury, she replied: "No."

Neither side moved to strike Number 185 for cause. The prosecution did, however, exercise a peremptory strike. In response, defendant Merritt raised a *Batson* challenge, which was joined by Savage, Northington and Kidada. The prosecutor responded to the challenge this way:

> [F]irst of all, there's been no prima facie case made in this case. The government has, of course, seated one African-American juror. There's no pattern of racial discrimination.
>
> Secondly, as to this juror, in an abundance of caution I would like to proffer our reasons for striking this juror; the primary reason being that she is unemployed and as a result she will be in court four days a week, all day long, would be unable to seek work during that time.
>
> She would also not be able to get work during that time and even if she were to obtain night shift work as she said she was seeking, that would take her working all day long in court, and then until 11 o'clock on the night shift. That's simply not conducive to being able to serve and to pay attention despite her statements that she would try to do that.

76

So that is the first reason.

The second reason is that in this case, especially with all of the events and all of the threats and the way this is from North Philadelphia, the fact that she lives in North Philadelphia is troublesome. There are a lot of events that occurred, and even though these specific areas did not give this juror cause for concern, it still concerns the government.

There are potentially 200, 250 witnesses in this case, many of them are going to be from North Philadelphia, who would testify to events that happened there.

This is a case that involves violence, witness intimidation. There's even a statement in the Court, intercepted communications from Mr. Savage indicating that he wanted to go after a juror. It's a big concern to the government that we would have a juror specifically from North Philadelphia.

A34:18030–31.

Northington responded that the Government had not taken issue with seating Number 149—a white male—the day before, even though he would have been working seventy to eighty hours a week while serving as a juror and working in the

business that he partially owned.[50]  Northington also pushed back on the Government's second reason for striking Number 185, pointing out that the crimes in this case had actually been committed in various parts of the city.  Counsel added that the Government had "already exercised strikes on minorities." A34:18033.  The District Court interjected that some of the strikes of minorities had been made by the defense.  Merritt's

---

[50] Number 149 testified that he was part-owner of a business and the "sole person in the organization that deals with contracts for new work."  A34:17975.  He expressed his belief it would be a hardship to serve, but thought it was "doable." *Id.*  When questioned further by Savage's counsel, the prospective juror mentioned his two-hour commute into the city and stated that jury service would be "extremely difficult." A34:17982.  Yet Number 149 acknowledged he was used to working long hours and believed he could be a fair and impartial juror.  The Government saw no need to strike for cause.  But Savage moved to strike for cause based on hardship and because he believed Number 149 was "substantially impaired from considering in a meaningful way mitigation circumstances based on this strong sense of accountability." A34:18005.  In short, Savage considered Number 149 as moving "the needle towards the death penalty."  A34:18006. The District Court rejected the request to excuse for hardship, highlighting the prospective juror's "willingness to be fair and impartial."  *Id.*  When Savage's counsel argued that this prospective juror would be unable to give full attention to the case, the District Court disagreed.  After his unsuccessful bid to excuse Number 149 for cause, Merritt exercised a peremptory strike.

counsel then noted that residents of North Philadelphia are primarily black, with Savage's counsel then speculating that the Government was "disappointed they didn't get [Number 185] to say something" that would have been a basis to excuse her for cause. A34:18036.

The District Court took the *Batson* challenge under advisement and commenced the voir dire of the last prospective juror of the day. That person was excused, and the parties returned to the subject of the *Batson* challenge. Kidada's counsel recounted that there had been eight black prospective jurors called and summarized the status of each.[51] She acknowledged that

> we don't have a long laundry list of individuals to show that there is a pattern, I think the case law talks about a pattern within the confines of the number of minorities that you actually bring into the courtroom and actually interview as we have done here. Strictly with regard to race, our position is that the government has peremptory challenges of two of these African-Americans, and that if you expand on that, there was one

---

[51] As noted previously, Number 2 had been seated, Number 11 was stricken for cause, Number 20 was removed by the Government's peremptory strike, Number 79 was excused for hardship, Number 108 was removed for cause, Number 110 was excused due to anonymity concerns, and Number 118 was excused for hardship. Number 185 was the eighth black prospective juror interviewed.

79

Hispanic that the government exercised a peremptory challenge today.[52]

A34:18042.

Savage argued that excluding prospective jurors simply because they reside in North Philadelphia—especially when they have not expressed concern about serving on the jury—was improper. He asserted that the prosecution should have moved to exclude generally on that basis prior to voir dire if they were seeking such a limit on who from Philadelphia County could serve on the jury. North Philadelphia, the defendants argued, comprises a vast area and that striking prospective jurors because they come from that part of the city is tantamount to "striking people on the basis of their race." A34:18049.

The prosecution repeated that its primary concern was Number 185's unemployment and that it did not "want unemployed people on the jury as a rule. It doesn't make any difference whether they are white, black or otherwise."[53] A34:18049. The Government noted that it was not challenging the prospective juror for cause, but using a peremptory strike. As to Number 185's residing in North Philadelphia, the prosecutor stated that this was, for him, reason for having a "residual concern" about her. *Id.* at 18051. Finally, the

---

[52] The record does not indicate which prospective jurors were Hispanic and the extent to which they were challenged for cause or the subject of a peremptory strike.

[53] The prosecution also offered that it struck an unemployed white female, which Savage does not dispute.

Government emphasized that this prosecution was not only about drug dealing but also included episodes of violence and witness intimidation, pointing to Savage's cellblock comments about "going after jurors." *Id.* at 18052.

The District Court ruled that the prosecution provided "race neutral reasons." A34:18055. The judge declared:

> In looking at the situation, counsel has given me information with regard to what has transpired during the course of the jury selection that's helpful information. We do have one African-American juror who was already selected to sit in this case. There was one other African-American juror that was excused as a result of a peremptory challenge by the government. We now have this juror who is African-American, and the government has exercised a peremptory challenge. It does not appear to me that the government is exercising its challenges, at least at this juncture, based upon race. As I said a minute ago, the reasons given by the government are race neutral. It's not unusual for an attorney, whether it be the defense or a prosecutor, to be concerned about a juror who may live in an area where the crime scene is by and large located.
>
> With regard to the juror's hardship, there is no question but that having her here and looking for a job, and if she finds a job, working almost around the clock would be a difficult situation.

81

> Under the circumstances, I'm going to deny the Batson challenge. I think that the government has not exercised its challenge for racial reasons.

A34:18055–56. In response to a question from Northington's counsel, the District Court acknowledged the broad expanse of North Philadelphia and gave leave to the defense to ask additional questions during voir dire of other prospective jurors from North Philadelphia "without getting into exactly where the juror lives."[54] *Id.* at 18057.

---

[54] Subsequently, Savage raised a *Batson* challenge to the exclusion of Number 364, a forty-six-year-old black woman. The District Court recounted the following:

> The Government offered the following reasons for the strike. First of all, that the juror has indicated that she does not support the death penalty. On the jury questionnaire she indicated that she was opposed to the death penalty and that it should be used only in extreme cases. The Government also indicated that they were concerned that the juror's son had been involved in a shooting incident. He was shot while sitting in a car and that this was similar to a matter that is before this court, the Tybius Flowers shooting. The Government points out that the juror became very emotional during the questioning with regard to that incident, actually started crying.

82

The voir dire process resulted in seventy-eight qualified prospective jurors who were neither removed for cause nor for hardship. Of these seventy-eight, eleven were black. After the parties exercised their peremptory strikes, the jury was comprised of ten white venirepersons, two black venirepersons, five white alternates, and one black alternate. The jury went on to find Savage guilty as charged.

Post-trial, Northington filed a timely motion for a new trial, which Savage joined. The motion asserted, *inter alia*, that the District Court erred by rejecting the *Batson* challenges raised by the defense. Judge Surrick noted that the Government's reasons for striking Number 185 were: (1) that "she was unemployed, was actively seeking a job, and was looking for a position where she could work night shifts"; and (2) that "the Government had concerns about the juror's

> The juror also indicated that the crime had not been solved and that she thought the police were indifferent in dealing with it. The Government also indicated that the juror's boyfriend was arrested on an assault charge and the juror visited that boyfriend in prison.
>
> The Government was concerned about all of these things and these are the reasons why they exercised the peremptory challenge. These reasons are all race neutral and they are credible.

A34:18073–74. Savage does not challenge the District Court's ruling as to this prospective juror on appeal.

83

residency—North Philadelphia—in light of the circumstances of this case." A1:158. The judge upheld his earlier conclusion that the strike had been for legitimate race-neutral reasons. He explained that "[b]ased upon all of the circumstances, including the fact that, prior to this strike, an African-American juror had already been empaneled, and taking into account the prosecutor's demeanor and credibility, we are satisfied that the Government's reason for striking the juror was not pretextual and not in any way motivated by a discriminatory intent." A1:159.

## B. Applicable Law

In *Batson v. Kentucky*, the Supreme Court explained that "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." 476 U.S. at 86. When determining whether there has been purposeful discrimination in the striking of a prospective juror, the district court engages in a three-step process:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

84

*Snyder*, 552 U.S. at 476–77 (citations and internal quotation marks omitted).  The *Snyder* Court emphasized that this analysis requires consideration of "all of the circumstances that bear upon the issue of racial animosity."  *Id.* at 478.

In *Hernandez v. New York*, the Supreme Court instructed that when the prosecution offers to explain its reasons for exercising its peremptory strike "without any prompting or inquiry from the trial court," "the preliminary issue [at step one] of whether the defendant had made a prima facie showing becomes moot."  500 U.S. 352, 359 (1991).  "The second step of this process does not demand an explanation that is persuasive, or even plausible."  *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) (per curiam).  Rather, it requires

> [a] neutral explanation . . . mean[ing] an explanation based on something other than the race of the juror.  At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

*Hernandez*, 500 U.S. at 360.

The third step requires the trial court "to determine if the defendant has established purposeful discrimination."  *Batson*, 476 U.S. at 98.  "It is not until the *third* step that the persuasiveness of the justification becomes relevant."  *Purkett*, 514 U.S. at 768.  "Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, . . . and the best

85

evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge." *Snyder*, 552 U.S. at 477 (internal quotation marks, bracket and citations omitted). This step requires the trial judge to decide "whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race. The ultimate inquiry is whether the [government] was 'motivated in substantial part by discriminatory intent.'" *Flowers*, 139 S. Ct. at 2244 (quoting *Foster*, 136 S. Ct. at 1754).

The "question of discriminatory intent [at step three] represents a finding of fact of the sort accorded great deference on appeal." *Hernandez*, 500 U.S. at 364. Because this finding will "largely turn on . . . credibility," *id.*, it is reviewed for clear error, *id.* at 369. *See also Snyder*, 552 U.S. at 477 ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous."). As the Supreme Court has instructed, "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Hernandez*, 500 U.S. at 369 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).

In ruling upon a *Batson* objection, the circumstances warranting consideration may include statistical evidence relating to the government's use of peremptory strikes. *Miller-El v. Dretke*, 545 U.S. 231, 240–41 (2005). But side-by-side comparisons can be more powerful than statistics. *Id.* at 241. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Id.*

86

### C. Savage's Claims of Error

Against this legal backdrop, we turn to the substance of Savage's *Batson* challenge. Savage agrees there's no need to address the first step in the analysis as the prosecution offered its reasons for exercising the peremptory strike. *See Hernandez*, 500 U.S. at 359. Nor does Savage contend that the Government failed to offer race-neutral reasons for striking Number 185: the prospective juror's unemployment and the safety concerns associated with her residence are both facially neutral.[55] Savage tacitly acknowledges as much in that he targets the District Court's engagement with the third step of the *Batson* analysis: its determination that there was no purposeful discrimination. *See* Def. Br. 155–56. Savage contends that the nondiscrimination finding was clearly

---

[55] Of course, the defense did assert during voir dire that striking Number 185 because she lived in North Philadelphia—an area that was in their view "predominantly" black—was simply a proxy for "striking people on the basis of their race." A34:18034; 18049. But the record here is devoid of evidence concerning the racial composition of North Philadelphia. Moreover, the Government did not simply identify where Number 185 resided as the reason for striking her. It noted its concern about safety and security given the circumstances of the case that warranted the empanelment of anonymous juries in 2005 and again in this prosecution. Considering the totality of the Government's second reason for exercising a peremptory strike, we see nothing inherently suggestive of racial discrimination.

87

erroneous because the District Court procedurally and substantively erred.

## 1. Procedural Error in the District Court's Analysis

The Supreme Court has reiterated that trial courts must consider "all of the circumstances that bear upon the issue of racial animosity" in ruling on a *Batson* objection. *Foster*, 136 S. Ct. at 1748 (quoting *Snyder*, 552 U.S. at 478); *see also Miller-El*, 545 U.S. at 239. Savage contends that the District Court failed to heed this instruction and engage with the evidence before it.

We cannot conclude that the District Court failed to consider all of the circumstances. We have "note[d] that 'a judge considering a *Batson* challenge is not required to comment explicitly on every piece of evidence in the record.'" *Hardcastle v. Horn*, 368 F.3d 246, 259 (3d Cir. 2004) (quoting *Riley v. Taylor*, 277 F.3d 261, 290 (3d Cir. 2001)). Here, the District Court heard argument from counsel for all the parties, took the objection under advisement, entertained further argument from the parties, was very familiar with the security issues surrounding this prosecution, and had the opportunity to observe the demeanor of counsel and all prospective jurors before ruling on any challenges.

## 2. Substantive Challenges to the District Court's Ruling

Savage first faults the District Court for considering the fact that a black juror had already been seated. Savage relies

88

on *Sanchez v. Roden*, 753 F.3d 279, 299 (1st Cir. 2014), in arguing that this observation by the judge constituted error. In *Sanchez*, the First Circuit reviewed a ruling in a § 2254 petition and concluded that the Massachusetts Appeals Court had unreasonably applied *Batson* at step one by acknowledging the "presence of other black people on the jury." *Id.* The First Circuit explained that "by focusing exclusively" on the fact that some black jurors had already been seated, the court "sent the unmistakable message that a prosecutor can get away with discriminating against some African Americans . . . so long as a prosecutor does not discriminate against all such individuals." *Id.* (emphasis omitted). Because the prosecution had not been required to articulate a race-neutral explanation for its challenge, the First Circuit vacated the judgment and remanded for further proceedings.

Savage's reliance on *Sanchez* is misplaced. It is one thing for a court to "focus[] exclusively" at step one on the fact that some black individuals have been seated on a jury, *Id.* Such a narrow focus would be error. But a court may—indeed should—consider all the circumstances at step three, including the status of black prospective jurors who were not excused for cause or hardship. Here, it was Kidada who, in responding to the Government's reasons for exercising its strike, initially reviewed the status of the seven black prospective jurors called prior to Number 185. And contrary to Savage's assertion, the District Court recited more than the mere fact that one black juror had been seated. In ruling, the judge recounted the status of the three black individuals who had not been excused (Numbers 2, 20 and 185), and then considered the reasons proffered by the Government for striking Number 185. The

89

District Court's mentioning that Number 2, a black person, had been seated on the jury was insufficient, by itself, to constitute error in the ruling as to Number 185.

### a. Number 149 and Number 185 are not similarly situated.

Savage asserts that the District Court "failed to consider or address the contrast between the Government's treatment of Jurors 149 and 185."[56]   Def. Br. 160.   In Savage's view,

[56] In a footnote, Savage submits that the Government's acceptance of other white prospective jurors with more pressing hardships further demonstrates that its reasons for striking Number 185 were pretextual.  Def. Br. 161 n.71.  He specifically refers to Numbers 315, 551 and 734.  But these prospective jurors were not comparable.  Savage cites the "extreme inconvenience" of Number 315's unavailability to her children.  *Id.* (citing A33:17562).  Number 315, however, was a working mother with two children, and the concern she expressed was based in part on the possibility that the jury would be sequestered.  Number 551, Savage contends, had a more pressing hardship than Number 185 as his "employer could not find a replacement."  Def. Br. 161 n.71.  But the concern expressed about a replacement was assuaged when Number 551 realized that finding a replacement was his employer's concern and not his.  He therefore conceded he did not have a personal hardship that would affect juror service.  As to Number 734, Savage cites her husband's upcoming surgery and her caregiver responsibility for her eighty-eight-year-old mother as hardships that were greater than Number 185's extended day.   The transcript of voir dire reveals,

90

Number 149, a white male, and Number 185, a black female, were similarly situated.  If both served, he claimed, each would be subject to extremely long days that might interfere with his or her service on the jury.  While the Government did not object to Number 149, it did move to strike Number 185.

*Miller-El* teaches that "side-by-side comparisons" can be "powerful" evidence "tending to prove purposeful discrimination."  545 U.S. at 241.  Yet Savage correctly notes that the District Court did not discuss Number 149.  We do not consider this an oversight.  Number 149 had been voir dired and challenged by the defense just the day before, so the District Court no doubt recalled what that voir dire had revealed.  While there is some congruence between Numbers 149 and 185 in that each would have been required to serve a long day (yet only if Number 185 was able to obtain employment) there were also significant differences.  Notably, Number 149 was not unemployed.  In fact, he was a business owner whose track record included regularly "work[ing] long hours."  A34:18003.  Number 185 had no such track record, so her capacity and stamina for serving both on the jury and in a part-time job were unknown.  Further, the Government had no

_____

however, that Number 734's caregiver responsibility was not for her mother, but her mother-in-law.  Moreover, that caregiver responsibility was simply companionship; her mother-in-law would not be in physical danger if she were to serve on the jury.  And although her husband's surgery would require him to temporarily be in a sling, Number 734 stated that he could "take care of himself," A34:18129, and that after the first four weeks of his recovery, her husband could then assist with his mother's care.

91

reason to be concerned for Number 149's safety based on his area of residence.  Given the differences between Number 149 and Number 185, the side-by-side comparison does not support Savage's claim.

### b. The Government's concern about Number 185's safety was not baseless.

Savage also contends that the Government's express concern for Number 185's safety because she resided in North Philadelphia was baseless.  We acknowledge, as we must, that Number 185 denied knowing any of the prospective witnesses named on eleven pages of the jury questionnaire, and that she did not express concern about serving on the jury.  Yet her responses do not themselves render the Government's stated safety concerns without merit.  The indictment charged Savage and others with participating in a RICO conspiracy that involved murders, drug trafficking and arson, not to mention tampering with and retaliating against a witness.  The District Court had already demonstrated its safety concerns by directing that the jury would serve anonymously and that special security measures were to be taken in transporting jurors to and from court.  And the District Court noted that an anonymous jury had been seated in Savage's 2005 trial.  There was also the prosecution's stark reminder that Savage had threatened to "go[] after jurors."  A34:18052.

Nor can we ignore that Number 185's stated unfamiliarity with those named in the jury questionnaire did not rule out that she may have been unwittingly acquainted with any one of them based on physical appearance from

92

having previously seen the person somewhere or even knowing of a person by nickname. Based on the foregoing, we reject Savage's contention that the Government's express concern regarding Number 185's North Philadelphia residence lacked factual support.

### c. Statistical evidence does not compel a conclusion that the Government's peremptory strike was racially motivated.

Savage's final argument in support of his *Batson* claim marshals statistical evidence that he claims demonstrates that the Government's strike was motivated by race.[57] Savage notes that of the seventy-eight prospective jurors in the venire, the Government exercised twenty-two peremptory strikes, and that six of them were against black prospective jurors. This

---

[57] He asserts that statistical evidence was presented to, but ignored by, the District Court when the defense raised its final *Batson* challenge to Number 364. At that time, Savage asserted that there was an "even greater pattern" of discrimination, A34:18065, as the Government had exercised twelve peremptory strikes and "50 percent of them have been against minorities, four African-Americans and two Hispanics." A34:18061. Given the substance of Number 364's voir dire examination and her emotional response to the questioning about her son, the District Court was not obliged to comment on all of the evidence before ruling from the bench. There were several patently race-neutral grounds cited by the prosecution for striking Number 364, all of which the District Court found credible.

yields a 27.3% strike rate against Blacks that "far exceeded [their] representation . . . in the venire as a whole (9.67%) as well as in the master jury wheel for the Eastern District of Pennsylvania (8.37%)." Def. Br. 165.

Savage also points out that the Government struck six of the eleven black prospective jurors, which equates to a strike rate of 54.5%. In contrast, the Government struck only sixteen of the sixty-seven non-black prospective jurors, yielding a 23.9% strike rate.

Unsurprisingly, the Government contends that these statistics are not a basis for overturning the District Court's *Batson* findings. Rather than address the total number of Blacks in the venire, the Government focuses on the number of Blacks at the time of the second *Batson* challenge to Number 364, when there were forty-three individuals in the venire, six of whom were black. The Government highlights that it had accepted three Blacks: Number 2, who was the first black juror seated on the jury, and two others who, ironically, the defense had struck.

We acknowledge that there is more than one way to analyze the racial statistics presented in this case. Most instructive for us are the numbers considered by the Supreme Court in its more recent *Batson* cases, *Miller-El*, *Foster* and *Flowers*—the total number of Blacks in the venire and the number of strikes of those black venire members.

In *Miller-El*, there were eleven Blacks in the venire. 545 U.S. at 240, 265. The government struck ten of the eleven

94

black prospective jurors, which constitutes a "strike rate"[58] of 91%. *Id.* at 240–41. These strikes were made "in a selection process replete with evidence that the prosecutors were selecting and rejecting potential jurors because of race" by "shuffl[ing]" the jury[59] and using "disparate lines of questioning . . . meant to induce qualms about applying the death penalty (and thus explain a strike)," *id.* at 265, as well as phrasing questions in a way "meant to induce a disqualifying answer," *id.* at 266. Given these circumstances, the Court rejected the state's argument that it had not stricken two of the prospective jurors because they were black. *Id.*

In *Foster*, stark numbers also contributed to the Court's conclusion that the prosecution had violated *Batson*. The venire's composition in that case included four Blacks. 136 S. Ct. at 1743. The government struck each of them, yielding a 100% strike rate for the black prospective jurors. *Id.* at 1742–43. Those numbers were accompanied by shifting explanations for why the strikes were made, misrepresentations about the record, and a copy of the prosecutor's annotated file identifying not only which venirepersons were black but also focusing on race in several other respects with an eye to seating an all-white jury. *Id.* at 1744–45, 1754. The Supreme Court commented that the

---

[58] *Miller-El* does not utilize the term "strike rate." But it did compute the percentage of Blacks in the venire that were stricken by the government. For that reason, we use the term "strike rate."

[59] *Miller-El* explained that jury shuffling is a Texas procedure that allows either party to rearrange the order in which the venire is seated and questioned. 545 U.S. at 253.

"sheer number of references to race in that file is arresting."
*Id.* at 1755.

Most recently, the Supreme Court vacated the judgment of the Mississippi Supreme Court in *Flowers* after concluding that the evidence demonstrated the state court had committed clear error in rejecting the defendant's *Batson* challenge. 139 S. Ct. at 2251. The venire in Flowers's sixth trial included six Blacks. The state moved to strike five of the six Blacks in the venire, yielding a strike rate of 83%. *Id.* at 2237. The Supreme Court also considered the state's repeated use of peremptory strikes in all of Flowers's six trials, cumulatively removing forty-one of forty-two Blacks, an overall strike rate of 97.6%.[60] *Id.* at 2235–36. This usage of strikes against black venirepersons was consistent with other evidence of discriminatory strikes. Together, all the evidence convinced the Court that striking one of the black prospective jurors had been "motivated in substantial part by discriminatory intent." *Id.* at 2248. The Court "reiterate[d]" that it did not "decide that any one . . . fact[] alone would require reversal." *Id.* at 2251. Rather, it emphasized that "all of the relevant facts and circumstances taken together establish that the trial court at Flowers's sixth trial committed clear error" in denying the defendant's *Batson* objection. *Id.*

Here, contrary to Savage's characterization, the numbers are not comparable. There were eleven Blacks among the prospective jurors. The Government's challenging of six of the eleven established a 54.5% strike rate. That percentage

[60] At times, the state used all, or almost all, of its peremptory strikes against Blacks. 139 S. Ct. at 2236–37.

is well below the strike rates of 91% in *Miller-El*, 100% in *Foster*, and 83% in *Flowers*.

Moreover, the 54.5% rate in this case is not nearly as powerful as Savage contends because we may take into account the seating of the black alternate. *See Bond v. Beard*, 539 F.3d 256, 269–70 (3d Cir. 2008) (considering black alternates in determining whether the government's strikes raised an inference of discrimination). Accordingly, there were twelve Blacks in the venire thereby yielding a strike rate of 50%. That strike rate, by itself, hardly supports Savage's *Batson* claim.

\* \* \*

In sum, we conclude that Savage has failed to establish that the District Court clearly erred when it found that the Government's strike of Number 185 was not motivated by race. At the time of this *Batson* challenge, the District Court made a finding that the "government ha[d] not exercised its challenge for racial reasons." A34:18056. Later, in ruling on post-trial motions, the District Court expressly took "into account the prosecutor's demeanor and credibility" and found that the Government was not "motivated by a discriminatory intent." A1:159. These factual findings are entitled to "great deference." *Hernandez*, 500 U.S. at 364. We will not disturb them.

97

**IX. THE DISTRICT COURT DID NOT PLAINLY ERR IN INSTRUCTING THE JURY ON THE DOCTRINE OF TRANSFERRED INTENT.**

This claim concerns the 2004 firebombing of the Coleman house. Recall that Coleman's mother, Marcella, was in the home with his infant son (Damir Jenkins), his twelve-year-old nephew (Tajh Porchea), his fifteen-year-old nephew (Sean Rodriguez), his cousin (Tameka Nash) and her ten-year-old daughter (Khadijah Nash). All six individuals—two adults and four children—perished in the fire. Savage was charged with the six murders as violent crimes in aid of racketeering ("VICAR") under 18 U.S.C. § 1959.

In his jury charge, Judge Surrick explained the doctrine of transferred intent. That instruction was given to assist the jury in deciding whether, if it found that Savage had a specific intent to kill Marcella Coleman, such intent could be "transferred" to the five other victims to meet the intent element of the six VICAR murder charges. Specifically, the District Court instructed:

> Now, in determining whether a defendant, in this instance Kaboni Savage, Robert Merritt, Kidada Savage, committed the murders of the Nash family as noted in Counts 10 through 15, you may find that any such crime was committed in aid of racketeering by applying the following principle of transferred intent. The doctrine of transferred intent and its additional application says that if a defendant shoots one person with the intent to kill and inadvertently kills another,

98

you are permitted to attribute or transfer the defendant's intent to kill to the second person. Now, as applied in this case, ladies and gentlemen, that principle says that if a defendant planned to commit a murder to maintain or increase his or her position in an enterprise and in attempting to carry out that plan committed a murder of another person, *the intent of the planned murder may be transferred to the other murders*. What this means for your purposes, ladies and gentlemen, is that the government may prove the fourth and fifth elements of the offense charged in Counts 11 through 15 by proving that on October 9, 2004, Defendants Kaboni Savage, Robert Merritt and Kidada Savage *specifically intended to cause the death of Marcella Coleman* for the purpose of maintaining or increasing their position in the enterprise, and then willfully set the fire that killed Tameka Nash, Sean Anthony Rodriguez, Tajh Porchea, Khadijah Nash and Damir Jenkins, as well as Marcella Coleman. *So the intent to kill Marcella Coleman is transferred to the other victims.*

A29:15197–99 (emphasis added).

Savage claims this instruction incorrectly defined the doctrine of transferred intent and thereby impermissibly "gave jurors permission to 'transfer'—or more accurately, to multiply—Savage's alleged intent that Lamont would kill Marcella Coleman . . . to the other arson victims, including the

99

children."[61]   Def. Br. 167.   In addition, because a similar instruction was given at sentencing, Savage claims the instruction "infected Savage's capital-sentencing hearing, producing an unreliable death verdict."   *Id.*   We are not persuaded.

### A. Standard of Review

A defendant claiming error in jury instructions must inform the District Court of any specific objection and specify the grounds for it.   *See Gov't of Virgin Islands v. Cruz*, 478 F.2d 712, 718 (3d Cir. 1973); Fed. R. Crim. P. 30(d), 52(b). Savage did not object on the trial record to the transferred intent instruction, despite the District Court's reminders to counsel that they should do so.   *See* A29:15225 ("All right, counsel, any additions or corrections to the Court's charge?"); A29:15227 (In response to a reference to a discussion during the charge conference, the District Court stated: "You better be more specific because we were in chambers, and it's not on the record.").

Because the claimed error is unpreserved, we review for plain error.   *Jones v. United States*, 527 U.S. 373, 388 (1999)

---

[61] Although Savage seems to imply that there was insufficient evidence to support the murder convictions as to the arson victims other than Marcella Coleman, his claim challenges only the District Court's jury instruction on transferred intent. Savage has therefore forfeited a sufficiency of the evidence claim.  *See United States v. Baxter*, 951 F.3d 128, 136 (3d Cir. 2020) (declining to consider forfeited claim), *petition for cert. filed*, No. 20-5133 (July 14, 2020).

(if a capital defendant fails to preserve an objection to a jury instruction, plain error review applies).  To prevail on plain error review, Savage must establish: (1) there was an error; (2) it was plain; (3) it affected his substantial rights (*i.e.*, it affected the outcome of the proceeding); and (4) it affected the fairness, integrity or public reputation of the proceeding.  *United States v. Olano*, 507 U.S. 725, 733–36 (1993).  An error is plain if it is "obvious" or "clear under current law."  *United States v. Vazquez*, 271 F.3d 93, 100 (3d Cir. 2001) (en banc) (quoting *Olano*, 507 U.S. at 734).

## B.  The "generic" doctrine of transferred intent in the context of VICAR murder

The VICAR statute, 18 U.S.C. § 1959, "was enacted by Congress in 1984 as a violent crime corollary to the RICO statute."  *United States v. Jones*, 566 F.3d 353, 361 (3d Cir. 2009).  It proscribes certain violent crimes—including murder—when committed, *inter alia*, to maintain or increase one's position in a racketeering enterprise.[62]  Although VICAR

---

[62] Section 1959(a)(1) provides:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or

101

expressly applies to murder, it does not define it. *See* 18 U.S.C. § 1959. Savage argues that the absence of a definition indicates Congress's desire to employ a "generic" definition of murder—and more specifically, transferred intent—for VICAR purposes. He suggests that the source for a generic definition should be "indications of national legal consensus" such as "the Model Penal Code, learned treatises, and other sources that show how the majority of jurisdictions defined the crime." Def. Br. 180.

Our Court has not had occasion to decide whether VICAR requires an instruction specific to state law, or if a "generic" definition is preferable. Some jurisdictions view generic definitions as appropriate in RICO cases. *See United States v. Kehoe*, 310 F.3d 579, 588 (8th Cir. 2002) ("RICO's reference to state crimes identifies the type of generic conduct which will serve as a RICO predicate and satisfy RICO's pattern requirement." (internal quotation marks omitted)); *United States v. Tolliver*, 61 F.3d 1189, 1208–09 (5th Cir. 1995) ("[F]ederal courts typically require only a 'generic' definition of the underlying state crime in a RICO charge."), *vacated on other grounds by Moore v. United States*, 519 U.S. 802 (1996).

---

threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—for murder, by death or life imprisonment, or a fine under this title, or both.

102

But the VICAR statute requires a predicate act that is chargeable under state or federal law. *See* 18 U.S.C. § 1959 (prohibiting certain predicate acts in "violation of the laws of any State or the United States"). So as the Second Circuit has observed, trial courts frequently instruct juries on the elements of the specific state or federal offense that is charged as the predicate act rather than outlining a "generic" version of the crime. *United States v. Carrillo*, 229 F.3d 177, 184–85 (2d Cir. 2000) (suggesting that the "best practice" is to instruct juries on the elements of the state offenses that are charged as predicate acts because, even if theoretically permissible, instruction on a "generic" offense risks prejudice to the defendant and possible reversal on appeal); *see also United States v. Adkins*, 883 F.3d 1207, 1211 (9th Cir. 2018) ("[C]ourts, in certain circumstances, should instruct on the state definition or otherwise risk prejudice to the defendant."). Notably, in Savage's case, the District Court's instruction on the elements of "murder" tracked Pennsylvania law because murder under Pennsylvania law was the predicate act charged, and Savage does not claim that the District Court erred by defining the predicate offense of murder under Pennsylvania law rather than "generically." *See* A29:15194 ("[I]n order for the state offense of murder to be considered as a racketeering act, the government must prove beyond a reasonable doubt that a member of the enterprise committed murder as defined by the Commonwealth of Pennsylvania."); *see also* A29:15172–73 (defining murder under Pennsylvania law for RICO purposes).

For purposes of Savage's transferred intent claim, we need not choose between Pennsylvania's state law definition and a "generic" definition. That is because the doctrine is

103

essentially the same regardless of whether it is Pennsylvania's definition or a generic version. As the Supreme Court instructed in *Taylor v. United States*, a "generic" definition usually refers to the common law meaning of a term, unless contemporary usage and relevant statutes indicate a divergence from that definition. 495 U.S. 575, 592–93 (1990). Pennsylvania's doctrine of transferred intent is rooted in the common law and is consistent with the formulation adopted in the Model Penal Code. *See* 18 Pa. Cons. Stat. Ann. § 303(b);[63]

---

[63] Section 303(b) codifies the doctrine of transferred intent. It provides:

> When intentionally or knowingly causing a particular result is an element of an offense, the element is not established if the actual result is not within the intent or the contemplation of the actor unless:
> (1) the actual result differs from that designed or contemplated as the case may be, only in the respect that a different person or different property is injured or affected or that the injury or harm designed or contemplated would have been more serious or more extensive than that caused; or
> (2) the actual result involves the same kind of injury or harm as that designed or contemplated and is not too remote or accidental in its occurrence to have a bearing on the actor's liability or on the gravity of his offense.

104

*Commonwealth v. Gaynor*, 648 A.2d 295, 298 (Pa. 1994) (Pennsylvania adopted the Model Penal Code's version of transferred intent); *Commonwealth v. Gibbs*, 626 A.2d 133, 138 (Pa. 1993) ("The 'transferred intent' theory provides that if the intent to commit a crime exists, this intent can be transferred for the purpose of finding the intent element for another crime."); *see also, e.g.*, *Commonwealth ex rel. McCant v. Rundle*, 211 A.2d 460, 461 (Pa. 1965); *Commonwealth v. Johnson*, 68 A. 53, 53 (Pa. 1907); *Commonwealth v. Eisenhower*, 37 A. 521, 521 (Pa. 1897). We can discern no difference between a generic version and Pennsylvania's articulation of the doctrine.

The parties discuss the propriety of the District Court's transferred intent instruction by considering cases from numerous jurisdictions, many of which rely on the common law doctrine, to establish that there is a consensus as to how the majority of jurisdictions define the doctrine. Indeed, as Maryland's Supreme Court has observed, "there is a singular unanimity among the decisions in the overwhelming majority of the states" concerning application of transferred intent. *Gladden v. State*, 330 A.2d 176, 181 (Md. 1974). We therefore follow the parties' approach and consider a broad survey of cases from jurisdictions throughout the United States before reaching our conclusions as to the "generic" meaning and application of the transferred intent doctrine.

---

With section 303(b), Pennsylvania has adopted the Model Penal Code's approach to transferred intent. *See* Model Penal Code § 2.03(2).

105

### C. Savage fails to establish that the District Court's transferred intent instruction clearly diverges from the "classic doctrine."

Both Savage and the Government agree that an instruction on transferred intent can be permissible during a jury charge on the meaning of intent in the context of VICAR murder, Def. Br. 181; Gov't Br. 145, and we concur. As the Court of Appeals for the Second Circuit concluded in *United States v. Concepcion*, transferred intent applies to VICAR crimes. 983 F.2d 369, 381–82 (2d Cir. 1992); *see also United States v. Rahman*, 189 F.3d 88, 141 (2d Cir. 1999).

Savage raises a more narrow issue in challenging the District Court's transferred intent instruction: he draws a distinction between "classic" or "generic" transferred intent—the long-accepted common law legal principle that he concedes could apply in a VICAR murder case—and "expanded" or "multiplied intent," which he argues is a novel legal theory. *See* Def. Br. 176, 188.

According to Savage, transferred intent specifically and exclusively means that "a defendant, who *intends to kill one person but instead kills a bystander*, is deemed the author of whatever kind of homicide would have been committed had he killed the intended victim." Def. Br. 181 (emphasis added) (internal quotation marks omitted) (quoting 2 Wharton, Criminal Law § 144 at 197 (14th ed. 1979)). Thus, transferred intent in Savage's view: (1) is limited *exclusively* to situations in which the intended victim survives; and (2) applies *only* when there is one intended victim and one actual, unintended victim. Having circumscribed the doctrine in this fashion,

106

Savage is able to argue that because Marcella was murdered, the specific intent to murder her cannot "multiply" to the additional victims.

We do not share this narrow view of the doctrine. Caselaw from numerous jurisdictions over many decades indicates that transferred intent, as it is generically and historically understood in the common law, applies to the circumstances of Savage's case.

We begin with *United States v. Sampol*, 636 F.2d 621 (D.C. Cir. 1980), a case that recognized the deep historical roots of the common law doctrine of transferred intent and applied it in a manner contrary to Savage's narrow approach. In *Sampol*, three defendants were accused of detonating a car bomb that killed the Chilean Ambassador to the United States along with another passenger. The defendants were charged, *inter alia*, with first-degree murder as to both victims, and the jury found them guilty. On appeal, the *Sampol* defendants argued that there was insufficient evidence of intent to kill the other passenger who was an unintended victim. The *Sampol* court was unpersuaded:

> We reject this argument because of the doctrine of transferred intent. Under this doctrine one who intends to kill one person and kills a bystander instead is deemed to have committed whatever form of homicide would have been committed had he killed the intended victim. *There are even stronger grounds for applying the principle where the intended victim is killed by the same act that kills the unintended victim.*

107

*Id.* at 674 (citation omitted) (emphasis added).

In reaching its determination, the *Sampol* court described the common law roots of the transferred intent doctrine, going back to the English courts of the 1500s and continuing through modern American statutory and common law. *Id.* at 674–75. Examination of the doctrine led the *Sampol* court to conclude that the defendants were accountable for *both* murders—despite the fact that the defendants had intended a single death (the ambassador's) and had achieved that goal. *Id.* at 675 ("[T]he mens rea of a defendant as to his intended victim will carry over and affix his culpability when such criminal conduct causes the death of an unintended victim." (quoting *Gladden*, 330 A.2d at 189)). Thus, in *Sampol*, common law transferred intent was not limited to what Savage would have us conclude is the "classic" scenario in which one unintended victim is killed rather than the intended target.

Similarly, in *United States v. Weddell*, the Eighth Circuit applied the doctrine of transferred intent to circumstances akin to *Sampol*. 567 F.2d 767, 768 (8th Cir. 1977). There, the defendant was convicted of two murders: a bullet passed through the intended victim and also killed an unintended victim. *Id.* The trial court instructed, among other things, that, once intent as to the intended victim was determined, the jury "could possibly find a lesser degree or no degree" as to the unintended victim, but not a greater degree. *Id.* at 769. On appeal, the Eighth Circuit affirmed the

108

convictions and concluded that the instruction "adequately cover[ed] the applicable law."[64]  *Id.* at 770.

Pennsylvania similarly interprets transferred intent more broadly than Savage suggests.  In *Commonwealth v. Jones*, the Pennsylvania Supreme Court considered the claims of a defendant who was convicted of capital murder for participating, with two co-defendants, in "firing a barrage of twenty bullets at [a group of] people in the courtyard" resulting

---

[64] Savage contends that *Weddell* supports his claim that transferred intent does not apply to his circumstances, arguing that "the court of appeals approved the jury instructions because they did *not* direct the jury, if it found an intent to kill the first victim, to transfer that to the second one as a matter of law."  Def. Br. 184.  We fail to see how the permissive nature of the jury instruction in *Weddell* supports Savage's argument.  The *Weddell* Court did not discuss, much less conclude, whether transferred intent is limited to a situation in which the intended victim survives or where there is only a single victim.  To the contrary, the *Weddell* Court upheld the transferred intent instruction although the defendant murdered *both* an unintended and an intended victim.  *See Weddell*, 567 F.2d at 768.  Moreover, the instruction in *Weddell* is consistent with the instruction in Savage's case, inasmuch as they both contain permissive, not mandatory, language.  *See* A29:15198 ("The doctrine of transferred intent . . . says that if a defendant shoots one person with the intent to kill and inadvertently kills another, you are permitted to attribute or transfer the defendant's intent to kill to the second person.").

109

in two deaths.  610 A.2d 931, 935, 938 (Pa. 1992).[65]  The bullets were apparently intended for a specific victim, but that person was not hit.  *Id.* at 935.  The *Jones* Court rejected the defendant's claim that he lacked specific intent to murder the two unintended victims: "[U]nder the doctrine of transferred intent, criminal responsibility is not affected by the fact that the bullets struck persons other than the one for whom they were apparently intended."  *Id.* at 938.  Thus, Pennsylvania holds that the intent to kill one individual can "multiply"—to use Savage's word—to apply to several unintended victims.  Indeed, in another case decided the same year as *Jones*, Pennsylvania's Supreme Court echoed this conclusion, and further observed that it would be "ludicrous" to hold otherwise.  It stated:

> Appellant argues that the death sentence is excessive in this case because he . . . was

---

[65] Savage would have us limit our consideration to sources that existed in 1984—the year of the enactment of the VICAR statute.  He has not cited any authority to support that limitation.  In any event, the doctrine of transferred intent does not appear to have changed since 1984, so we need not take a position on the issue.  Absent some indication that a post-1984 case has diverged from the common law "generic" doctrine, more recent caselaw buttresses our understanding just as pre-1984 caselaw does.  In other words, although the transferred intent doctrine is of "ancient vintage," "[i]t has lost none of its patina by its application over the centuries down unto modern times; its viability is recognized by its current acceptance and application."  *Gladden*, 330 A.2d at 181.

convicted of murder of the first degree based upon "transferred intent." This position is ludicrous. *The jury found that appellant did intend to kill and did kill, and he has no basis to compare himself with those who did not.* One who intentionally kills, but whose fatal blow falls on a mistaken victim, is if anything *more* culpable than murderers who do not carelessly kill innocent bystanders. *This type of murder . . . is the product of a heart turned not only against the intended victim but also against all those anonymous but within range of the murder weapon.*

*Commonwealth v. Williams*, 615 A.2d 716, 727 (Pa. 1992) (first and third emphases added).

New Jersey takes the same approach as Pennsylvania. In *State v. Worlock*, the Supreme Court of New Jersey rejected the claim that the successful murder of an intended victim meant that the specific intent could not transfer to the unintended victim. 569 A.2d 1314, 1324–25 (N.J. 1990). Although New Jersey codified the transferred intent doctrine in its penal code, the *Worlock* court recognized that the transferred intent doctrine is a long-standing principle that pre-dates the adoption of the penal code. The doctrine provides that "[w]hen a defendant intentionally shoots at one victim but kills another, his punishment should be consistent with his intent and not his bad aim." *Id.* at 1325. The *Worlock* court also observed that federal courts apply transferred intent in the same manner. *Id.* (citing *Sampol*, 636 F.2d 621, and *Weddell*, 567 F.2d 767). Thus, the *Worlock* court rejected the

111

defendant's claim that he lacked specific intent to kill the unintended victim solely because he also killed the intended victim.[66] *Id*.

The Supreme Court of Connecticut has considered—and rejected—the same arguments that Savage makes here. In *State v. Hinton*, the defendant killed three individuals with a single shot of "triple ought" buckshot and was charged with three murders. 630 A.2d 593, 596 (Conn. 1993). The defendant disputed the transferred intent jury charge, contending that the instruction was erroneous because (1) the intended victim was killed; and (2) there was more than one

---

[66] There are numerous jurisdictions that similarly interpret transferred intent. For instance, the District of Columbia Court of Appeals has concluded that "application of the transferred intent doctrine is not limited to situations in which the intended victim survives the deadly assault." *Lloyd v. United States*, 806 A.2d 1243, 1251 (D.C. 2002); *see also Hunt v. United States*, 729 A.2d 322, 326 (D.C. 1999). And the Indiana Supreme Court concluded that a defendant's intent to kill his wife transferred to the accidental death of their child, whom the wife was holding during the attack. *Noelke v. State*, 15 N.E.2d 950, 952 (Ind. 1938). The Appellate Court of Illinois rejected a claim that transferred intent cannot apply when both an intended and unintended victim are killed. *People v. Young*, 635 N.E.2d 473, 481 (Ill. App. Ct.), *appeal denied*, 642 N.E.2d 1300 (Ill. 1994). And in *Smith v. Commonwealth*, the Supreme Court of Kentucky upheld a death sentence where the defendant, in the course of ultimately killing the single intended victim, also killed three unintended victims. 734 S.W.2d 437, 447 (Ky. 1987).

victim. *Id.* at 597. "The defendant claims that because the court's transferred intent instruction improperly allowed the jury to find him guilty of all three murders even if there had been only one intended victim, all three intentional murder convictions must be reversed." *Id.*

The *Hinton* court rejected this argument. It concluded that Connecticut's statute codifying transferred intent "leads to the result that, when a person engages in conduct with the intent to kill someone, there can be a separate count of murder for every person actually killed by the conduct." *Id.* at 598. The *Hinton* court considered the typical usage of singular phrasing in the century-old description of the transferred intent doctrine—the same formulation that Savage relies upon—but it observed that the use of the singular was never intended to limit the doctrine's application exclusively to single-victim scenarios. "[A]lthough the traditional formulation of the doctrine of transferred intent is usually stated in singular terms, that does not mean that such intent, once employed, is thereby totally expended." *Id.* at 598 (citation omitted). Concluding that such use of the singular should not rule out application of the doctrine to conduct that kills more than one unintended victim, and consistent with *Sampol*, *Jones*, *Worlock* and other cases, the *Hinton* court observed that "the purpose of deterrence is better served by holding defendant responsible for the knowing or purposeful murder of the unintended as well as the intended victim." *Id.* at 599.

In yet another case, *Commonwealth v. Melton*, the Supreme Judicial Court of Massachusetts observed that "[w]e have never required that a defendant's intent be directed at the precise victim of the crime." 763 N.E.2d 1092, 1097 (Mass.

113

2002). Instead, "the requisite mens rea must be shown, but it does not need to be shown separately or independently for each victim. Rather, once established as to any victim, it satisfies that element with respect to *all other victims*, even if those victims are unintended or even unknown to the defendant." *Id.* at 1098 (emphasis added).

Although *Melton* concerned assault rather than murder, the opinion discussed the longstanding principle of transferred intent, citing numerous examples of decisions from many jurisdictions going back decades, including *Sampol*, *Worlock* and *Hinton*, in which the "principle of transferred intent applies to satisfy the element of intent when a defendant harms *both* the intended victim *and one or more additional but unintended victims*." *Id.* at 1097 (emphasis added). The *Melton* court recognized that a minority of jurisdictions take the view that transferred intent does not apply in cases in which a defendant succeeds in perpetrating the intended crime against the intended victim. *Id.* at 1098 n.7 (citing *People v. Birreuta*, 208 Cal. Rptr. 635 (Cal. 1984) and *Ford v. State*, 625 A.2d 984 (Md. 1993)).[67] The *Melton* court expressly rejected that

---

[67] Notably, the portions of both cases cited as supporting the minority view have since been set aside in favor of the majority approach. In 2002, the Supreme Court of California concluded that *Birreuta*'s transferred intent analysis was incorrect and that "[i]ntent to kill transfers to an unintended homicide victim even if the intended target is killed." *People v. Bland*, 48 P.3d 1107, 1115 (Cal. 2002). Similarly, in 2011, the Court of Appeals of Maryland rejected the dictum in *Ford* and concluded that "transferred intent is fully applicable where both the intended victim and an unintended victim are killed."

minority view: "[t]o hold that a defendant who succeeds in perpetrating a crime on his intended victim cannot commit any form of intentional crime against anyone who is not his actual intended victim fails to recognize the harm perpetrated on others who are unfortunate enough to be injured or killed by the defendant's criminal conduct." *Id.*

Savage cites a handful of cases lending support to his narrow interpretation of transferred intent. For instance, he points to *Roberts v. State*, in which the Court of Criminal Appeals of Texas observed that, where the intended victim was pregnant—a fact of which the defendant was not aware—"we cannot use transferred intent to charge capital murder based on the death of the unintended [unborn] victim, as that would require using a single intent to support the requirement of two intentional and knowing deaths." 273 S.W.3d 322, 330 (Tex. Ct. Crim. App. 2008).[68] But the mere existence of a minority view of a legal doctrine hardly suggests that a jury instruction

*Henry v. State*, 19 A.3d 944, 951 (Md. 2011). *Bland* and *Henry* rely on many of the same cases we have cited in our discussion concerning the "classic" meaning of transferred intent, including *Sampol*, *Worlock* and *Hinton*.

[68] The *Roberts* court based its conclusion on the language of the Texas capital murder statute, which requires a discrete "specific intent to kill" as to each death. *Id.* The Court of Criminal Appeals of Texas has since limited *Roberts*, observing that its dictum requiring "proof of intent to kill the same number of persons who actually died" was improvident. *Ex parte Norris*, 390 S.W.3d 338, 341 (Tex. Ct. Crim. App. 2012). But Texas requires separate conduct to establish "separate intents" for each death. *Id.*

that was consistent with the majority view amounts to plain error.

Numerous state and federal cases, decided both before and after VICAR's 1984 enactment, reveal that the principle of transferred intent is not limited to scenarios in which the intended victim survives and there is only one unintended victim. While we concede that the examples we have considered do not constitute an exhaustive study, they are more than sufficient to allow us to conclude—with confidence—that if there is any error in the District Court's transferred intent instruction, such error is neither "clear" nor obvious." The District Court's transferred intent instruction was not plainly erroneous.[69]

### D. The District Court did not plainly err by instructing the jury on transferred intent during the sentencing phase.

During the sentencing phase of Savage's trial, the District Court again instructed the jury on the doctrine of transferred intent. *See* A32:16804–05. Savage did not object. *See* A32:16841–47. Savage now contends this instruction was improper, claiming that "[n]either the language nor the history of the [Federal Death Penalty Act (FDPA), 18 U.S.C. § 3591,]

---

[69] Savage also contends that the prosecution made erroneous arguments by relying on a transferred intent theory. For the same reasons we are unpersuaded that the transferred intent jury instruction was plainly erroneous, we are similarly unpersuaded that counsel's arguments consistent with the jury instruction constitute plain error.

116

suggests that Congress meant to incorporate . . . the transferred-intent doctrine into the determination of aggravating factors at a capital-sentencing hearing." Def. Br. 187. In addition, Savage challenges the transferred intent instruction as unconstitutional. Relying upon *Enmund v. Florida*, 458 U.S. 782, 794, 800 (1982), he argues that the Eighth Amendment prohibits the use of transferred intent in a capital sentencing to substitute for proof of the actual mental state. We do not agree.

Savage has not identified any case holding that transferred intent cannot apply in a federal capital sentencing.[70] Indeed, there appears to be little federal authority on the subject, although several state courts have upheld the application of the doctrine in capital sentencing. *See People v. Shabazz*, 130 P.3d 519, 524–25 (Cal. 2006); *State v. Higgins*, 826 A.2d 1126, 1137–38 (Conn. 2003); *Diaz v. State*, 860 So.2d 960, 969 (Fla. 2003); *Williams*, 615 A.2d at 727–28; *Smith v. Commonwealth*, 734 S.W.2d 437, 447 (Ky. 1987).

---

[70] Although Savage's brief makes a passing reference to the effect that language and history of the FDPA prohibit the use of transferred intent in a federal capital sentencing proceeding, he provides no substantive argument concerning the language and history of the FDPA to support this position. Such a passing reference is insufficient to raise the issue for our review. *See United States v. Hoffecker*, 530 F.3d 137, 162–63 (3d Cir. 2008). The issue is therefore forfeited. *See United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to . . . argue an issue in his opening brief constitutes waiver of that issue on appeal."). Accordingly, we will focus, as Savage did, on whether caselaw supports his claim.

117

And the Supreme Court has upheld on habeas review the application of transferred intent in a state capital proceeding. *Bradshaw v. Richey*, 546 U.S. 74, 75–76 (2005).

Savage's sole support for his position that transferred intent cannot apply in a federal capital sentencing proceeding appears in a footnote in his brief wherein he argues that "the few state courts to consider the issue [of transferred intent as an aggravated factor at a capital sentencing] have expressly refused to read the doctrine into their death-penalty statutes." Def. Br. 187 n.75. He cites two "murder for hire" cases: *Grandison v. State*, 670 A.2d 398 (Md. 1995) and *Commonwealth v. Gibbs*, 626 A.2d 133 (Pa. 1993). Neither case stands for the proposition he advances.

In *Grandison*, the defendant was sentenced to death for hiring an assassin to commit a double murder on his behalf. 670 A.2d 398, 406–07. The assassin killed one intended victim and, due to mistaken identity, killed a second, unintended victim. In considering Grandison's challenge to his sentence, Maryland's highest court rejected his claim that the sentencing court erred by *not* instructing the jury on the doctrine of transferred intent. *Id.* at 424. According to Grandison, the aggravating circumstances of his "murder for hire" conviction necessarily relied on a transferred intent theory. *Id.* The Maryland Court of Appeals disagreed because, for purposes of capital sentencing, it did not matter if the victim was intended or unintended. Rather, the specific aggravating factor under Maryland law concerned only whether or not Grandison hired someone to commit a murder; it did not matter who the

118

intended or unintended murder victim was.[71]  *Id*.  Accordingly, while transferred intent might have played a role in Grandison's *conviction*, it simply was irrelevant to the "murder for hire" aggravating factor at *sentencing*.  *Id.* at 425.

*Gibbs* concerned the sentencing of an assassin who committed a murder for hire, rather than the individual who did the hiring.  626 A.2d 133, 135 (Pa. 1993).  Gibbs was hired to kill a woman's husband but ultimately killed a security guard instead; he received a death sentence for that murder.[72]  *Id.*  The Pennsylvania Supreme Court considered whether "the trial court erred in determining that the common law principle of transferred intent is applicable with respect to finding a 'contract killing' an aggravating circumstance when the victim is not the person the killer was hired to kill."  *Id.* at 136.

The Pennsylvania Supreme Court considered Gibbs's petition seeking review of the refusal to issue an order

---

[71] Under then-applicable Maryland law, an aggravating factor for the death penalty included whether "the defendant employed or engaged another to commit the murder and the murder was committed under an agreement or contract for remuneration or promise of remuneration."  Md. Code Ann., Crim. Law § 2-303(g)(1)(vii).  Section 2-303 was repealed in 2013.

[72] Although there was some question as to whether Gibbs was hired to kill the security guard as well, *see Gibbs*, 626 A.2d at 135, the possibility that the security guard was an intended victim was not relevant to consideration of the transferred intent issue because there was no challenge to the sufficiency of the evidence, *see id.* at 137.

precluding consideration of the death penalty. The Superior Court ruled that the trial court erred in applying transferred intent to a "contract killing" as an aggravating circumstance because Gibbs killed an unintended victim rather than the individual he was hired to murder. The Pennsylvania Supreme Court affirmed. It concluded that the "plain language" of its aggravating factor statute, 42 Pa. Cons. Stat. § 9711(d)(2), required the killing of the intended victim, not an unintended one.[73] "The plain language of the statute does not include an unintended victim. Rather the clear language requires that the defendant was to be paid to kill *the victim.*" *Id.* at 138 (emphasis added).

*Gibbs* and *Grandison* simply do not demonstrate that the District Court in Savage's case plainly erred in instructing on transferred intent at sentencing. Both *Gibbs* and *Grandison* concerned specific statutory language in "murder for hire" aggravating factor statutes. Neither case speaks to the applicability *vel non* of transferred intent at a capital sentencing absent the murder for hire context. Rather, each relied on specific statutory language to determine whether transferred intent could apply under the particular circumstances.

"Murder for hire" was not one of the aggravating factors in Savage's sentencing. More importantly, Savage does not argue that the aggravating factors that were at issue in his

---

[73] The statute provides, "[t]he defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the *killing of the victim.*" 42 Pa. Cons. Stat. § 9711(d)(2) (emphasis added).

120

sentencing included analogous language making the particular identity of the victim—and more specifically, whether the victim was intended or unintended—relevant, as it was in *Gibbs* and *Grandison*.

Savage's aggravating factors do not rely on whether the actual victim was the intended victim. *See* 18 U.S.C. § 3592(c)(6) ("The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim."), (c)(9) ("The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism."), (c)(11) ("The victim was particularly vulnerable due to old age, youth, or infirmity."), (c)(16) ("The defendant intentionally killed or attempted to kill more than one person in a single criminal episode."). For instance, one aggravating factor refers to "substantial planning and premeditation to cause the death of *a person*." § 3592(c)(9) (emphasis added). The statutory language does not imply that the "person" must be an intended victim, and Savage offers nothing to persuade us otherwise.

In support of his Eighth Amendment claim, Savage relies on *Enmund*, 458 U.S. at 794, 800, to argue that the Eighth Amendment "forbids application of felony-murder doctrine at capital sentencing to substitute for proof of [an] accomplice's actual mental state." Def. Br. 188. *Enmund*'s felony-murder analysis does not assist Savage.

*Enmund* concerned a defendant who remained in the getaway car during a robbery that resulted in two unplanned murders. *Id.* at 788. Under Florida law, Enmund was

121

convicted of first-degree murder under the felony-murder rule and was sentenced to death. *Id.* at 786. The Supreme Court held that imposition of the death penalty in such a circumstance violates the Eighth Amendment. *Id.* at 788.

Specifically, the Supreme Court concluded that it is cruel and unusual punishment to sentence a defendant to death if the defendant "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, *or intend that a killing take place* or that lethal force will be employed." *Id.* at 797 (emphasis added). For death penalty purposes, consideration should have been limited to the crime in which Enmund actually participated—robbery—rather than murder. *Id.* at 801 ("For purposes of imposing the death penalty, Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt.").

Savage's circumstances differ profoundly from *Enmund*'s, rendering *Enmund* unhelpful to our plain error review. It was a decision specific to felony murder, and it was of central importance to the Supreme Court's analysis that Enmund did not intend to kill anyone. *Id.* at 798 ("Enmund himself did not kill or attempt to kill; and . . . the record before us does not warrant a finding that Enmund *had any intention of participating in or facilitating a murder*." (emphasis added)). In contrast, the jury determined that Savage specifically intended the death of at least one individual, Marcella Coleman. Because Savage acted with lethal intent, we are not convinced that *Enmund* clearly supports an Eighth Amendment violation in Savage's case.

122

\*    \*    \*

Savage has failed to show that the District Court's transferred intent instructions, both during the trial and during the sentencing proceeding, were plainly erroneous.

## X.    THE DISTRICT COURT DID NOT PLAINLY ERR IN ITS JURY INSTRUCTION ON LAY OPINION EVIDENCE.

At trial, Agent Kevin Lewis provided lay opinion testimony intended to assist the jury in understanding the meaning of certain coded words and phrases used during recorded conversations between Savage and his confederates. Savage claims that the District Court's jury instruction concerning Lewis's opinion testimony violated Rule 701 of the Federal Rules of Evidence by suggesting that he was an expert.

We conclude that the District Court's lay opinion jury instruction is not plainly erroneous for two reasons. First, the instruction is consistent with our Court's caselaw. Second, when viewed in context, the instruction did not mislead the jury or suggest that it should afford undue weight to Agent Lewis's opinions.

### A. Standard of Review

Savage argues that our review is de novo because he has raised a legal question as to whether the District Court presented the correct legal standard in its jury instructions. *See United States v. Urban*, 404 F.3d 754, 779 (3d Cir. 2005) ("Where the challenge to a jury instruction is a challenge to the instruction's statement of the legal standard, we exercise

123

plenary review." (internal quotation marks omitted)). But Savage did not object on the record to the instruction on Agent Lewis's testimony,[74] and we have already rejected the claim that we should simply assume that Savage objected off the record during the District Court's charging conference. *See generally supra* Part III. Accordingly, under Rules 30 and 52 of the Federal Rules of Criminal Procedure, we review the instruction for plain error. *See* Fed. R. Crim. P. 30(d), 52(b); *United States v. Salahuddin*, 765 F.3d 329, 337 (3d Cir. 2014); *United States v. Brennan*, 326 F.3d 176, 192 (3d Cir. 2003). We therefore "inquire whether there is (1) an error; (2) that is plain; and (3) that affected substantial rights." *Salahuddin*, 765 F.3d at 337 (internal quotation marks omitted). If all three of those inquiries are answered in the affirmative, we have discretion to grant relief "if the error seriously affects the fairness, integrity, or public reputation" of the proceeding. *Id.* (citation omitted). An error is "plain" if it is "obvious" or "clear under current law." *Vazquez*, 271 F.3d at 100 (quoting *Olano*, 507 U.S. at 734) (internal quotation marks omitted).

## B. The District Court's instruction is consistent with our caselaw concerning lay opinion testimony.

Federal Rule of Evidence 701 permits the introduction of lay opinion testimony that is "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701(a), (b). Rule 702, in contrast, provides for the admission of testimony by a qualified expert, which must be

---

[74] Savage raised other objections to the jury instructions, but not an objection to the lay opinion instruction.

based on, *inter alia*, "the expert's scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a).

In 2000, Rule 701 was amended to add subsection (c), which bars lay testimony "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). Subsection (c) clarifies the distinction between lay opinion and expert opinion "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee's note to 2000 amendments. Subsection (c) "prohibits a party from 'us[ing] Rule 701 as an end-run around the reliability requirements of Rule 702 and the disclosure requirements of [Federal Rule of Criminal Procedure 16].'" *United States v. Shaw*, 891 F.3d 441, 453 (3d Cir. 2018) (alterations in original) (quoting *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 227 (3d Cir. 2008)).

Here, Savage claims that the District Court's instruction on Agent Lewis's lay opinion testimony ran afoul of Rule 701(c).[75] The District Court instructed:

_____

[75] Prior to trial, the Government moved *in limine* to admit Agent Lewis's lay opinion testimony pursuant to Rule 701. Robert Merritt and Kidada Savage opposed the motion; Kaboni Savage did not, although he earlier filed a preemptive motion requesting that the District Court grant him any pretrial relief sought by his co-defendants. Kidada argued, *inter alia*, that Lewis's testimony would violate Rule 701(c). The District Court granted the Government's motion. The District Court

125

Ladies and gentlemen, witnesses are generally not permitted to state their own personal opinions about questions during the trial. However, a witness may be allowed to testify to his or her opinion if it is rationally based on the witness' perception and is helpful to a clear understanding of the witness' testimony or to the determination of the facts at issue.

I'm speaking now about the testimony you will remember of Special Agent Kevin Lewis. In this case, Agent Lewis was permitted to offer his opinions as to the meaning of certain words or conversations. He gave you these opinions based upon his perceptions.

The opinions of this witness should be received and given whatever weight you think is appropriate, given all of the other evidence in this case and the other factors discussed in these instructions.

---

acknowledged some risks in having Agent Lewis provide lay opinion testimony, but concluded that "such risks are mitigated by vigorous policing of the Government's questioning to ensure Special Agent Lewis does not testify about clear statements or provide speculative opinions outside the realm of his rational perception." A1:96 (citation omitted). Despite his co-defendants' pretrial objection to the admission of Lewis's opinion testimony, Savage does not challenge on appeal the District Court's decision to admit the testimony.

Now, ladies and gentlemen, in weighing Special Agent Kevin Lewis' opinion testimony, *you must consider his qualifications, the reasons for his opinions, the reliability of the information supporting those opinions, as well as the other factors discussed in these instructions for weighing the testimony of witnesses.*

*You may disregard the opinion entirely, if you decide that the witness' opinion was not based on sufficient knowledge or skill or experience or training or education.* You may also disregard the opinion if you conclude that the reasons given in support of the opinion are not sound, or if you conclude that the opinions are not supported by the facts shown by the evidence or if you think that the opinions are outweighed by other evidence.

So, ladies and gentlemen, you have opinions that were offered to you by experts who have special training, skill, knowledge and experience. You have opinions that were offered to you by Agent Lewis, a lay witness, based upon his perceptions and his experience as it relates to this matter. It is for you to weigh those opinions and give them whatever weight you believe they deserve.

127

A29:15119–21 (emphasis added).[76]

---

[76] The District Court's instruction varied from our Circuit's model jury instruction on lay opinion testimony, which provides:

> Witnesses are not generally permitted to state their personal opinions about important questions in a trial. However, a witness may be allowed to testify to his or her opinion if it is rationally based on the witness' perception and is helpful to a clear understanding of the witness' testimony or to the determination of a fact in issue.

> In this case, I permitted *(name)* to offer *(his)(her)* opinion based on *(his)(her)* perceptions. The opinion of this witness should receive whatever weight you think appropriate, given all the other evidence in the case and the other factors discussed in these instructions for weighing and considering whether to believe the testimony of witnesses.

3d Cir. Model Criminal Jury Instructions § 4.09. Our Model Jury Instructions are not binding on District Courts, however, and a variance from the model instruction does not necessarily constitute error. *United States v. Shannon*, 766 F.3d 346, 352 n.9 (3d Cir. 2014); *United States v. Maury*, 695 F.3d 227, 259 (3d Cir. 2012) ("[T]he Model Instructions are not-binding on

128

Savage focuses on the District Court's mention of Agent Lewis's qualifications, reasons for his opinions, and reliability of those opinions, as well as the District Court's statement that the opinions may be disregarded if based upon insufficient knowledge, skill, experience, education or training. He contends that this language pertains to expert witness testimony under Rule 702 and therefore improperly invited the jury to consider Lewis as an expert and "to trust Lewis unduly, despite his lay status." Def. Br. 193. Savage argues that the purportedly erroneous instruction could reasonably have affected the outcome of the trial and sentencing.

The District Court's instruction is not clearly erroneous because it is consistent with our Circuit's caselaw addressing lay opinion testimony. We require lay testimony to be grounded either in experience or specialized knowledge. In *Asplundh Manufacturing Division v. Benton Harbor Engineering*, we held that "in order to be 'helpful,' an opinion must be reasonably reliable," and Rule 701 therefore "requires that a lay opinion witness have a reasonable basis grounded either in *experience or specialized knowledge* for arriving at the opinion that he or she expresses." 57 F.3d 1190, 1201 (3d Cir. 1995).

In the time since Congress amended Rule 701, we have repeatedly affirmed our holding in *Asplundh* that the reliability of lay opinion testimony should be assessed in light of the

this, or any, court. They thus cannot invalidate the decisions of this Circuit or others.").

129

witness's relevant specialized knowledge and experience. *See, e.g.*, *Eichorn v. AT&T Corp.*, 484 F.3d 644, 649–50 (3d Cir. 2007) ("In order to satisfy these . . . Rule 701 requirements, the trial judge should rigorously examine the reliability of the lay opinion by ensuring that the witness possesses sufficient special knowledge or experience which is germane to the lay opinion offered." (quoting *Asplundh*, 57 F.3d at 1201)); *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 83 (3d Cir. 2009) ("A trial judge must rigorously examine the reliability of a layperson's opinion by ensuring that the witness possesses sufficient specialized knowledge or experience which is germane to the opinion offered." (citing *Asplundh*, 57 F.3d at 1200–01)). We have clarified that "[w]hen a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702." *United States v. Fulton*, 837 F.3d 281, 301 (3d Cir. 2016) (quoting *Donlin*, 581 F.3d at 81).

Thus, "as long as the technical components of the testimony are based on the lay witness's personal knowledge, such testimony is usually permissible" under Rule 701.[77] *Id.*;

---

[77] The permissibility of lay opinion testimony based upon specialized knowledge aligns with the advisory committee's note to Rule 701, which explains that the amendment is not designed to prevent lay witnesses from testifying based on "particularized knowledge that the witness has by virtue of his or her position." Fed. R. Evid. 701 advisory committee note to 2000 amendments; *see also, e.g.*, *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1222 (11th

*see also, e.g.*, *United States v. El-Mezain*, 664 F.3d 467, 514 (5th Cir. 2011) ("Testimony need not be excluded as improper lay opinion, even if some specialized knowledge on the part of the agents was required, if it was based on first-hand observations in a specific investigation."); *United States v. Rollins*, 544 F.3d 820, 831–32 (7th Cir. 2008) (agent's testimony as to the meaning of coded terms is based on experience in the particular case and is therefore permissible under Rule 701).  Indeed, as one of our sister circuits has observed, it is appropriate to inform a jury of a lay witness's qualifications and experience so that the jurors may assess the value of the opinion testimony:

> Had the agent been testifying exclusively as a lay witness about the code words he had learned the meaning of in the course of his investigation of the defendants' conspiracy, it would not have been improper to introduce him to the jury as an experienced investigator, rather than a novice listening to taped conversations of drug conspirators for the first time, any more than it is improper to ask an eyewitness whether he has good vision.

---

Cir. 2003) (concluding, based on the advisory committee's note citing *Asplundh*, that "opinion testimony by business owners and officers is one of the prototypical areas intended to remain undisturbed" by Rule 701(c)).

*United States v. Moreland*, 703 F.3d 976, 983 (7th Cir. 2012), *holding modified on other grounds by United States v. Jett*, 908 F.3d 252 (7th Cir. 2018).

In light of our precedent, the error Savage says is in the jury instructions is certainly not "clear under current law." *Vazquez*, 271 F.3d at 100.

### C. When viewed in context, the District Court's instruction did not mislead the jury.

We abide by the longstanding principle that jury instructions are not to "be evaluated in artificial isolation," but "must be evaluated in the context of the overall charge." *United States v. Berrios*, 676 F.3d 118, 137 (3d Cir. 2012) (citations omitted). When the District Court's lay opinion instruction is considered in context, the instruction does not suggest that Agent Lewis's opinion testimony should be treated as that of an expert to whom the jury should defer. *See id*. ("[A]n instruction that appears erroneous on its own may be remedied by the balance of the court's instructions.").

Immediately prior to giving the instructions regarding Agent Lewis's lay opinion, the District Court provided instructions regarding expert witnesses. It used the term "expert" throughout those instructions, specifying that "because of their knowledge, their skill, their experience, their training and their education in a particular science or profession, these witnesses were permitted to give you their opinions *in those areas of their expertise*." A29:15118 (emphasis added). The District Court did not mention Agent Lewis during its instruction on expert opinion.

132

When it reached its instructions regarding Agent Lewis, the District Court preceded those instructions with the transition that "a witness may be allowed to testify to his or her opinion if it is *rationally based on the witness' perception* . . . . I'm speaking now about the testimony you will remember of Special Agent Kevin Lewis." A29:15119–20 (emphasis added). Shortly thereafter, it stated that Agent Lewis's opinions were based on his perceptions, rather than on expertise. *See* A29:15120 (reiterating that "[Agent Lewis] gave you these opinions *based upon his perceptions*") (emphasis added). And the District Court concluded by explaining a third time the difference between expert opinion testimony and Agent Lewis's lay opinion testimony: "So, ladies and gentlemen, you have opinions that were offered to you by experts who have special training, skill, knowledge and experience. You have opinions that were offered to you by Agent Lewis, a lay witness, *based upon his perceptions and his experience as it relates to this matter*."[78] A29:15121 (emphasis added). Thus, the District Court took appropriate care to explain to the jury that Agent Lewis's lay opinion testimony

---

[78] Relatedly, the District Court instructed that a witness's status as a law enforcement officer does not mean that the individual's testimony is entitled to any special weight: "The fact that a witness is employed as a law enforcement officer does not mean that his or her testimony necessarily deserves more or less consideration or greater or lesser weight than that of any other witness." A29:15108–09.

133

was based upon his personal perceptions and was different from the testimony of the expert witnesses.

The District Court also instructed the jury in multiple instances that it was not required to accept the testimony of any witness, including Agent Lewis. *See* A29:15098 ("Ladies and gentlemen, you have to give the evidence whatever weight you believe it deserves."); A29:15104 ("[Y]ou must decide what testimony you believe and what testimony you did not believe."); A29:15107 ("[A]fter you make your own judgment about the believability of a witness, you can then attach to that witness' testimony the importance or the weight that you think that witness' testimony deserves."); A29:15121 ("It is for you to weigh those opinions and give them whatever weight you believe they deserve."). And of course, as a general matter, we presume that juries follow the instructions given to them. *United States v. Bryant*, 655 F.3d 232, 252 (3d Cir. 2011).

Considered in context, then, the District Court's instructions do not suggest the jury should give undue weight to Agent Lewis's opinion testimony. Savage has failed to establish that the District Court's jury instruction on lay opinion amounts to plain error.

## XI. NO ERROR OCCURRED DURING THE PENALTY-PHASE PROCEEDINGS.

Finally, Savage raises six issues relating to his "penalty-phase" proceedings. None constitute reversible error.

**A. Background**

We start by reviewing the capital-sentencing process generally, and the Federal Death Penalty Act specifically. Every criminal prosecution involves two basic segments: First, is the defendant guilty? And second, if he is guilty, what should the punishment be? In most trials, the trier-of-fact—paradigmatically, a jury—answers the first question; the judge decides the second, considering the government's recommendation before choosing from the statutory menu of potential punishments.

But when the government seeks the death penalty, recognizing the special need "to maintain a link between contemporary community values and the penal system," the law requires that a jury answer the second question. *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (plurality opinion) (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 519 n.15 (1968)); *see also Ring v. Arizona*, 536 U.S. 584, 615–16 (2002) (Breyer, J., concurring in the judgment). And to pass constitutional muster, a sentencing statute authorizing the death penalty must guide the jury's discretion with "general rules that ensure consistency in determining who receives a death sentence." *Kennedy v. Louisiana*, 554 U.S. 407, 436 (2008). It must also empower the jury to consider "the 'character and record of the individual offender and the circumstances of the particular offense.'" *Id.* (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality opinion)).

In federal courts, the Federal Death Penalty Act, 18 U.S.C. §§ 3591–3599, authorizes the death penalty for defendants guilty of certain homicides, as long as an

135

aggravating circumstance makes a death sentence neither "excessive" nor "grossly disproportionate." *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (plurality opinion). And even then, all the aggravating circumstances must outweigh any mitigating circumstances "that might induce a sentencer to give a lesser punishment." *Ring*, 536 U.S. at 611 (Scalia, J., concurring); *see* § 3593(e).

If the government intends to seek the death penalty, it must file a pretrial notice "stating that . . . the circumstances of the offense" justify a capital sentence and specifying which "aggravating factor or factors" it "proposes to prove." § 3593(a). The FDPA identifies sixteen statutory aggravating factors for homicide, and the government can propose additional nonstatutory aggravators tailored to the particular offense. *See* § 3592(c).[79] The FDPA also identifies seven

---

[79] The sixteen statutory aggravating factors are:
1. if the homicide occurred during commission of another crime;
2. if the defendant previously committed a violent felony involving a firearm;
3. if the defendant previously committed an offense punishable by death or life imprisonment;
4. if the defendant previously committed other serious offenses;
5. if the homicide created a grave risk of death to other persons;
6. if the homicide was especially heinous, cruel or depraved;
7. if the defendant procured the homicide by payment;

136

mitigating factors, plus a catchall provision for any "factor[] in the defendant's background, record, or character or any other circumstance of the offense that mitigate[s] against imposition of the death sentence." § 3592(a).[80]

---

8. if the defendant committed the homicide for pecuniary gain;
9. if the homicide involved substantial planning and premeditation;
10. if the defendant previously committed two felony drug offenses;
11. if the victim was particularly vulnerable;
12. if the defendant previously committed a serious federal drug offense;
13. if the homicide occurred during a continuing criminal enterprise involving drug sales to minors;
14. if the victim was a high public official;
15. if the defendant previously committed sexual assault or child molestation; or
16. if the homicide involved multiple killings or attempted killings.

*See* § 3592(c)(1)–(16).

[80] The seven mitigators include:
1. if "[t]he defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired";
2. if "[t]he defendant was under unusual and substantial duress";
3. if "the defendant's participation was relatively minor";

137

The government's notice triggers "a bifurcated procedure . . . in which the question of sentence is not considered until the determination of guilt has been made." *Gregg*, 428 U.S. at 190–91 (plurality opinion). If the jury returns a guilty verdict, a second proceeding is conducted to determine the sentence. Each side may offer opening arguments; the government presents testimony and exhibits supporting the noticed aggravators; the defense may present testimony and exhibits supporting any mitigators; each side may put on rebuttal testimony and exhibits; each side may offer closing statements; the District Court instructs the jury; the jury then deliberates. *See* § 3593(c). Notably, the Federal Rules of Evidence do not apply—the District Court may exclude relevant information only "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Id.*

To impose the death penalty, the jury must unanimously find that

- at least one statutory aggravating factor exists beyond a reasonable doubt; and

---

4. if another "equally culpable" defendant "will not be punished by death";
5. if "[t]he defendant did not have a significant prior history of other criminal conduct";
6. if "[t]he defendant committed the offense under severe mental or emotional disturbance"; or
7. if "[t]he victim consented to the criminal conduct that resulted in the victim's death."

*See* § 3592(a)(1)–(7).

138

- all the aggravating factors found unanimously beyond a reasonable doubt outweigh "the perceived significance" of all the mitigating factors that any juror found by a preponderance of the evidence.

*United States v. Ebron*, 683 F.3d 105, 150 (5th Cir. 2012) (quoting *Jones v. United States*, 527 U.S. 373, 408 (1999) (Ginsburg, J., dissenting)); *see* § 3593(c)–(d).

Here, the Government sought the death penalty on all thirteen homicide counts. The jury found multiple aggravators for each, including the statutory aggravator that the arson murders were especially heinous, cruel or depraved, and the nonstatutory aggravators that Savage posed a risk of future dangerousness, and that he caused the victims' families injury and loss.[81] The jury found several mitigators as well, including

---

[81] The jury found others too. The longest list applied to Counts 12 through 15, which relate to the arson murders. The jury found eleven aggravators, seven statutory and four nonstatutory:
- Savage knowingly created a grave risk of death to other persons;
- Savage committed the offense in an especially heinous, cruel or depraved manner;
- Savage committed the offense as consideration for pecuniary gain;
- the offense entailed substantial planning and premeditation;
- Savage had a previous serious federal narcotics conviction;

139

the statutory mitigator that Lamont Lewis, although an equally culpable defendant, would not receive the death penalty. And they found nonstatutory mitigators that "Savage has been a positive influence in the lives of his children, niece, and nephew," and that he "can continue to be an important influence in the lives of his children." A2:790. Yet after weighing the aggravators against the mitigators, the jury unanimously agreed Savage should be sentenced to death on each count.

Savage now contends that the Government offered erroneous argument supporting the "future dangerousness" aggravator, that the Government impermissibly offered victim-impact statements supporting the "harm to victims' families" aggravator, and that the District Court improperly admitted the arson victims' autopsy photographs to support the "especially heinous, cruel, or depraved" aggravator. He also argues that the Government's penalty-phase summation relied on unconstitutional inferences to undercut the "equally culpable" mitigator, that the Government improperly rebutted the mitigators concerning Savage's relationship with his family, and that the verdict form layout impermissibly emphasized the

- Savage intended to kill more than one person in a single criminal episode;
- the victims were particularly vulnerable;
- Savage posed a risk of future dangerousness;
- Savage caused injury and loss to the victims;
- Savage had committed additional murders; and
- Savage obstructed justice.

140

aggravators while giving short shrift to the mitigators. We reject each claim for the reasons that follow.

## B. The Government permissibly argued that Savage posed a risk of future dangerousness.

As noted, the Government proposed—and the jury unanimously found beyond a reasonable doubt—the nonstatutory aggravator "that Kaboni Savage would be a danger in the future to the lives and safety of other persons, and is likely to commit or procure the commission of, retaliatory and other criminal acts of violence in the future." A2:737–87. Savage now claims that three arguments the Government made to support this aggravator lacked factual support: First, that the "Special Administrative Measures" (SAMs) imposed by the Bureau of Prisons (BOP) to constrict Savage's ability to contact the outside world might not remain in effect indefinitely. Second, that Savage might collude with his attorneys to circumvent the SAMs. And third, that managing the security risks necessary to safely house Savage indefinitely would saddle the BOP with an enormous burden.

We review a district court's ruling as to whether a prosecutor's argument is appropriate for abuse of discretion. *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001). If the argument was improper, we determine whether it justifies relief by "examin[ing] the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Id.*

141

Applying that standard, we first conclude that there was no error: the prosecutor's comments accurately summarized information before the jury. And we also conclude that even if error occurred, it was harmless given the mounds of evidence against Savage and the other aggravating factors the jury found.

**1**

Before turning to the specific comments Savage challenges, we need to review what the jury knew about Savage's SAMs and why they were considered necessary.

**a**

Recall that Savage planned, coordinated, and directed the killing of seven people while being held in a federal prison. Savage had Tybius Flowers killed to prevent him from testifying about Lassiter's murder. Then Savage orchestrated the Coleman house firebombing as retaliation for Eugene Coleman's cooperation with prosecutors. Two women, three children and one infant died as a result.

The horrid nature of these murders is underscored by a disturbing series of comments Savage made from prison reflecting both his desire and ability to kill or intimidate witnesses:

- "No witness, no crime. No witness, no case." A29:15551.

- "The rats will pay." A29:15564.

142

- "Death before dishonor to the family."  A29:15565.

- "That's why that N[*****]'s got to pay.  Those f[***]ing rats.  Those kids got to pay for making my kids cry.  I want to smack one of their four-year-old sons in the head with a bat straight up. I have dreams about killing their kids, killing their kids, cutting their kids' heads off."  A29:15566.

- "These rats are going to pay.  Their momma is going to pay.  I'm sick of them.  I'm killing them what they love while they're in there."  A29:15568.

- "These rats deserve to die.  Wars with the rats.  I'm going to hunt every last one b[****] that I can.  I'm going to kill 'em."  A29:15570.

- "By the time of trial everybody be dead. . . . [W]e're just getting started.  The night's still young."  A29:15571.

- "The fight don't stop until the casket drop."  A29:15572.

- "I can still get messages out over the bowl"—a reference to his ability to sneak communications through his cell toilet's plumbing system.  A29:15572.

- "You can't stop the inevitable."  A29:15572.

143

- "Tears of rage, I'm flooded internally from 'em. Tears of rage because these sons of b[*****]s are going to pay, man. They gonna pay or my name ain't what it is, my pop name wasn't what it was, they gonna pay. They kids gonna pay, they mommas gonna pay. That's the kind of conviction that I got for this s[***], man. I'm dedicated to their death, man. . . . They better hope and pray I go to jail for a long time. It don't matter because while I'm still living, I'm a get them." A29:15572–73.

In at least six cases, Savage was caught on tape actually threatening to kill a cooperator or his family:

- Tybius Flowers, *see* A29:15552 ("Don't worry about it. He's not going to take the stand. He'll never make it to trial.");

- Paul Daniels, *see* A29:15565 ("Think about what you're doing man, because your son, he's history. I got to tell you how I feel. Everything must go."); *see also* A29:15566 ("I'd rather just kill his mother f[***]ing mom. I want this N[*****]. You see what I'm saying?"); A29:15567 ("I got to get [Daniels's girlfriend]'s a[**], [her] and that little b[****]y baby he got.");

- Keith Daniels, *see* A29:15568 ("The rats, they got to pay. I have dreams about hitting [his] daughter in the head, man, opening her head wide open with 40s, dum-dums, man. That's all I dream about getting that N[*****] killed. I want to erase his whole family tree,

144

man.  You hurt my kids sending me to jail.  Your kids, your mom.  Nobody is getting a pass, man.  Before I get a dollar, they are going to pay.  That's all I dream about.");

- Juan Rosado, *see* A29:15565 ("You know what it's going to cost you, your life and your mom's life.  I'm going to kill your mother F[***]ing a[**].  Tell the prosecutor I threatened you, too, b[****].");

- Stanley Smith, *see* A29:15565–66 ("I'm going to kill everything that you love."); *see also* A29:15566 ("Yeah, he got a daughter down my way.  I'm going to blow her little head off.  She like five."); and

- Craig Oliver, *see* A29:15569 ("His family goes first. His mom, his pop, all of them.").

These comments led the BOP to separate Savage from potential government witnesses in BOP custody, and even required several witnesses to enter the Witness Protection Program.

Savage made similar comments about a prison guard. *See* A29:15567–68 ("I want to F[***] the captain up. I want to blow his head off.  I want everybody to know it, too. . . . That captain is a mother F[***]er, man.  He's going to die a miserable death, and I hope I'm there.  I hope I'm the cause of that mother f[***]er.  I'm going to torture his a[**].  I'm going to set him on fire alive.  That's what I want to do with the N[*****].  I want to set that N[*****] on fire alive.  Watch

145

him jump around like James f[***]ing Brown. Get a metal chair and cuffs, douse him with that gasoline, set his a[**] on fire and say welcome to hell, b[****]. I'm going to get somebody. That fire's a motherf[***]er.").

And these comments take on added meaning when we consider Savage's conduct while incarcerated. In 2011, prison guards searching Savage's cell discovered Savage had somehow obtained confidential prison records revealing information about potential government witnesses in BOP custody, including some of the ones who entered Witness Protection. The BOP also terminated his ability to make monitored social calls after those calls "started to get kind of coded." A29:15713. And as recently as fall 2012—during jury selection for this trial, and even under SAMs severely curtailing his ability to communicate with the outside world— Savage exploited opportunities to make unmonitored legal calls by telephoning his attorney's office and having them patch him through to unapproved individuals. He instructed those individuals to send him packages disguised as legal mail, detailing what his attorneys' address labels looked like so the packages would not attract attention. Savage managed to illicitly receive at least one package this way. Then once the Government discovered his abuse of legal calls, he bragged to a prison guard that he had "got a lot of information out on those calls and got a lot done during those calls." A29:15683.

All told, the jury learned of Savage's persistent efforts to thwart restrictions on his ability to communicate with the outside world, and the extraordinary danger he posed if he succeeded in doing so.

146

**b**

The jury also heard information about Savage's present and potential future confinement conditions. Because of the security risks described above, the BOP transferred Savage to USP Florence ADMAX—the highest security prison in the federal system. Inmates at ADMAX fall into four categories depending on their security risk. The BOP holds the lowest-risk inmates—those demonstrating improvement during their time at ADMAX—in a step-down unit preparing them for transfer back to another penitentiary. The BOP holds the "average" ADMAX inmate—still someone the BOP determines it cannot control in any other facility—in a general population unit, where they spend twenty-two hours per day in single cells and recreate in enclosures. The "Control Unit" is even more restrictive, reserved for inmates "who have committed homicides" inside BOP facilities, "are serious escape risks[,] or [are] a severe threat to the orderly running of an institution." A30:16067. Finally, there is the "H Unit"—the most restrictive unit and the one for defendants like Savage who are subject to SAMs.

The H Unit is comprised of thirty-six single-inmate cells. When an inmate arrives at the H Unit, he typically spends at least the first year subject to the most stringent restrictions. During that initial phase, the BOP permits inmates three showers per week and ninety minutes of daily recreation alone in an individual enclosure. With the warden's approval, an inmate can move to a more relaxed phase. In that phase, a daily shower is available and although prisoners still recreate in an individual enclosure, they do so in the presence of other

147

inmates. After another year, an inmate may recreate with up to four inmates in the enclosure.

The BOP allows an H Unit inmate one social call and five non-contact visits per month. Visitors and callers must be pre-approved, and each call or visit must be arranged in advance and monitored by the FBI. To initiate a call, a guard physically dials the number and ensures that the person who answers has been pre-approved. The guard then passes the receiver to the inmate through a slot in the cell door while holding the phone. H Unit inmates are permitted to make an unlimited number of legal calls, conducted in much the same way, though such calls are unmonitored. (The guard "stand[s] back at a respectable distance" so he can see the phone but not hear what is said. A30:16029–30.)

The FBI x-rays and reviews all non-legal mail, and that mail can only come from pre-approved senders. Similarly, legal mail must come from the inmate's counsel of record; guards open it in the inmate's presence and cursorily review it to ensure it contains no contraband.

On top of these general H Unit restrictions, each inmate receives specific SAMs tailored to their individual security risks. Savage faces even more limitations on who he can contact, who can visit him, and what publications he can receive—though he remains able to have unlimited and unmonitored legal calls. A SAM expires if not renewed annually by the Attorney General.

The BOP's goal is to move inmates from the H Unit to the general population units once they show sufficient

148

rehabilitation to warrant lifting their SAMs. And after entering the general population units, compliant inmates begin a three-year process that gradually moves them through the step-down unit to a more typical penitentiary. The point, as both a government and defense expert observed, is that ADMAX is not meant to be "a permanent assignment." A31:16566–67 ("We don't want people in there permanently.").

Once transferred to another penitentiary, inmates have much more freedom to move and interact. Typical federal penitentiaries house roughly 1500 inmates in double cells, locked from 10:00 p.m. to 6:00 a.m. Outside those hours, inmates are generally expected to be at a job or educational site. In other words, "[t]here is nobody escorting them. There is nobody standing over there, telling them what to do. From the time the cells are opened . . . they are responsible to go where they are supposed to be." A31:16562. "They have access to all of the 1500 other inmates and all the staff that are in the institution," including recreating and eating together without physical restraint. A31:16562. The BOP records social calls but monitors only about 10% of them, and even then only partially.

Some former H Unit inmates have been transferred to other federal institutions through this process. *See, e.g.*, *Rezaq v. Nalley*, 677 F.3d 1001, 1004–06 (10th Cir. 2012) (four inmates, one involved in a 1985 airline hijacking that killed fifty-seven airline passengers, plus three planners of the 1993 World Trade Center bombing). Still other inmates remain on the H Unit but under relaxed conditions allowing greater contact with other inmates. *See, e.g.*, *Mohammed v. Holder*, 47 F. Supp. 3d 1236, 1243 (D. Colo. 2014) (terrorist who

149

bombed the U.S. Embassy in Tanzania moved to a less-restrictive phase of H Unit incarceration); *Yousef v. United States*, No. 12-2585, 2014 WL 1908711, at *2–4 (D. Colo. May 13, 2014) (1993 World Trade Center bombing leader remains on H Unit but under relaxed confinement conditions allowing him to communicate with other inmates during recreation, showers, at the law library, and while working as an orderly). By the time of the sentencing proceedings in this case, Savage had already been recommended for a move to a more-relaxed phase of H Unit confinement, though the approving official denied the request. Officials have also allowed Savage to work as an orderly, which affords him time outside his cell without physical restraints.

**2**

Against this backdrop, we conclude that the Government's arguments supporting Savage's future dangerousness accurately summarized and fairly characterized information before the jury. *See Darden v. Wainwright*, 477 U.S. 168, 180–82 (1986) (holding comments casting the death penalty as the only guarantee against future similar acts do not deprive the defendant of a fair trial as long as they "d[o] not manipulate or misstate the evidence"). Here are the specific statements Savage alleges constituted prosecutorial misconduct:

- From the Government's penalty-phase opening statement:

    o "They put tighter restrictions on Kaboni Savage. They put tighter restrictions on his ability to have

150

visits. They put tighter restrictions on his ability to make phone calls and his ability to interact with other inmates. Problem solved? Not exactly, because you're going to hear that, first of all SAMs restrictions have to be updated every year. They are not automatic. There's no guarantee. They don't follow him necessarily for life. There's no guarantee they will continue." A29:15574.

- From the Government's penalty-phase summation:

  o "You've heard the testimony of why he will be a future danger. Why should everyone in BOP be on constant vigil for the next 40 years of his life? That is the question that you need to answer. In order to protect the prisoners, staff, cooperators in jail, cooperators' families out of jail, he will have to remain at AD[MA]X on SAMs forever. Even then you're not sure that [] will be enough. Putting aside for a moment that no one will likely be on SAMs for life, and he will likely enter the step-down process at some point in time, remember what he did while on SAMs, while under the restrictions imposed by the Attorney General of the United States, the most severe sanctions and restrictions there can be. [BOP] will have to monitor him until when? For what purpose? He's vowed to fight to the death. At what risk do we not take him at his word? As he said, 'you can't stop the inevitable.' He still gets

151

visits.  He still has the bowl.  You know he will find a way to get the word out.  You know that after the evidence presented to you in this penalty phase.   He manipulates and he abuses the systems in place to defeat their purposes.  SAMs restrictions, this highest level of restriction that you can have, no problem."  A31:16705–06.

o "You've heard the phrase, the reference, 'The past is prologue.' . . . It's truly applicable in this case.  Kaboni Savage's past has foretold you what the future will hold.  There truly is no other option in this case.  He will not be on SAMs forever.  He will not be at AD[MA]X forever. He will manipulate the guards.  He will compromise the guards, and he will compromise the system at every chance.  He will continue to do what he has done since the day he was incarcerated in 2004.  He will seek revenge on every cooperating witness and everything that they [h]old dear, their family, and he will do that from behind prison walls.  Kaboni Savage refuses to stop.  There's no way to be truly safe from his conniving ways as he vows, 'The fight don't stop till the casket drops.'"  A31:16713–14.

• From the Government's penalty-phase rebuttal:

o "[Defense counsel] says no one has been harmed [by Savage] in the nine years since 2004.  He's correct, at this point in time no one has been

152

harmed. It's not because of Kaboni Savage. It's in spite of Kaboni Savage. . . . It's because of AD[MA]X. It's because of a lot of things. It's because of the [Witness Protection] program. You heard a number of the witnesses in this case had to give up their lives. They gave up their names and were moved to locations where they have to start all over again all because of Kaboni Savage. So the [Witness Protection] program worked for them. Lamont Lewis is in [Witness Protection] in jail. It's worked for him. How long does this program have to go on to keep Kaboni Savage from acting out? At what cost and for what reason? . . . Now, if he is sentenced to life imprisonment, he goes to AD[MA]X for some period of time. None of us know how long. It's not going to be forever. . . . Now you have to put your trust and faith in people you don't know hoping, praying that they will do their jobs and be as vigilant, and 24 hours a day they will stay on top of Kaboni Savage . . . . Do you really want to run that risk? For what reason? . . . He starts at the H Unit. Where he goes from there is up to Kaboni Savage essentially. The SAMs are in place right now. How long will they be in place? None of us know. It's a yearly renewal. The Attorney General has to agree every single year to do this. If the decision is made to take down the SAMs, Kaboni Savage can be sent to a general population at a U.S. penitentiary anywhere. In general population, he will be free

153

16 hours a day. We're not talking about a couple of years, ladies and gentlemen. We're talking about a lifetime. In five, six, eight, ten years Kaboni Savage could easily be at a USP in general population, if that's what he decided to do. At that time, he has the freedom to do everything that he did at FDC and more." A31:16769–71.

o "I just want to make one point very clear. . . . There was a discussion [during cross-examination of a government expert witness] of three-way phone calls and the ability to monitor three-way phone calls. Let me be clear, that does not exist at the Bureau of Prisons. You heard that testimony. That does not exist. If Mr. Savage compromises those phone calls, he will be able to make three-way calls without anyone monitoring them." A31:16771–72.

o "Why is a sentence of death appropriate? He killed 12 people, killed innocent mothers, killed helpless children. He killed an innocent man over a car bump. He used fire to torture a family. He killed a witness to obstruct justice. He killed a family to obstruct justice. He coordinated killings from inside prison. He vowed to kill cooperators and their families until he dies. He manipulates the system to his advantage. He compromises BOP employees. You know the SAMs are not built to last forever. He won't be

154

housed at AD[MA]X forever. There is no way to guarantee the safety of the community even while he's incarcerated." A31:16774.

o "While [Savage's] children are certainly innocent victims in all of this, his very limited relationship with them does not outweigh the horrific violence that he has caused, and there's no reason to exhaust BOP resources to keep him from himself. . . . I'll rephrase the word, just to be clear . . . resources will be expended for him. Why do we need to expend resources for him?" A31:16775–76.

o "[W]hy must you make a choice to spare him the punishment he earned when it comes with so much peril and constant monitoring and is so likely subjected to compromise with a potentially deadly result?" A31:16777.

Savage correctly points out that the government may not urge jurors to speculate that a defendant will pose a future danger because prison officials might act incompetently. *See Darden*, 477 U.S. at 180 (condemning a prosecutor's argument that executing a defendant for a murder committed while furloughed was the "only guarantee" to prevent future violence because corrections officials might release him again); *Tucker v. Kemp*, 762 F.2d 1496, 1508 (11th Cir. 1985) (en banc) (deeming a prosecutor's comments about future parole improper because they "extended beyond a mere argument about future dangerousness into a claim that the jury had to

155

account for errors to be committed by other actors in the criminal justice system"). But that is not what the prosecutor argued here. Rather than implying the Attorney General or BOP officials might erroneously or lawlessly remove Savage's SAMs, prosecutors merely emphasized what both side's experts had testified to—no one can really say how long Savage will remain on SAMs, but everyone knows SAMs are not intended as a permanent solution. Additionally, as both experts conceded, although the H Unit/SAMs combination may effectively control Savage's behavior, no precaution can eliminate all security risks. *See also Tucker*, 762 F.2d at 1507 (concluding prosecutorial comments about the possibility of a defendant killing a prison guard or inmate if given a life sentence were "proper because they concerned the valid sentencing factor of [the defendant]'s future dangerousness"); *cf. United States v. Caro*, 597 F.3d 608, 625–26 (4th Cir. 2010) (finding parts of the government's future-dangerousness argument "troubling" but refusing relief since they were isolated, responsive to the defendant's suggestion that the BOP could adequately secure the inmate, and supported by the record).

Savage again overreaches in claiming the prosecutor suggested that his lawyers "would criminally conspire to help him violate the SAMs at AD[MA]X by arranging to 'patch him through' for unmonitored communications with unauthorized persons." Def. Br. 230. In examining the comments in question, we believe the Government merely highlighted the vulnerability of the legal-call system and Savage's prior manipulation of it. What's more, while presenting testimony on Savage's prior abuse of legal calls, prosecutors clarified that

156

Savage's trial counsel played no role. *See* A29:15642–43 ("Q: I want to be absolutely clear here. Different attorneys in 2004 and 2005 than the attorneys who represent Mr. Savage here, correct? A: Yes. Q: If you can tell us, you are fully competent, his current attorneys and their offices in no way participated in this type of scheme? A: Correct."). So prosecutors neither impugned Savage's trial team nor strayed from information that had been presented to the jury.

Finally, despite what Savage says now, the Government never directly argued that keeping Savage alive would be too costly. It is indeed improper for prosecutors to "argue that death should be imposed because it [is] cheaper than life imprisonment." *Blair v. Armontrout*, 916 F.2d 1310, 1322–25 (8th Cir. 1990) (quoting *Brooks v. Kemp*, 762 F.2d 1383, 1412 (11th Cir. 1985)) (holding the district court erred—though harmlessly—by permitting the prosecutor to argue "Why should we as taxpayers have to house this man for fifty years? Why should we have to feed him three meals a day for fifty years, clothe him for fifty years, furnish him recreation, medical care?"). But only economic efficiency arguments that specifically reference the pecuniary cost of prosecuting a defendant or of keeping a defendant alive have been held to violate that rule. *See, e.g.*, *Baer v. Neal*, 879 F.3d 769, 787 (7th Cir. 2018) ("We are not anxious to file the death penalty . . . the cost is unbelievable. Who knows what it's going to cost our community. Probably a half a million dollars. We've got people laid off. It's not something you do haphazardly. It's something you do to seek justice in a community" (alteration in original)); *see also Edwards v. Scroggy*, 849 F.2d 204, 210 n.5 (5th Cir. 1988) (finding error but declining to award habeas

157

relief after a prosecutor argued for a death sentence because the defendant could "watch television and live off the taxpayers' money for ten years . . . [a]nd get fed and housed and given all the conveniences of life"). In short, general references to the financial and administrative burden of ensuring a safe prison environment do not cross the line.

And that's what these comments did: they focused on the burdens the BOP faced to protect guards, other inmates and the public from Savage. The only time the prosecutor used the word "cost" was in relation to the need to keep witnesses in the Witness Protection Program. Even then, the reference was plausibly to emotional and psychological costs to witnesses rather than economic costs to taxpayers and the BOP. Those references were not improper prosecutorial comment.[82]

---

[82] Even if it could be said that any of the comments complained of were improper, such error would have been harmless beyond a reasonable doubt. The quantum of evidence mustered against Savage was weighty, and future dangerousness was just one of numerous aggravating factors the jury found unanimously beyond a reasonable doubt. *See supra* note 81. With that constellation of aggravating factors in mind, we are "confident that the jury would have imposed the same sentences even if the [future-dangerousness] factor had not been submitted for their consideration." *United States v. Bernard*, 299 F.3d 467, 485 (5th Cir. 2002).

**C. The District Court did not plainly err by admitting victim-impact statements.**

Savage next challenges the admission of victim-impact statements supporting the "harm to victims' families" aggravator. Although he concedes some statements permissibly "relat[ed] to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family," *Payne v. Tennessee*, 501 U.S. 808, 817 (1991), he still argues that others crossed the line and impermissibly involved "characterizations and opinions . . . about the crime, the defendant, and the appropriate sentence." *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (per curiam).

**1**

We must first determine the applicable standard of review. Since Savage challenges the statements on Eighth Amendment grounds, plenary review will apply if he preserved the issue in the District Court. *See United States v. Torres*, 383 F.3d 92, 95 (3d Cir. 2004) (applying plenary review to preserved challenges presenting legal questions). If not preserved, we review the issue for plain error—an actual, obvious error that prejudiced Savage and that substantially affected his trial's fairness, integrity and public reputation. *See United States v. Plotts*, 359 F.3d 247, 248–49 (3d Cir. 2004).

Savage contends plenary review applies. He makes that argument because his counsel asserted during a pre-sentencing-phase hearing that "there are issues with . . . about 90 percent of the victim impact letters," including "some things which just blatantly shouldn't be in the[m]" such as the

159

authors' "thoughts [about] the punishment." A29:15431, 15437. But Savage's counsel retreated from that position once the Government agreed to redact statements "mak[ing] reference to what the appropriate punishment should be." A29:15437. The District Court then recessed the hearing to "give [the parties] a chance to look at" the letters, adding: "If there's any disputes, I'll hear them before the day is out." A29:15438–39. Significantly, Savage's counsel never returned to the issue. And when it came time to admit the victim-impact statements, Savage's counsel remained silent. *See* A30:15776–15825. We therefore conclude that Savage did not "contemporaneous[ly] object[] to the victim-impact testimony." *United States v. Davis*, 609 F.3d 663, 683 (5th Cir. 2010). So we review his claims for plain error. *Id.*

**2**

We begin our review by surveying the law governing use of victim-impact statements in capital sentencing cases, including some state court decisions in cases raising Eighth Amendment challenges. The government may generally introduce victim-impact evidence "relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family." *Payne*, 501 U.S. at 817. Presenting that information "is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question." *Id.* at 825. And the government can always "remind[] the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Id.* (quoting *Booth v. Maryland*, 482 U.S. 496, 517 (1987) (White, J., dissenting)).

160

Yet we are mindful that "admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence" violate the Eighth Amendment if they "distract the sentencing jury from . . . the background and record of the accused and the particular circumstances of the crime" and thereby "create[] an impermissible risk that the capital sentencing decision will be made in an arbitrary manner." *Bosse*, 137 S. Ct. at 2; *Booth*, 482 U.S. at 505–07, *overruled on other grounds by Payne*, 501 U.S. 808. In *Booth v. Maryland*, the Supreme Court considered victim-impact statements saying that the victims were "butchered like animals," that the defendant could "[n]ever be rehabilitated" and should not be "able to . . . get away with it" or "to do this again," and that even "animals wouldn't do" what the defendant did. 482 U.S. at 505–08. The Court held that those statements violated the Eighth Amendment because they directly characterized both the crime and the defendant in a way that "serve[d] no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence." *Id.* at 508.

Mindful of the Supreme Court's admonition about jurors characterizing the appropriate sentence, courts have held victim-impact statements directly asking the jury for a death sentence violate the Eighth Amendment, too. *See, e.g.*, *Dodd v. Trammell*, 753 F.3d 971, 995–96 (10th Cir. 2013); *Ex parte Washington*, 106 So.3d 441, 445–46 (Ala. 2011) (same); *Miller v. State*, 362 S.W.3d 264, 283–84 (Ark. 2010) (same).

That said, abstract pleas for justice, accountability or closure do not by themselves violate the Eighth Amendment. *See State v. Worthington*, 8 S.W.3d 83, 89–90 (Mo. 1999). Nor

161

does "emotionally charged testimony" inviting the jury to "infer" a desire for "execution," as long as "no evidence as to the witnesses' preferred sentence [i]s actually admitted." *United States v. Whitten*, 610 F.3d 168, 190–92 (2d Cir. 2010) (noting "[i]t cannot be expected that victim impact testimony will be cool and dispassionate" and concluding "anguished testimony . . . describ[ing] how [the victim's] children visit the cemetery on Father's Day and other occasions, write letters to their father, and embrace his headstone . . . . does not appear to exceed (or approach) the margins of what has been allowed"); *see also Williams v. State*, 251 S.W.3d 290, 293–95 (Ark. 2007) (upholding admission of a victim's testimony, "The meeting of my brother and sisters when we get together it'll never be the same.  We ask ourselves what can we do in situations like this.  Well, we can't do anything as a family but hold together and pray together.  But you can do something.  You are in a position to do that.  What would you do if it was your brother or your sister or your baby that someone stole away from you.  I can't do anything, but you can.  No words can express how we feel.  Silence, the silence of never hearing [my brother]'s voice again haunts me and it will continue to haunt me.  We miss him.  We want him back but we can't."); *State v. Chinn*, 709 N.E.2d 1166, 1188 (Ohio 1999) (upholding admission of a victim's testimony that "now we feel that the time has come for [the defendant] to be punished according to the law of Ohio.").

And statements expressing an ongoing fear of reprisals fall well within bounds since they "properly show[] how the victim's death affected his surviving relatives."  *People v. Wilson*, 114 P.3d 758, 792 (Cal. 2005); *see also United States*

162

*v. Battle*, 173 F.3d 1343, 1348 (11th Cir. 1999); *People v. Tully*, 282 P.3d 173, 245–46 (Cal. 2012); *Baker v. State*, 71 So.3d 802, 817–18 (Fla. 2011).

To be sure, applying these rules requires a judge, inevitably, to engage in line-drawing. At one end of the spectrum, the Fifth Circuit held that a district court plainly erred by admitting a father's victim-impact statement saying, "our children were tragically and recklessly stolen from us. . . . [I]t was just a useless act of violence and a total disregard of life," apparently concluding the statement would distract the jury and cause them to make an arbitrary sentencing decision. *United States v. Bernard*, 299 F.3d 467, 480 (5th Cir. 2002).

At the other end, the California Supreme Court permitted a sister to testify "that she could not understand why someone whom [her late brother] befriended and trusted would kill him," holding the statement did not improperly characterize the defendant but rather merely addressed how the murder affected her. *Wilson*, 114 P.3d at 790–92 (Cal. 2005). The Arkansas Supreme Court reached a similar conclusion about a victim-impact statement expressing "disbelief," "anger," and the feeling of being "torn apart." *Kemp v. State*, 919 S.W.2d 943, 957 (Ark. 1996). The Fourth Circuit likewise upheld the admission of a mother's victim-impact statement expressing her suffering through rhetorical questions posed to the defendant. *See United States v. Barnette*, 390 F.3d 775, 797–800 & n.7 (4th Cir. 2004) ("I didn't get to tell her good-bye. She was the joy of my life. Marc [the defendant] knew she was the joy of my life. The only little girl I had. You knew that, Marc. You took her life. Took away her future. You know how much she meant to me. . . . How can you kill my

163

baby?  Why you kill [sic] my baby, Marc?  She loved you, you know that.  She never mistreated you, Marc."), *vacated on other grounds*, 546 U.S. 803 (2005); *cf. United States v. McVeigh*, 153 F.3d 1166, 1218–22 (10th Cir. 1998) (allowing emotionally "devastating" victim-impact statements about "witnesses' last contacts with deceased family members" killed in the 1995 Oklahoma City bombing and their "agonizing efforts to find out what happened to their loved ones," "the professional and personal histories of victims," a mother's "recovery and return of her deceased daughter's hand six months after the explosion," and a graphic depiction of the near-suicide of a victim's husband).

**3**

Against this background, we turn to the specific victim-impact statements Savage challenges:

- "What gives anybody the right to blatantly take a life with no thought of remorse and audacity to play God?"  A30:15779–80.

- "I disconnected myself from most of my family, not wanting to be in the presence of constant reminders of better times.  Also a lot of them didn't want me around fearing that I would put them and their families in danger. . . .  I questioned my faith because—let's see.  The only positive I see in my future is justice. . . . I know it will not bring my family back, but this will not allow anyone to hurt anyone else.  This should end right here."  A30:15796–98.  Because

164

this victim worked as a prison guard, she also explained her "genuine concern of [being] where [Savage was] in any way affiliated with anyone, whether they know him. When in the presence of inmates, it took me [to] a whole different level. I began to have anxiety attacks when in the presence of a lot of them in the rec room[,] leading to my transfer and [a] no inmate contact agreement." A30:15797–98.

- "[P]lease, we ask of you, the Court, let justice be done for all that have been killed by these people. Please let justice be done." A30:15805–06.

- "How can anyone take the lives of women and kids[?]" A30:15809.

- "It is not fair or right for . . . the person directly or indirectly responsible for the death of those souls to walk around the earth free, not being held accountable for the part of the crime. We deserve closure in this matter and for [the] full extent of the law to be done in this matter. . . . All I ask is for the members of our family's lives not to be in vain." A30:15811–12.

- "It hurts my heart when I look in their eyes, see the pain we all share. Just waiting for justice. . . . My sister's and nephew's heart have been broken into many pieces. What kind of man would kill women and children?" A30:15812–13.

165

- "I can't understand how or why a person would do such a heinous act. Then to say such hurtful words after you have did this to our family. . . . I feel that everyone involved should get the same sentence as if they all threw the gasoline and match. How do they sleep at night? My family didn't deserve this at all. We don't trust no one with or around our children, and don't feel protected because if calls were [monitored by the Government], why did we have to lose our family members? . . . I'm afraid of courtrooms due to you don't know who is who and not living in a safe environment because of pollution of murderers who saw fit to kill children . . . . My prayer is full justice for all." A30:15813–15.

- "[M]y son and his paternal family were brutally murdered for no reason . . . . This was the worst crime in the history of Philadelphia in 2004. . . . How do you live with yourself and the decisions you've made[?] . . . How do we go on in our daily lives knowing you could care less that you inflicted so much pain and grief to so many people?" A30:15816–17.

- "My daughter said to me, Mommy, I still can't believe my brother is gone. I have no closure. How do I comfort my child? Honestly, I can't because we have no closure." A30:15817.

166

- "I will never understand how someone could kill anyone, anyone kill innocent people who are full of life." A30:15819.

- "Every year on October 9th I'm reminded how the evil actions of one man cost my family a tremendous loss." A30:15820.

- "I will forever have the image of their bodies being carried out in those blue bags. For a long time after the fire I couldn't go past 6th Street because that's all I saw. He, Kaboni Savage, turned my last memory of a place that I and many of my other family members shared so many fun times, into the most terrible thing I ever saw, into a lasting image and heart-tearing image." A30:15821.

- "Sean Anthony Rodriguez's life ended on October 9, 2004 at the age of 15. His murder caused his family pain unlike no other. He spent the night at a friend's house and never came home, the life of an innocent child, and a part of his family died never knowing that you will get what is coming to you, and hopefully the next." A30:15823.

- "I'm still confused about how anyone could do something like this to anyone. I personally continue to feel the pain of having to live with the fact that the people who are responsible for

167

this crime have not been held accountable for their actions. But with this having been said, I hope that this will bring some cleansing for myself and my family." A30:15824.

None of these statements form a basis for plain error. The Government acknowledges some "came close to" the constitutional line, Gov't Br. 203, and we don't disagree. But none are blatant violations of the Eighth Amendment's prohibition against direct and inflammatory characterizations. Nor do any explicitly request the death penalty.[83] At most, the statements express a generalized desire for justice and closure. Some seem to gesture vaguely toward capital punishment. Others emphasize a victim's individuality and the unique loss a victim's death posed, or highlight a witness's profound loss and vulnerability. And most significantly for plain-error purposes, all resemble statements that other courts of appeals and state supreme courts have declared constitutional.

In any event, even if a statement crossed the line (which we do not see here), we conclude Savage was not prejudiced "[i]n light of all of the other evidence, including the properly admitted victim impact testimony and the grisly nature of [the] crime." *Storey v. Roper*, 603 F.3d 507, 521 (8th Cir. 2010)

---

[83] Indeed, underscoring that none of the victim-impact statements directly opined on what Savage's sentence should be, the District Court instructed the jury that "because the law does not permit any witness to state whether he or she personally favors or opposes the death penalty, you should draw no inference either way from the fact that no witness has testified as to their views on this subject." A32:16795.

168

(refusing relief for improper victim-impact testimony because it did not affect the defendant's substantial rights); *see also Hain v. Gibson*, 287 F.3d 1224, 1239–40 (10th Cir. 2002) (holding "the jury would have imposed a sentence of death even absent the improper victim impact testimony" because "the horrific nature of the murders"—the defendants forced the victims into a car trunk before setting the car on fire—"was uncontroverted" and "the evidence of [the defendant's] guilt [and future dangerousness] was substantial"). Either way, no victim-impact statement considered by the jury, nor any portion thereof, constituted plain error.[84]

### D. The District Court's admission of autopsy photographs offered to support the "especially heinous, cruel, or depraved" aggravator was not improper.

Savage challenges the District Court's decision to admit the firebombing victims' autopsy photographs. Although the Federal Rules of Evidence do not apply during a capital

---

[84] Savage also claims the Government compounded a constitutional violation by highlighting these victim-impact statements during its penalty-phase summation. We reject this argument for many of the same reasons we reject his challenge to the statements themselves. What's more, we conclude that even if these prosecutorial comments were improper, they would not warrant plain error relief since they are "not, in and of themselves, nearly as inflammatory as the graphic evidence of the murders, or as powerful as the extensive victim impact testimony" itself. *Mikhel*, 889 F.3d at 1056 (quoting *United States v. Mitchell*, 502 F.3d 931, 995–96 (9th Cir. 2007)).

sentencing phase, the FDPA supplies a limitation paralleling Rules 402 and 403: "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor," but "may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." § 3593(c).[85]

Here, Savage brings something akin to a Rule 402 relevancy challenge. The Government offered the autopsy pictures to show the arson murders were "especially heinous, cruel, or depraved"—a noticed statutory aggravator. § 3592(c)(6). That aggravator requires proof of "torture" or "serious physical abuse." *Id.* As relevant here, prosecutors can prove "serious physical abuse" by showing a defendant "inflicted 'suffering or mutilation above and beyond that necessary to cause death.'" *United States v. Montgomery*, 635 F.3d 1074, 1095–96 (8th Cir. 2011) (quoting *United States v. Agofsky*, 458 F.3d 369, 374 (5th Cir. 2006)). Savage argues the pictures are not relevant to that point since they don't reveal anything about the cause of death, but "merely document the . . . . 'gruesome spectacle' of the murders' aftermath." Def. Br. 263 (quoting *Godfrey v. Georgia*, 446 U.S. 420, 433 n.16 (1980)).

---

[85] In fact, § 3593(c) is slightly more sensitive than 403, because Rule 403 only excludes evidence "if its probative value is *substantially* outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." (emphasis added). That said, Rule 403 also allows for exclusion based on undue delay, waste of time or cumulativeness, none of which justify exclusion under § 3593(c).

He also brings what is effectively a Rule 403 challenge, arguing "any conceivable probative value of the autopsy photographs was negligible and far outweighed by their unfair prejudicial impact." Def. Br. 274.

The District Court disagreed on both fronts. The Judge ruled that the gruesome postmortem injuries remained relevant to the "serious physical abuse" question. And though acknowledging the photographs were "not pleasant," he allowed the jury to view them under conditions designed to minimize unfair prejudice. A32:16861. We discern no error.

**1**

Here too the parties dispute the applicable standard of review. Citing *United States v. Trala*, Savage argues for de novo review because he says the District Court's decision to admit the autopsy photographs rested on an erroneous understanding of a legal standard. *See* 386 F.3d 536, 545 (3d Cir. 2004). For its part, the Government says any "decision regarding the admissibility of evidence is reviewed for abuse of discretion." Gov't Br. 220. We need not decide the issue because the District Court's rulings on relevancy and prejudice withstand even plenary review.

**2**

Here, the District Court got the relevancy question right. The autopsy pictures tended to show that the fire mutilated the victims above and beyond their cause of death. And that fact supports the "especially heinous, cruel, or depraved"

171

aggravator. Savage's contrary argument fails, both on precedent and even on its own terms.

Savage's quasi–Rule 403 challenge fails as well. The autopsy photographs may be horrific, but they have considerable probative value, and the District Court took adequate steps to ameliorate any risk of unfair prejudice.

**a**

Savage raises a narrow legal challenge to the photographs' relevancy. He claims that for a murder to involve serious physical abuse, the abuse cannot arise directly from the same force that caused death. This position allows Savage to argue that the autopsy pictures lack relevancy because "[t]he exact same force that was used to kill the victims—the ignition of the arson—also produced the . . . post-mortem thermal injuries captured in the photographs." Reply Br. 90. But that can't be right.

If Savage is correct, the "especially heinous, cruel, or depraved" aggravator would almost never apply to an arson murder. Yet that's not how some courts have seen it. Several state courts have recognized that arson murders are often—if not always—especially heinous, cruel or depraved. *See, e.g.*, *Scott v. State*, 163 So.3d 389, 470 (Ala. Crim. App. 2012); *Dunaway v. State*, 746 So.2d 1021, 1039–41 (Ala. Crim. App. 1998); *State v. Knapp*, 562 P.2d 704, 716 (Ariz. 1977) (en banc) ("We can hardly think of a more ghastly death than this for anyone."); *Hain v. State*, 919 P.2d 1130, 1146–47 (Okla. Crim. App. 1996); *Smith v. State*, 659 P.2d 330, 337 (Okla. Crim. App.) ("The victim was beaten into helplessness and left

172

in the bed of his pickup truck, and the truck was then set on fire. He died from the inhalation of flames and smoke. It is clear that the defendant either intended to inflict a high degree of pain or else he was utterly indifferent to his victim's suffering."), *vacated on other grounds*, 464 U.S. 924 (1983).

Although those state court decisions do not directly interpret the federal statute at issue here, they clearly demonstrate that burning someone to death is a heinous crime within the ordinary meaning of that word. And being burned to death certainly involves 'torture or serious physical abuse' as required by the FDPA. § 3592(c)(7). That is a more than sufficient basis to invoke the "especially heinous, cruel, or depraved" aggravator. The autopsy photos were directly relevant to proving that the victims died as a result of the arson. They were thus directly relevant to the applicability of the aggravator.

**b**

The District Court also correctly held that the risk of unfair prejudice did not outweigh the probative value of the photographs. Savage protests, arguing that the photographs are extremely graphic. They are. They depict the horrific results of a horrific crime. Yet it should hardly be surprising that evidence probative of the "especially heinous, cruel, or depraved" aggravator will often be horrific in nature. That fact alone cannot be a reason for excluding it.

And it is worth emphasizing that these autopsy photographs came into evidence during the penalty phase of the proceedings and not the guilt phase. The jury had already

173

concluded Savage was guilty of the murders. So the classic Rule 403 concern—that a photograph's gruesome nature will "lure the factfinder into declaring guilt" based on emotion or passion, *Old Chief v. United States*, 519 U.S. 172, 180 (1997)—is inapposite here. Put simply, the jury had already decided Savage was guilty of the six arson murders. Deciding just how brutal or cruel those murders were is inherent in penalty-phase determinations.

On this point, the autopsy pictures—gruesome as they are—offer singular probative value. Photographs convey a pictorial accuracy and detail that words cannot duplicate nor that advocates can spin. Twelve jurors listening to a description of an abused corpse might walk away with twelve different understandings of the abuse's severity. Color photography, especially these photographs, leave little room for disparate impressions. It is hard to imagine more accurate evidence of a murder's cruelty, heinousness or depravity. We therefore conclude that any danger of unfair prejudice did not outweigh the photographs' probative value.[86]

---

[86] In so holding, we join several other courts of appeals in allowing autopsy photographs to support the "especially heinous, cruel, or depraved" aggravator. *See, e.g.*, *United States v. Brown*, 441 F.3d 1330, 1362 (11th Cir. 2002) (holding color photographs of stab wounds, both fatal and nonfatal, were admissible to prove the "especially heinous, cruel, or depraved" aggravator); *United States v. Sampson*, 486 F.3d 13, 43 (1st Cir. 2007) (holding the district court did not abuse its discretion in admitting autopsy photographs during the penalty phase because they "shed light on the manner in which each

174

Although we reach that conclusion based on our examination of the photographs themselves, we also consider the District Court's prudent steps intended to mitigate the risk of unfair prejudice. Even after admitting the photographs into evidence, the District Court did not immediately publish them to the jury. Instead, the photographs were placed in an envelope, leaving it to the jury to decide whether they wished to view them. When the jurors, during their deliberations, asked to see the photographs, the District Court returned them to the courtroom, warned that the photographs were "not pleasant," reminded the jurors "that your decisions in this matter must be based upon the evidence and testimony and not based upon any bias or prejudice or emotion," told them to "heed those instructions when you are looking at these photographs," and directed them to return the photographs after they finished viewing them. A32:16861. The jury returned the photographs less than ten minutes later.[87] To the

victim was killed (an important integer in the jury's determination of whether the murders were committed in an especially heinous, cruel, or depraved manner)"); *United States v. Ortiz*, 315 F.3d 873, 897 (8th Cir. 2002) (finding no abuse of discretion after a district court admitted "graphic" photographs of a murder "victim's bloody corpse" to "support the government's contention that the crime was particularly heinous and depraved").

[87] The pictures' quantity and composition further diminish the risk of unfair prejudice. The District Court admitted only one photograph for each victim, and the bodies are depicted lying on a medical examination table, not amid the arson ashes and rubble. So although "gruesome crimes result in gruesome

175

extent the photographs posed a risk of unfair prejudice—and we acknowledge that such risk is always present when photographic evidence of this nature is before a jury—the District Court took sensible and effective measures to mitigate it.

\* \* \*

All told, the District Court correctly admitted the autopsy photographs as proof of the "especially heinous, cruel, or depraved" aggravator.

### E. The Government's argument against the "equally culpable" mitigator did not violate the Fifth or Sixth Amendments.

Savage's penalty-phase strategy sought to cast Lamont Lewis as an equally culpable defendant who was nevertheless not facing the death penalty—a statutory mitigator jurors were to consider. *See* § 3592(a)(4). Indeed, it was Lewis who firebombed the Coleman home and later admitted to five other murders—yet ultimately pled guilty in exchange for forty years of imprisonment.

In response, the Government sought to distinguish Lewis's past conduct as less blameworthy than Savage's. Savage now contends that making the distinction

---

photos," *Hain*, 919 P.2d at 1143, these photographs portray the victims in a manner not designed to accentuate the victims' horrific injuries.

176

impermissibly turned his Fifth and Sixth Amendment rights against him.

**1**

We start with this passage from the Government's penalty-phase closing argument (but ignore the underlining for now):

> I want to talk about ... equally culpable defendants not getting death. That is one of the mitigators. You know in this case Lamont Lewis is not getting the death penalty. You know that. He will be sentenced to 40 years to life. ... When weighing that mitigator, consider Lamont Lewis' acceptance of responsibility. His acknowledgment of his wrongs, his willingness to <u>cooperate</u>, the fact that he does not have a vendetta against the rats or the rats' families. He doesn't have a pact to kill loved ones. He did not call out hits from inside the jail. He's not bent on destroying the justice system by killing witnesses. He is not and has not abused the right to communicate while he has been in prison. While these two men, Kaboni Savage and Lamont Lewis, were engaged in the same criminal actions at times and Lamont Lewis is certainly responsible for his violent killing spree, these two men are not equally culpable. They are not equally culpable for the rampage that Mr. Savage is responsible for. The only person responsible for all of that is Kaboni Savage.

177

> That's why justice warrants the ultimate punishment.

A31:16708–09 (emphasis added).

Then came the defense summation. Savage's attorney tried to reinforce the "equally culpable" mitigator by contrasting Lewis's extensive criminal history with his lesser punishment. Defense counsel also tried to use Lewis's criminal history—including his admission during the guilt-phase trial that he sold drugs in jail—to suggest Lewis himself posed a future danger. "You should be [concerned] about future dangerousness," he concluded. *Id.* at 16742. "You are looking at it right there, Lamont Lewis." *Id.*

The Government pushed back during its rebuttal, acknowledging that recommending Lewis's non-capital sentence required a "tough call," but urging jurors to "remember [Lewis's] testimony" when "comparing" him to Savage:

> He sat in this courtroom and he took responsibility for everything that he has ever done wrong. He admitted he was wrong. He didn't say, "The rats had it coming." He didn't say his problems were caused by rats. He admitted he was the one who was at fault. He isn't a danger going forward. He told you that he had time to reflect when he got to [jail] and realized the magnitude of all of the harm that he had caused. He does not have the vendetta going forward that Kaboni Savage has. He is not trying

178

to blame people on the outside for his situation. He is trying to take steps to try to <u>get some amends for what he has done</u>. . . . Never going to happen, but at least he's trying. Also, remember that . . . Lamont Lewis did the . . . murders under the direction and when ordered by Kaboni Savage. Kaboni Savage is the one who wanted those people dead. . . . Lamont Lewis is not seeking revenge. He's not looking to kill witnesses. . . . Lamont Lewis is like a trigger on a gun. Kaboni Savage is the trigger man.

*Id.* at 16764–66 (emphasis added).

As for Lewis's criminal history, the prosecutor noted Lewis "admitted it was wrong" after

ha[ving] time to reflect and think about what he had done and to understand and appreciate the magnitude of what he had caused. He told you that's one of the reasons he <u>pled guilty</u>. That's one of the reasons when you're considering comparing Lamont Lewis to Kaboni Savage, that the two are not equally culpable. Remember that Lamont Lewis has been in federal custody since 2007. Did you hear one peep during his testimony about him illegally using the legal mail or the legal phone calls to talk to, to coordinate, to make—touch base with people on the outside illegally? Not once. He did not order any murders from prison. Kaboni Savage ordered two that ultimately resulted in seven

179

deaths.  I say this not because Lamont Lewis is an angel.  He is not.  He is a convicted killer of multiple people.  But when you're comparing the two, he is not the danger that Kaboni Savage is.  Kaboni Savage is a danger going forward.

*Id.* at 16766–67 (emphasis added).

**2**

Savage contends that the prosecutorial comments that we have underlined violated the Fifth and Sixth Amendments by faulting Savage for not pleading guilty and for failing to testify.  But in context, the statements he challenges weren't about him at all; the Government was merely rebutting defense counsel's suggestions of equal culpability and of future dangerousness by pointing to the fact of Lewis's cooperation.

**a**

The parties again disagree about the standard of review.  The Government argues for abuse-of-discretion review, the usual standard when a defendant challenges a district court's decision to allow or excuse certain prosecutorial comment.  *See Moore*, 255 F.3d at 107.  But Savage argues for the more exacting de novo standard since these statements related to his Fifth and Sixth Amendment rights.  *See* Def. Br. 279 (citing *United States v. Hardy*, 37 F.3d 753, 756 (1st Cir. 1994); *United States v. Mayans*, 17 F.3d 1174, 1185 (9th Cir. 1994)).  We need not resolve the issue since the prosecutor's comments clear either hurdle.

**b**

The Government's penalty-phase closing and rebuttal did not impermissibly trench on Savage's Fifth and Sixth Amendment rights.  True, the Fifth Amendment does forbid prosecutors from commenting on a defendant's decision not to testify, just as the Sixth Amendment forbids prosecutors from commenting on a defendant's decision to plead not guilty. *See United States v. Jackson*, 390 U.S. 570, 581–83 (1968).  But prosecutors cross these lines only when they use language "manifestly intended" or "of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify" or plead guilty.  *United States v. Chaney*, 446 F.2d 571, 576 (3d Cir. 1971) (internal quotation marks omitted) (quoting *Hayes v. United States*, 368 F.2d 814, 816 (9th Cir. 1966)).

So we consider the specific statements that Savage challenges.  Here's how he describes them in his brief: "the prosecutor's adverse references to Savage's failure to 'cooperate,' 'ple[a]d guilty,' 't[ake] responsibility,' and thus 'get some amends for what he has done.'"  Def. Br. 292 (underlining added) (alterations in original).

None of these statements, nor all of them taken together, come close to violating Savage's constitutional rights.  First of all, the underlined language does not describe Savage's failure to do anything.  Rather, Savage plucks individual words and phrases from portions of the Government's closing argument that highlighted the cooperation of Lewis.  Hearken back to the underlined language in the quotations.  Fairly viewed and read in context, rather than in sliced-and-diced form, these

181

statements focus on Lewis, explaining why he wasn't equally culpable and why he wouldn't pose a future danger. Savage's invocation of the equally culpable mitigator necessarily invites just such testimony and argument.

And Savage offers no authority to support his constitutional injury-by-implication argument. Instead, courts find a constitutional injury only when a prosecutor explicitly faults a defendant's exercise of his *own* constitutional rights. *Lesko v. Lehman* is just such a case. There, a prosecutor impermissibly highlighted the defendant's lack of remorse, "ask[ing] the jury to consider [the defendant's] 'arrogance' in taking the 'witness stand' to present mitigating evidence about his background, without even having the 'common decency to say I'm sorry for what I did.'" 925 F.2d 1527, 1544–45 (3d Cir. 1991) (quoting trial transcript) (describing "[t]he prosecutor . . . parod[ying] the gist of [the defendant]'s testimony: 'I don't want you to put me to death, but I'm not even going to say that I'm sorry.'" (quoting trial transcript)). So too in *United States v. Whitten*, where a prosecutor tried using a capital defendant's own failure to take the stand to discredit the defendant's penalty-phase allocution. 610 F.3d 168, 198–200 (2d Cir. 2010) (restating "the uncontroversial rule that prosecutors can emphasize that an allocation is unsworn and uncrossed" but holding the prosecutor's remark that "[t]he path to that witness stand has never been blocked for [the defendant]" could be understood as an impermissible comment on the defendant's failure to testify during the guilt-phase trial).

If anything, the Government's comments in this case land closer to what was said in *United States v. Mikhel*, where

182

a prosecutor rebutted the "equally culpable" mitigator by asking the jury to "compare [the cooperator's] conduct with that of [the defendants]" and noting the cooperator "led the FBI to bodies they never would have found in this case." 889 F.3d 1003, 1060 (9th Cir. 2018) (quoting trial transcript) (emphasis omitted). Judge Bybee explained these comments did not violate the Fifth Amendment since they "would[n't] naturally and necessarily be understood as commenting on defendants' failure to testify." *Id.* (internal quotation marks omitted). So too here. Viewed in their proper context, the challenged statements merely rebut both Savage's "equally culpable" mitigator stance and his argument concerning Lewis's future dangerousness. A jury would not naturally—and certainly not necessarily—take them as a comment on Savage's choice to exercise his constitutional rights.

And once again, any error in this regard would have been harmless since the jury unanimously agreed that the "equally culpable" mitigator did apply despite the prosecutor's arguments to the contrary. In that way, this case mimics *United States v. Runyon*, where a prosecutor undercut the "equally culpable" mitigator by pointing out that another defendant pled guilty rather than forcing "a jury[ to] weigh in on all the evidence and determine whether [he] was guilty." 707 F.3d 475, 508 (4th Cir. 2013) (second alteration in original). Without deciding whether this comment impermissibly shaded the defendant's Fifth and Sixth Amendment rights, the Fourth Circuit concluded that any error would have been harmless beyond a reasonable doubt since the jury unanimously found the "equally culpable" mitigator anyway. *Id.* at 510 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)) (noting "[t]he

183

list of aggravators and mitigators weighed by the jury would thus have been identical with or without the statements of which [the defendant] complains").

*    *    *

In sum, the prosecutor rebutted the "equally culpable" mitigator without impermissibly faulting Savage for invoking his constitutional rights. And even had he crossed the line, any error would have been harmless because the jury still found for Savage on the "equally culpable" mitigator.

### F. The Government properly rebutted the mitigators relating to Savage's relationship with his family.

We turn to two nonstatutory mitigating factors concerning Savage's relationship with his family: that "Savage has been a positive influence in the lives of his children, niece, and nephew" and that "Savage can continue to be an important influence in the lives of his children." A2:790. Although the Government sought to rebut these mitigators with testimony and argument tending to show Savage had maintained little contact with his family, eight jurors still found the first mitigator and four jurors found the second. Despite those findings, Savage now rehashes the prosecution's rebuttal, arguing the Government violated his constitutional rights by limiting his contact with family while he was imprisoned, and then disparaging the limited nature of the familial relationships.

184

For analytical purposes, we separate his argument into two claims: First, that the Government unconstitutionally interfered with his ability to develop mitigation evidence about family relationships; second, that the Government's rebuttal of the "familial relationship" mitigators unfairly characterized those relationships as limited.

Distilled to its essence, the first claim challenges Savage's confinement conditions. To be sure—and for reasons previously explained—the Government broadly circumscribed Savage's ability to communicate generally with the outside world. Those restrictions reasonably related to legitimate penological interests and, at all events, the record shows Savage still had an adequate opportunity to develop and present mitigation evidence about his familial relationships.

The second claim boils down to allegations of improper cross-examination and prosecutorial argument. Here too, we discern no error. The challenged cross-examinations reiterated facts the defense itself had already elicited, and the challenged argument appropriately rebutted the defense's mitigation evidence.

**1**

The first claim—that the Government unconstitutionally interfered with Savage's ability to develop mitigation evidence about his familial relationships—simply retreads disagreements over the time, place and manner of Savage's family visits. These disagreements began during voir dire, and prompted a memorandum opinion from the District Court recognizing that Savage needed "the opportunity to

185

develop . . . evidence" to "present at the sentencing phase of his trial." The District Court also agreed with the defense that "the ability to visit with his children could impact the preparation of [Savage]'s mitigation case." A1:46–48. The Judge ultimately refereed ongoing disputes over the time, place and manner of the visitation throughout the trial. Savage, however, was never satisfied.

One such example stems from the BOP's confinement of Savage on FDC-Philadelphia's maximum-security floor during the trial. Although the maximum-security floor had a visitation room, the BOP did not allow the presence of minors on that floor. That led defense counsel to demand either that the BOP make an exception and allow Savage's children onto the maximum-security floor, or that the BOP transfer Savage to another facility that could accommodate minors' visits under maximum-security conditions (like, apparently, the Metropolitan Correctional Center in New York, where the BOP sometimes held Savage during breaks in his trial). For its part, the BOP offered to shut down the entire lower-security floor's visitation area and to conduct the visit there. But because of the lower-security environment, the BOP said Savage would have to be immobilized by keeping him in a seated position. Defense counsel bristled, protesting that "[t]hat is inappropriate to meet with his children," thereby precipitating an impasse that went unresolved. A34:18080.

Yet we fail to see how this impasse amounts to a constitutional deprivation. The defense team still managed to arrange two occasions for the defense's expert social worker to observe Savage interacting with his children. The social worker testified that she had considered "a lot of evidence" and

formed an educated opinion—an opinion that was very favorable to Savage, and that went largely unchallenged by the Government. A30:16264–68. She never suggested that more observation would have changed her opinion, and Savage never specified what additional witnesses or information he was prevented from offering. Although more familial contact may have strengthened his ability to build mitigation evidence generally, the same could be said for every capital defendant. The Constitution simply does not guarantee capital defendants unfettered access to their families.

At all events, to the extent Savage challenges the BOP's refusal to allow him to be unrestrained on a lower-security floor, he is essentially challenging the reasonableness of a prison regulation. But "restrictive prison regulations are permissible if they are 'reasonably related to legitimate penological interests[]' and are not an 'exaggerated response' to such objectives." *Beard v. Banks*, 548 U.S. 521, 528 (2006) (citation omitted) (quoting *Turner v. Safley*, 482 U.S. 78, 87 (1987)). Savage never explains why the BOP's conditions violated this standard; indeed, Savage doesn't even cite the standard. That failure is fatal to his argument since "the prisoner 'bears the burden of persuasion' when he is challenging a regulation." *Sharp v. Johnson*, 669 F.3d 144, 157 (3d Cir. 2012) (quoting *Banks*, 548 U.S. at 529).

We regard the BOP's insistence on immobilizing Savage in a seated position as well within bounds. "[P]rison administrators are not required to use the least restrictive means possible to further legitimate penological interests," *Monroe v. Beard*, 536 F.3d 198, 207 (3d Cir. 2008), and we "presum[e] that the prison officials acted within their 'broad

discretion,'" *Shaw v. Murphy*, 532 U.S. 223, 232 (2001) (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989)). "We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Given Savage's extraordinary history of initiating violent crime through his contact with the outside world, we are especially unwilling to second-guess the BOP's assessment of the risks Savage posed outside his specially modified, maximum-security cell.

Savage's proposed alternatives—allowing minor children onto a maximum-security floor or transferring him to another facility—would "burden . . . prison resources." *Jones v. Brown*, 461 F.3d 353, 360 (3d Cir. 2006). That factor, plus that Savage "retain[ed an] alternative means of" visiting his children and that no "alternative" would "fully accommodate" Savage's request "at *de minimis* cost to valid penological interests," underscore the reasonableness of the BOP's position. *Id.*

**2**

Next, Savage identifies four prosecutorial comments— two made during cross-examination and two in closing arguments—which he contends improperly exploited his restricted familial relationship.

188

**a**

Before we discuss the comments themselves, we summarize the relevant portions of Savage's mitigation case. The mother of one of Savage's children described Savage as "a good father, a loving person, very family-oriented," and someone who "always wanted all the kids . . . . to come over and spend time with him."  A30:16224, 16228.  She also testified that their daughter Siani

> loves her father very much.  She wants to talk to him.  She wants to come visit him, but we haven't been able to do that on a regular basis. . . . Kaboni has always been a positive factor in his daughter's life.  These negative things that people are bringing about is nothing that we have witnessed, his daughter has not witnessed.  He's been a positive influence on her.
>
> . . .
>
> They have a bond with each other that just was unbreakable. . . . [S]he loves him regardless of anything that is happening in this case.  This has been her father since birth.  She's grown up and basically looked up to him.  He has been her hero.  She was daddy's little girl from the beginning, so it's really difficult and hard for her to not have him around.  She still loves him and wants him in her life, and I want him to be part of her life as well.  He needs to be around.  She needs to have him in her life.  She has to have

189

him in her life. She doesn't want to function without him in her life. She still goes to school and does well anyway and gets good grades and wants to make him proud, and that's what she focuses her goals on.

A30:16228–29, 16241–42.

Savage's own mother similarly noted that Savage still communicated with his children through letters, and that "they love him so hard." A31:16400.

Savage's son Kaiion testified that before his father's arrest, they "went out every weekend to the movies" and that Savage "stayed on us all the time about school" and "made sure he raised us like men." A31:16527. Kaiion also expressed a belief that despite Savage's incarceration, his father "c[ould] continue to have influence in [his] life." A31:16543.

Similarly, Savage's nephew Yusef described a "school project" from "2004" when he

had to choose the person of the year, the person who impacted [his] life the most, and [he] nominated [Savage] because of the role that [Savage] played on [him] and pushing [him] in [his] education and stuff [Savage] taught [him] about being a man and taking care of [his] family.

A30:15991–93.

190

The defense also introduced letters Savage wrote to his children, niece and nephew over the years. That said, Kaiion conceded during his testimony that he "ha[dn']t gotten a letter in a long time." A31:16533.

To buttress the significance of Savage's familial relationships, defense witnesses reiterated the barriers Savage had to overcome to maintain contact with family. Both Kaiion and Savage's sister Conchetta testified that Savage's niece and nephew were not permitted to visit Savage since they were not his children. Conchetta noted that it became much harder to communicate with Savage once the Government moved him to ADMAX, and that Savage's niece and nephew communicated with him through phone calls and letters "up until the point where we could." A30:15974.

The Government did little to refute this evidence. Prosecutors briefly cross-examined Kaiion:

Q: Good afternoon, Mr. Savage.

A: How you doing.

Q: You are 17 years old?

A: Yes.

Q: And your whole life, have you lived with your mother?

A: Yes.

191

Q: Your mother has been your primary caregiver?

A: Yes.

Q: It's safe to say that for most of your life your father has been incarcerated, is that right?

A: Yes.

Q: On that letter that [defense counsel] just showed you[,] there was no date on that letter?

A: No.

Q: But that letter was sometime within the last year that that was written to you by your father?

A: No.

Q: Last—approximately when was it written, do you know?

A: 2011, 2010, something like that.

Q: So sometime within the last couple of years, is that correct?

A: Yes.

Q: Last two or three years?

192

A: Yes.

Q: Since he has been charged in this case?

A: Yes.

Q: And you are, as Mr. Savage's son, you are allowed visits occasionally, right?

A: Yes.

Q: You are allowed to have phone calls with your father, right?

A: Yes.

Q: But despite that, you said you have not gotten a letter from him in a long time?

A: No.

Q: How long has it been since you last got a letter from your father?

A: Around like two, three years ago.

[Prosecutor]: Nothing further.

A31:16544–45. And when cross-examining Yusef, the Government reiterated that his "Man of the Year" project took place in 2004—a fact defense counsel had already elicited. *Compare* A30:15991 (defense's direct) ("Q: In 2004, did you in a school project put him in for some sort of award? A: Yes."), *with* A30:15998 (Government's cross) ("Q: [Defense

193

counsel] showed us this certificate that you did for your uncle when you were a young man, correct?  A: Yes.  Q: What's the date on that?  A: December 8, 2004.").

During its sentencing summation, the Government admonished the jury to "not allow [Savage] to use his children as a mercy shield from imposing the ultimate sentence." A31:16683.  And after the defense summation had emphasized mitigating evidence involving Savage's family, the prosecution used its rebuttal to remind the jury about the dearth of recent correspondence, and to argue that "[w]hile his children are certainly innocent victims in all of this, his very limited relationship with them does not outweigh the horrific violence that he has caused."  A31:16775.

**b**

Savage claims the following comments improperly leveraged his restricted familial relationship against him:

- the Government's cross-examination of Yusef, which reiterated the "Man of the Year" school project was in 2004;
- the Government's cross-examination of Kaiion, which established Savage had not written him in several years;
- the Government's summation comment that Savage shouldn't be able to use his children as a "mercy shield"; and
- the Government's rebuttal assertion that Savage had a "very limited relationship" with his children.

194

Savage concedes his trial counsel failed to object to these comments, so we review them for plain error.  *See* Fed. R. Crim. P. 52(b).  None clear that high bar.

First, the one-off question asked during Yusef's cross-examination and which reminded the jury that Yusef's school project nominating Savage as "Man of the Year" took place back in 2004.  But defense counsel had already elicited this fact on direct examination, so the Government's query was not an error let alone a plain one.  *See Glass v. Phila.  Elec.  Co.*, 34 F.3d 188, 194 (3d Cir. 1994) (citing Fed.  R.  Evid. 611(b)).

Second, a fleeting comment during Kaiion's cross-examination similarly rehashed a point already made on direct examination.  The jury knew from defense questioning that Kaiion had admitted his father hadn't written him a letter "in a long time."  A31:16533.  Again, this cannot constitute error.

Third, there is also the "mercy shield" comment.  To be sure, the locution was derisive.  But stripped of its rhetorical gloss, the term merely underscored the Government's position that Savage's relationship with his children did not outweigh the aggravating factors.  The "mercy shield" reference may have been a hard blow, but it is not one we can rule as a foul.

Finally, characterizing Savage's parental relationship as "very limited" is innocuous.  Savage's limited familial contact was hardly news to the jurors: the defense itself had cataloged the severe restrictions Savage faced and the strain those restrictions placed on his familial relationships.  In fact, much of Savage's mitigation case was an attempt to prove that familial bonds remained despite the limited contact.  How,

195

then, could it be plain error for the Government to suggest that the same limited contact might cut against mitigation?  The prosecution was merely arguing a competing inference.  *See also* 18 U.S.C. § 3593(c) ("The government . . . shall be permitted to rebut any information . . . and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor . . . ."); *United States v. Montgomery*, 635 F.3d 1074, 1097–98 (8th Cir. 2011) (permitting the government to rebut a "familial relationship" mitigator by disparaging the defendant's parenting, including asking the defendant's young daughter whether the defendant had "ever apologize[d] for what she put you and your siblings through").

*   *   *

In sum, because the Government did not act to obstruct Savage's opportunities to develop his mitigation case, and because the Government properly rebutted his argument supporting the "familial relationship" mitigators, there was no error.

### G. The verdict sheet's format did not violate the Eighth Amendment.

Finally, we take up Savage's argument that the District Court constitutionally erred by producing a verdict form "dramatically overemphasiz[ing]" the aggravating factors "while relegating" the mitigating factors "to an afterthought." Def. Br. 325.  As the District Court correctly concluded, this argument lacks both factual and legal merit.

196

Savage specifically faults the verdict form for marching count-by-count through the various aggravating factors the Government offered while merely enumerating the defense's blanket list of mitigating factors once at the end of the form. Alternatively, he suggests the form could have listed the mitigating factors once if it had listed the aggravating factors only once. The error, he contends, was "unfairly elevat[ing] the significance of the aggravating factors by repeating them over and over while relegating the mitigating ones to a single, short list at the back of the form." Def. Br. 332.

Once again, the parties do not agree on our standard of review. Though this claim deals solely with the District Court's verdict form, not its instructions, Savage analogizes to *United States v. Sussman*'s de novo review of "a district court's refusal to give a jury instruction on a defendant's 'theory of defense.'" 709 F.3d 155, 175 (3d Cir. 2013). But Savage isn't arguing that the District Court refused to include the mitigators on the form; he merely protests *how* the mitigators appeared on the form. So the closer analogy would be to a "refusal to give a particular instruction or the wording of instructions," which *Sussman* reviewed for "abuse of discretion." *Id.* (quoting *United States v. Jimenez*, 513 F.3d 62, 74 (3d Cir. 2008)). The Government offers *United States v. Hedgepeth* as more support for abuse-of-discretion review. That case involved a "District Court's decision to submit a special verdict form to the jury." 434 F.3d 609, 612 (3d Cir. 2006). And of course, applying the abuse-of-discretion standard here tracks how we review trial management rulings generally. *See, e.g.*, *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 609 (3d Cir. 1995).

197

Accordingly, we review Savage's challenge to the verdict form's layout for an abuse of discretion.

Yet the verdict form would pass muster under any standard. Repeating the aggravating factors for each count but listing the mitigating factors once at the end makes sense both legally and factually.

Legally, a capital defendant's default sentence is life imprisonment. A death sentence can be reached only after all twelve jurors find a statutory aggravator beyond a reasonable doubt. Sequentially, then, finding and weighing mitigating factors becomes important only after a jury has already found—unanimously—at least one aggravating factor. This means that if jurors go through all capital counts without finding a single aggravating factor, there is no need for them to consider any mitigators. Their work is over, and the defendant must receive a sentence of life imprisonment. Listing the mitigators after the aggravators tracks this order of jury deliberations, and should be of assistance to the jurors in their work. This format makes good sense.

And viewed factually, it makes sense for two reasons. First, each of the thirteen capital counts had a unique set of applicable aggravators; the Government tailored thirteen separate lists, weaving different statutory aggravators with different non-statutory aggravators. But the defense sought to globally apply the same general list of twenty mitigators to all counts. So although the verdict form needed to specify which aggravators applied to which counts, nothing demanded repeating the twenty mitigators, count-by-count.

198

Second, and relatedly, the FDPA obliges jurors to consider "*any* mitigating factor," while limiting jurors to the aggravating factors "for which notice has been given." § 3592(a), (c) (emphasis added). That means the verdict form had to include several blank lines for the jury to add any additional mitigators. So when the District Court produced the verdict form, although a certain subset of aggravators applied to each count, it was not clear in advance how many mitigators might apply, and what mitigators might apply to what counts.

Moreover, the District Court prevented any risk of confusion by emphasizing the need to apply the mitigating factors to each capital count. On the verdict form itself, prominent oversized text preceded the list of mitigators and notified jurors that

> **IN CONSIDERING THE MITIGATING FACTORS, YOU MUST KEEP IN MIND THAT EACH MITIGATING FACTOR IS ALLEGED WITH RESPECT TO EACH OF THE CAPITAL COUNTS. IF YOU DETERMINE BY A PREPONDERANCE OF THE EVIDENCE THAT A MITIGATING FACTOR IS PRESENT, THEN IT MUST BE CONSIDERED IN THE WEIGHING PROCESS FOR EACH AND EVERY CAPITAL COUNT.**

A2:788. Elsewhere, the verdict form tasked jurors with specifying "the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence *with regard to each of the capital counts*." *Id.*

199

(emphasis added).  And when instructing the jury during the sentencing phase, the District Court repeatedly highlighted the need for a count-by-count analysis.

In sum, the District Court reasonably formatted the verdict form to reflect this case's unique factual and legal circumstances.  And it took several additional steps to ensure that jurors correctly understood and followed the form.  We commend the District Judge for crafting and approving a verdict form that so intelligibly presented to the jurors the many difficult questions they were being asked to resolve.  Nothing in the verdict form gave rise to legal error.

## XII.  CONCLUSION

As Savage reminds us in his opening brief, "it has been nearly a century since this Court last adjudicated a direct appeal in a capital case."  Def. Br. 1.  That passage of time has given rise to considerable debate over the death penalty: Is it just?  Is it moral?  Is it applied and administered in a manner that does not discriminate on the basis of race?  These and other serious questions resound within the public square.

Yet none of those questions are what this Court is called upon to resolve.

We have meticulously combed the very substantial record provided us.  We have given scrupulous attention to, and taken great care in resolving, each of the issues brought before us.  And we have done so with what the late Justice Thurgood Marshall called "especial concern"—because, as he solemnly noted more than three decades ago, "execution is the

200

most irremediable and unfathomable of penalties." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (plurality opinion).

Exercising the heightened responsibility required of us, we discern no grounds entitling Savage to relief on any of the issues he raises. The judgment of the District Court therefore will be affirmed.